NEIL S. CARTUSCIELLO (NC-2460)
Cartusciello & Associates, P.C.
104 Mountainside Road
Mendham, NJ 07945
(973) 543-8204
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | |
|---|---|
| CHURCH & DWIGHT CO., INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>MAYER LABORATORIES, INC., a California Corporation,<br><br>Defendant.<br><br>- - - - - - - - - - - - - - - - - - - - - - - - -<br><br>MAYER LABORATORIES, INC., a California Corporation,<br><br>Counterclaimant,<br><br>v.<br><br>CHURCH & DWIGHT CO., INC., a Delaware Corporation, and DOES I through XX,<br><br>Defendants on the Counterclaims. | Civ. Action No.:  3:08-cv-05743-FLW-TJB<br><br>**AMENDED ANSWER AND COUNTERCLAIMS FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. §§ 1, 2; THE CLAYTON AND ROBINSON PATMAN ACTS, 15 U.S.C. §§ 13(a), (d), (e); THE CALIFORNIA CARTWRIGHT ACT, UNFAIR COMPETITION ACT AND OTHER SECTIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, CAL. BUS. & PROF. CODE §§ 16720, 16727, 17045, 17200; TORTIOUS INTERFERENCE WITH CONTRACT; TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND VIOLATIONS OF THE LANHAM ACT, 15 U.S.C. § 1125(a), AND CALIFORNIA COMMON LAW**<br><br>**JURY TRIAL DEMANDED** |

The above-named defendant, MAYER LABORATORIES, INC. ("Mayer Labs"), a

corporation organized under the laws of the State of California, with its principal place of

business at 1950 Addison Street, Suite 101, Berkeley, California  94704, by and through its

attorneys, CARTUSCIELLO & ASSOCIATES, P.C., by Neil S. Cartusciello, Esq., as and for its

Answer to the Complaint of Plaintiff CHURCH & DWIGHT CO., INC. ("Church & Dwight"), a

Delaware corporation with its principal place of business at 469 North Harrison Street,

Princeton, New Jersey 08543, does state and pray as follows:

**Preliminary Statement**

Although Church & Dwight has characterized this action as one for a declaratory judgment, it is in reality yet another step in furtherance of a wrongful course of conduct designed and carried out by Church & Dwight to attain, perpetuate and consolidate monopoly power in the market in the State of California and the United States generally for male contraceptive, prophylactic products known as "condoms" in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Cartwright Act of the State of California, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and other federal and state laws prohibiting monopolization and unfair competition. Accordingly, defendant Mayer Labs categorically denies that Church & Dwight is entitled to a declaratory judgment and respectfully suggests to this Honorable Court that it should abstain from exercising jurisdiction in this matter under the Declaratory Judgment Act, 28 U.S.C. § 2200, *et seq.* In the alternative, Mayer Labs is bringing the within Counterclaims to redress the injuries that Church & Dwight has caused by its illegal and wrongful conduct.

**Mayer Labs' Responses To Church & Dwight's**
**Unnumbered Allegation On Page 1 Of The Complaint**

Mayer Labs lacks sufficient information as to the truth of allegations regarding Church & Dwight contained in the paragraph on page 1 of the Complaint. Mayer Labs admits that it is a corporation organized under the laws of the State of California, with its principal place of business at 1950 Addison Street, Suite 101, Berkeley, California 94704.

**Mayer Labs' Responses To Church & Dwight's**
**Allegations Denominated "NATURE OF ACTION"**

1. As paragraph 1 of the Complaint is purely introductory and conclusory, no response is required. Notwithstanding the foregoing, Mayer Labs avers:

2

(a) that Church & Dwight has violated federal and state antitrust laws and other laws prohibiting monopolization and unfair competition; and

(b) that Church & Dwight is not entitled to the declarations that it claims to seek from this Honorable Court.

2.   To the extent that paragraph 2 contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  Notwithstanding the foregoing, Mayer Labs avers that:  (a) Church & Dwight has offered and entered into, and is continuing to offer and to enter into, anticompetitive, restrictive rebate agreements with major retailers that have effectively forced (and continue to force) these retailers to devote ever-increasing in-store display (or "planogram") space to condoms manufactured and distributed by Church & Dwight, while greatly diminishing and often eliminating entirely the space allocated to competing brands, such as Mayer Labs' products; and (b) Church & Dwight's rebate agreements are violative of federal and state antitrust laws and other laws prohibiting monopolization and unfair competition.  In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of allegations contained in paragraph 2 of the Complaint and on that basis denies such allegations

3.   Mayer Labs lacks sufficient information to form a belief as to the truth of allegations contained in paragraph 3 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that Church & Dwight has entered into a supply agreement with Sagami Rubber Industries Co., Ltd. ("Sagami"), and has thereby tortiously interfered with Mayer Labs' contracts and business relationship with Sagami, and its exclusive right to market in North America products manufactured by Sagami.

4.   Mayer Labs lacks sufficient information to form a belief as to the truth of allegations contained in paragraph 4 of the Complaint and on that basis denies such allegations, except that

3

Mayer Labs avers that, notwithstanding any representations that a representative of Sagami may have allegedly made, Mayer Labs has an exclusive supply and distribution relationship with Sagami that gives Mayer Labs the right to be Sagami's exclusive North American agent and exclusive North American distributor of latex condoms.

5. Mayer Labs admits that on or about October 30, 2008, counsel for Mayer Labs sent to Church & Dwight's General Counsel a letter and draft complaint, to which Mayer Labs refers Church & Dwight for the contents thereof.  In all other respects, Mayer Labs denies the allegations contained in paragraph 5 of the Complaint, and avers that:  (a) it markets and distributes a variety of products; (b) as Sagami's exclusive North American Agent, it sells and distributes latex urosheaths (external latex condom catheters), latex probe covers, and non-latex semen collection sheaths; and (c) it also sells products produced by other contract manufacturers including personal lubricants and Female Condoms.

6. Mayer Labs admits that, as evidenced by the counterclaims set forth below, it has real, current and substantial claims against Church & Dwight for economic injuries caused by Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices as alleged therein.  To the extent that paragraph 6 of the Complaint contains asserted legal conclusions and a statement of the relief Church & Dwight is requesting in the Complaint, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.

**Mayer Labs' Responses To Church & Dwight's**
**<u>Allegations Denominated "PARTIES"</u>**

7. Upon information and belief, Mayer Labs admits the allegations contained in paragraph 7 of the Complaint.

4

8.  Mayer Labs lacks sufficient information to form a belief as to the truth of allegations contained in paragraph 8 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers, upon information and belief, that Church & Dwight holds a total market share in excess of 75% of the relevant market in the United States for condoms.

9.  Mayer Labs denies the allegations contained in paragraph 9 of the Complaint, except that Mayer Labs admits that:  (a) it is a corporation organized under the laws of the State of California, with its principal place of business in the County of Alameda, Berkeley, California; (b) it does business in many places throughout the United States, and has sales in New Jersey through retail and specialty stores, and mail orders; and (c) it has been engaged in the marketing and distribution of condoms in the United States under the Kimono®, Kimono® MicroThin™ and MAXX® brands since 1987.

10.  Mayer Labs admits the allegations contained in paragraph 10 of the Complaint, and avers that it has an approximately 5% share of the California condom market and a share of less than 1% of the United States condom market.

## Mayer Labs' Responses To Church & Dwight's Allegations Denominated "JURISDICTION AND VENUE"

11.  To the extent that paragraph 11 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  Mayer Labs admits, upon information and belief, that Church & Dwight and Mayer Labs are corporations of different states and that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

12.  To the extent that paragraph 12 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations

contained in paragraph 12 of the Complaint, and specifically denies that venue is proper in this district.

13.  To the extent that paragraph 13 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  Mayer Labs admits, upon information and belief, that Church & Dwight's headquarters and principal place of business are in New Jersey, and that Church & Dwight does business in New Jersey.  Mayer Labs further admits that it does business in many places throughout the United States, and sells latex condoms to retailers in New Jersey, including certain Whole Foods stores.  In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of allegations contained in paragraph 13 of the Complaint and on that basis denies such allegations.

### Mayer Labs' Responses To Church & Dwight's Allegations Denominated "RELEVANT MARKETS"

14.  Mayer Labs denies the allegations contained in paragraph 14 of the Complaint and avers:  (a) that the relevant product market is all male condoms sold in the State of California and the United States generally; (b) that a segment in the condom market for high-quality, ultra-thin condoms produced by Japanese manufacturers constitutes a relevant submarket; and (c) that the majority of Mayer Labs' sales of condoms are in this high-quality, ultra-thin segment.

15.  Mayer Labs admits that the entire United States constitutes a relevant geographic market but denies that it is the only relevant geographic market, and avers that California constitutes a relevant geographical market as well.

16.  Mayer Labs admits that condom manufacturers and distributors market and sell condoms with and without various features, including surface texturing and special shapes, and that all properly manufactured condoms help reduce the risk of unwanted pregnancy and

6

sexually transmitted disease.  In all other respects, Mayer Labs denies allegations contained in

paragraph 16 of the Complaint, and specifically denies that "thinness" is an "enhancement."

17.  Mayer Labs denies the allegations contained in paragraph 17 of the Complaint and

avers that:  (a) each consumer is different and will make his or her purchasing decisions based on

a multitude of factors, including but not limited to:  gender, age, marital status, income status,

education, ethnic background, geography and, perhaps most important, the variety of condoms

available at the point of purchase; and (b) that while brand recognition may be an important

factor in consumers' decisions to purchase condoms, other important considerations include

product placement in store displays and shelving, packaging information and appeal, and

attributes of the condoms that facilitate and do not interfere with sexual sensation and pleasure,

such as, in particular, the thickness of the material forming the condoms.

18.  Mayer Labs denies the allegations contained in paragraph 18 of the Complaint to the

effect that non-latex condoms are not a substitute for latex condoms.  Mayer Labs lacks

sufficient information to form a belief as to the truth of the remaining allegations contained in

paragraph 18 of the Complaint and on that basis denies such allegations.

19.  Mayer Labs admits the allegations contained in paragraph 19 of the Complaint.

### Mayer Labs' Responses To Church & Dwight's Allegations Denominated "FACTUAL BACKGROUND" and "The Latex Condom Industry"

20.  Mayer Labs lacks sufficient information to form a belief as to the truth of the

allegations contained in paragraph 20 of the Complaint and on that basis denies such allegations,

except that Mayer Labs admits, upon information and belief, that Church & Dwight currently

manufactures, distributes and markets a variety of consumer and specialty products.

21.  Upon information and belief, Mayer Labs admits the allegations contained in

paragraph 21 of the Complaint.

22.  Upon information and belief, Mayer Labs admits the allegations contained in paragraph 22 of the Complaint.

23.  Upon information and belief, Mayer Labs admits the allegations contained in paragraph 23 of the Complaint.

24.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 24 of the Complaint and on that basis denies such allegations, except that Mayer Labs admits, upon information and belief, that Church & Dwight currently markets, distributes and sells to consumers numerous varieties of condoms under the Trojan brand and other brands, including latex, non-latex, lubricated, non-lubricated, ribbed, thin, shaped, and textured condoms.

25.  Mayer Labs denies the allegations contained in paragraph 25 of the Complaint, except admits, on information and belief, that manufacturers and distributors of condoms do from time to time introduce new types of condoms and condoms with particular enhancements. Mayer Labs avers that the reason for such changes is to maintain and increase sales.

26.  Mayer Labs denies the allegations contained in paragraph 26 of the Complaint, and avers that each consumer is different and will make his or her purchasing decisions based on a multitude of factors, including but not limited to:  gender, age, marital status, income status, education, ethnic background, geography and, perhaps most important, the variety of condoms available at the point of purchase.

27.  Mayer Labs denies the allegations contained in paragraph 27 of the Complaint, and avers that each consumer is different and will make his or her purchasing decisions based on a multitude of factors, including but not limited to:  gender, age, marital status, income status, education, ethnic background, geography, condom thickness, packaging, and, most important, the variety of condoms available at the point of purchase.

28. Mayer Labs admits that condoms are marketed and sold in a variety of sizes, including regular, large, extra-large and fitted, and that size is a factor that can affect the purchasing decisions of consumers. In all other respects, Mayer Labs denies the allegations contained in paragraph 28 of the Complaint, and avers that each consumer is different and will make his or her purchasing decisions based on a multitude of factors, including but not limited to: gender, age, marital status, income status, education, ethnic background, geography and, most important, the variety of condoms available at the point of purchase.

29. Mayer Labs admits that condom manufacturers and distributors market and sell both lubricated and non-lubricated condoms, and that the presence and type of lubrication are factors that can affect the purchasing decisions of consumers. In all other respects, Mayer Labs denies the allegations contained in paragraph 29 of the Complaint, and avers that each consumer is different and will make his or her purchasing decisions based on a multitude of factors, including but not limited to: gender, age, marital status, income status, education, ethnic background, geography and, most important, the variety of condoms available at the point of purchase.

30. Mayer Labs admits that condom manufacturers and distributers market and sell condoms with and without various features, including surface texturing, special shapes, colors, and flavors, and that the presence or absence of such features are factors that can affect the purchasing decisions of consumers. In all other respects, Mayer Labs denies the allegations contained in paragraph 30 of the Complaint, and avers that each consumer is different and will make his or her purchasing decisions based on a multitude of factors, including but not limited to: gender, age, marital status, income status, education, ethnic background, geography and, most important, the variety of condoms available at the point of purchase.

31. Mayer Labs admits that condom manufacturers and distributors market and sell condoms in packages containing various quantities of condoms, and that the quantity of condoms

in a package is a factor that can affect the purchasing decisions of consumers. In all other respects, Mayer Labs denies the allegations contained in paragraph 31 of the Complaint, and avers that each consumer is different and will make his or her purchasing decisions based on a multitude of factors, including but not limited to: gender, age, marital status, income status, education, ethnic background, geography and, perhaps most important, the variety of condoms available at the point of purchase.

32. Mayer Labs denies the allegations contained in paragraph 32 of the Complaint, except admits and avers, on information and belief: (a) that Church & Dwight condoms account for over 75% of all condoms sold in the United States; and (b) that Church & Dwight is typically the "category captain" for condoms for nearly all, if not all, major retail chains.

33. Mayer Labs denies the allegations contained in paragraph 33 of the Complaint, except admits and avers, on information and belief: (a) that large retail chains often enter into agreements with a large manufacturer whereby the manufacturer provides services as "category captain" for a particular product category for the chain; (b) that Church & Dwight is typically the "category captain" for condoms for major drug, supermarket and mass merchandising chains; and (c) that the role of category captain generally involves more than merely "assisting" the chain in retail management and, indeed, includes deciding or participating in the decisions regarding the selection of products in that category to be carried and sold by the retailer, and the positions of those products in the retailers' planograms, and thus in their in-store display space.

34. Mayer Labs denies the allegations contained in paragraph 34 of the Complaint, except admits and avers, on information and belief: (a) that there are other brands of condoms on the market, including the Durex brand (which has a market share of approximately 15.3% of the United States condom market, and is marketed by SSL Americas, Inc., a subsidiary of the UK company SSL International, plc), and the Lifestyles brand (which has a market share of

approximately 7.7% of the United States condom market, and is marketed by Ansell Healthcare, Inc. and Ansell Healthcare Products, L.L.C., subsidiaries of Ansell Limited, an Australian company); (b) that the Durex and Lifestyles brands are, respectively, the second and third largest selling condom brands in the United States, and together with condoms marketed by Church & Dwight account for approximately 98.3% of all sales in the United States condom market; and (c) that there are other condom suppliers in the United States market, each with a market share of less than 1% of the United States market, including Global Protection Corp.

35.  Mayer Labs admits that it currently markets latex condoms under the Kimono® name, including Kimono Thin®, Kimono® MicroThin™, Kimono® MicroThin Large™, Kimono® MicroThin Ultra Lubricated™, Kimono Maxx®, and Kimono® Textured.

36.  Mayer Labs admits the allegations contained in paragraph 36 of the Complaint, and avers that it has an approximately 5% share of the California condom market and a share of less than 1% of the United States condom market.

37.  Mayer Labs admits the allegations contained in paragraph 37 of the Complaint.

### Mayer Labs' Responses To Church & Dwight's Allegations Denominated "Church & Dwight's Planogram Program"

38.  Mayer Labs admits the allegations contained in paragraph 38 of the Complaint and avers that most condoms sold in the State of California and the United States are sold through major drug, supermarket, and mass merchandising chains.

39.  Mayer Labs admits the allegations contained in paragraph 39 of the Complaint and avers that:  (a) in drugstores, supermarkets, specialty shops and mass merchandising stores, condoms in general are often displayed for sale on pegboards and spring-loaded "slider" displays, and sometimes on shelves; (b) a spring-loaded slider display allows the store to place a number of units of each individual product in a separate spring-loaded slider, which

11

automatically pushes another unit of the product to the front of the display when a consumer removes the front unit in order to examine or purchase it; and (c) both pegboard displays and slider displays typically allow the store to display all the competing products offered by the store for consumers to view.

40.  Mayer Labs admits the allegations contained in paragraph 40 of the Complaint and avers that:  (a) condoms in general are products that rely heavily on point-of-sale display; and (b) condoms in general have minimal television and print advertising so the customer's primary way of learning about them is at the point of sale.

41.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 41 of the Complaint and on that basis denies such allegations, except that Mayer Labs admits, upon information and belief, that Church & Dwight spends significant resources on a variety of efforts designed to maintain and to increase the market share of condoms manufactured, distributed and marketed by Church & Dwight.

42.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 42 of the Complaint and on that basis denies such allegations.

43.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 43 of the Complaint and on that basis denies such allegations.

44.  Mayer Labs denies the allegations contained in paragraph 44 of the Complaint, and avers that the term "brand blocks" can refer to a number of practices that involve the grouping of the products of a particular manufacturer or distributor.

45.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 45 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that the grouping of the products of a particular manufacturer or distributor can have both pro-competitive and anti-competitive effects, depending on the

particular manner in which products are grouped, their location in a display, and other factors.

46. To the extent that paragraph 46 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof. In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 46 of the Complaint and on that basis denies such allegations, except that Mayer Labs specifically denies that Church & Dwight has a single "Planogram program" that "has been in existence since Church & Dwight acquired the Trojan Brand from Carter-Wallace in 2001." Indeed, Mayer Labs avers upon information and belief that, to the contrary, Church & Dwight has universally used a series of anticompetitive, restrictive kick-back or rebate schemes, which it calls "Condom Planogram Agreements," to effectively force major retailers (including but not limited to Longs Drugs, Rite-Aid, CVS, Walgreens, Duane Reade, Safeway Stores, Target, Kroger, Meijer, Fred Meyer, and others) to devote ever-increasing in-store display (or "planogram") space to condoms distributed and marketed by Church & Dwight, while greatly diminishing and in many instances eliminating the in-store display (or planogram) space allocated to competing brands.

47. To the extent that paragraph 47 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof. In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 47 of the Complaint and on that basis denies such allegations, except that Mayer Labs specifically denies that Church & Dwight's "Condom Planogram Agreements," or any condom planograms designed or approved by Church & Dwight thereunder, merely "encourage" retailers to include condoms marketed and distributed by Church & Dwight. Indeed, by employing its

anti-competitive, restrictive schemes, Church & Dwight uses its monopoly power to essentially force retailers to allocate as much as 80% of the condom display (or "planogram") space to condoms marketed by Church & Dwight, while diminishing the display space available to competing brands, and thereby unfairly restricting the number of competing brands and products that a store can reasonably carry, by giving the retailers extremely large kick-backs or "rebates" in return for doing so. For example, under Church & Dwight's 8.5% "Condom Planogram Agreement," a retailer receives a kick-back equal to 8.5% of its purchases of Church & Dwight condoms if it devotes at least 80% of its condom pegboard or other display space to condoms marketed and distributed by Church & Dwight. The direct effect of these schemes has thus been and still is to force retailers to devote ever-increasing in-store display space to condoms distributed and marketed by Church & Dwight, while diminishing the in-store display space allocated to competing brands, thereby greatly diminishing and in some cases eliminating competition in the relevant markets. On information and belief, most if not all of the major drug, supermarket and mass merchandising chains (other than Wal-Mart) participate in Church & Dwight's "Condom Planogram Agreements."

48. To the extent that paragraph 48 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof. In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that Church & Dwight, under its "Condom Planogram Agreements," has agreed to pay and has paid retailers kick-backs equal to specified percentages (up to 8.5%) of the retailer's annual net purchases of Church & Dwight condoms, but only when the retailer has accepted and followed the planograms defined and approved by Church & Dwight, or has implemented and

14

continuously maintained a display or planogram in which Church & Dwight's products comprise a specified percentage (as high as 80%) of the retailer's available display or planogram space.

49. Mayer Labs denies the allegations contained in paragraph 49 of the Complaint, and avers that Church & Dwight's "Condom Planogram Agreements," and any condom planograms designed or approved by Church & Dwight thereunder, are restrictive, anti-competitive and illegal in that their direct effect is to force retailers to limit the numbers of competing products that they offer and display, thereby restricting and eliminating competition in the relevant markets. Each retailer has a limited amount of display space that it is willing to devote to condoms. By committing to allocate to Church & Dwight 75% to 80% of that display space in return for a cash kick-back, the retailer must of necessity limit the number of competing brand products that can be displayed and offered for sale.

50. To the extent that paragraph 50 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof. In all other respects, Mayer Labs denies the allegations contained in paragraph 50 of the Complaint, and avers that Church & Dwight's "Condom Planogram Agreements," and any condom planograms designed or approved by Church & Dwight thereunder, are restrictive, anti-competitive and illegal in that their direct effect is to force retailers to limit the numbers of competing products that they offer and display, thereby restricting and eliminating competition in the relevant markets.

51. To the extent that paragraph 51 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof. In all other respects, Mayer Labs denies the allegations contained in paragraph 51 of the Complaint, and avers that Church & Dwight's "Condom Planogram Agreements," and any condom planograms designed or approved

15

by Church & Dwight thereunder, are restrictive, anti-competitive and illegal in that their direct effect is to force retailers to limit the competing products that they offer and display, thereby restricting and eliminating competition in the relevant markets. Moreover, because of Church & Dwight's role as "category captain" for many retail chains, Church & Dwight has considerable power to control the placement of competing products within those chains' display space.

52. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 52 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that Church & Dwight uses its monopoly power to essentially force retailers to diminish the in-store display space available to competing brands (and often to eliminate it entirely) by giving the retailers extremely large kick-backs or "rebates" in return for doing so. As a result, a retailer that chooses not to enter into a "Condom Planogram Agreement" with Church & Dwight suffers an enormous penalty—namely, the foregoing of a cash kickback that could be as much as 8.5% of its purchases of condoms marketed and distributed by Church & Dwight.

53. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 53 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers on information and belief that most major retail chains (other than Wal-Mart) participate in Church & Dwight's Condom Planogram Agreements.

54. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 54 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers on information and belief that most major retail chains (other than Wal-Mart) participate in Church & Dwight's Condom Planogram Agreements.

55. To the extent that paragraph 55 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to

that document or those documents for the contents thereof. In all other respects, Mayer Labs denies the allegations contained in paragraph 55 of the Complaint, and avers that Church & Dwight's "Condom Planogram Agreements," and any condom planograms designed or approved by Church & Dwight thereunder, are restrictive, anti-competitive and illegal in that their direct effect is to force retailers to limit the numbers of competing products that they offer and display, thereby restricting and eliminating competition in the relevant markets. Moreover, neither Church & Dwight's "Condom Planogram Agreements," nor any condom planograms designed or approved by Church & Dwight thereunder, "create" any display space for competitor products. To the contrary, they severely restrict the space that retailers are willing to devote to competing products.

56. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 56 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers on information and belief that Church & Dwight has kept its Condom Planogram Agreements largely secret from many retailers, as well as from the consuming public and regulatory authorities.

57. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers on information and belief that Church & Dwight's Condom Planogram Agreements have resulted in higher prices to consumers.

### Mayer Labs' Responses To Church & Dwight's Allegations Denominated "Supply Agreements with Sagami"

58. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 58 of the Complaint and on that basis denies such allegations.

59. Mayer Labs lacks sufficient information to form a belief as to the truth of the

allegations contained in paragraph 59 of the Complaint and on that basis denies such allegations.

60. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 60 of the Complaint and on that basis denies such allegations.

61. To the extent that paragraph 61 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof. In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 61 of the Complaint and on that basis denies such allegations.

62. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 62 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers: (a) that Church & Dwight, as part of an effort to take over the market segment consisting of ultra-thin condoms, has induced Japanese manufacturer Sagami to breach Sagami's exclusive supply and distribution contracts with Mayer Labs; and (b) that Sagami has begun manufacturing condoms for Church & Dwight which are sold under Church & Dwight's Trojan and Magnum brands.

63. Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 63 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that:

    (a) consumers have for decades desired and sought condoms that would increase sensitivity and thereby increase sexual pleasure;

    (b) manufacturers have known for decades that thinner condoms afford greater sensation;

    (c) in response to consumer demand, manufacturers have made efforts to produce progressively thinner condoms, and have marketed and sold such condoms as

"thin" and "sensitive";

(d) the competition among manufacturers to produce thinner condoms has led to the evolution of a distinct market segment for ultra-thin condoms;

(e) Sagami has developed technology and know-how in the manufacture of high quality ultra-thin condoms that is superior to that of other manufacturers, including Church & Dwight;

(f) through the investment of substantial time, energy, effort, creativity, know-how and financial resources, Mayer Labs established and maintained an exclusive supply and distribution relationship with Sagami that gives Mayer Labs the right to be Sagami's exclusive North American agent and exclusive North American distributor of latex condoms;

(g) through the investment of substantial time, energy, effort, creativity, know-how and financial resources, Mayer Labs successfully established a place in the United States condom market for Japanese-made ultra-thin latex condoms;

(h) Mayer Labs was one of the first manufacturers and distributors to measure, quantify and explicitly market condoms in this market, and in 1987 reported in its marketing literature that its Kimono brand condoms were 25% thinner than standard condoms, and more than 15% thinner than competing manufacturers' "Ultra Sensitive" products;

(i) thereafter, Church & Dwight identified Mayer Labs' success, targeted the Japanese-made, ultra-thin condom market segment, and began to purchase and distribute condoms manufactured by Okamoto Industries, Inc. ("Okamoto"), another Japanese condom manufacturer;

(j) Okamoto, however, was unable to produce ultra-thin condoms of the same quality

as those produced by Sagami;

    (k) consequently, Church & Dwight tortiously interfered with Mayer Labs' exclusive supply relationship with Sagami, and illegally infringed on Mayer Labs' rights by using the phrases "MICRO-THIN" and "Made in Japan" on its condom boxes; and

    (j) prior to Church & Dwight's tortious inducement of Sagami, Church & Dwight did not have a product that could compete with Mayer Labs' products in the ultra-thin condom market segment.

64.  Mayer Labs admits that Church & Dwight has launched two new product lines, which it calls "Trojan ThinTensity" and "Magnum UltraThin," and that other manufacturers of condoms, including Durex and Lifestyle, also market and sell condoms that they call "thin."  In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the remaining allegations contained in paragraph 64 of the Complaint and on that basis denies such allegations, except that Mayer Labs repeats and realleges its averments in paragraph 63 above as if set forth in full herein.

65.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint and on that basis denies such allegations, except that Mayer Labs repeats and realleges its averments in paragraph 63 above as if set forth in full herein.

66.  Mayer Labs admits the allegations contained in paragraph 66 of the Complaint.

67.  Mayer Labs admits that David Mayer, its President, and Tim Conner, a member of its Board of Directors, attended a dinner and meetings in Princeton, New Jersey in or about December 2007 with representatives of Church & Dwight and Sagami.  In all other respects, Mayer Labs denies the allegations contained in paragraph 67 of the Complaint, and specifically

denies that there was any discussion whatsoever regarding the possible "co-branding" of a "Trojan Kimono" condom.

68.  Mayer Labs lacks sufficient information to form a belief as to the truth of allegations contained in paragraph 68 of the Complaint regarding testing by Church & Dwight, and on that basis denies such allegations.  In all other respects, Mayer Labs denies the allegations contained in paragraph 68 of the Complaint, and specifically denies that there was any discussion whatsoever regarding the possible "co-branding" of a "Trojan Kimono" condom.

69.  Mayer Labs admits that during the dinner in Princeton, New Jersey, or in meetings before or after dinner, David Mayer and Tim Conner each advised the representatives of Church & Dwight that Mayer Labs had an exclusive supply and distribution relationship with Sagami. In all other respects, Mayer Labs denies the allegations contained in paragraph 69 of the Complaint.

70.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that, notwithstanding any representations that a representative of Sagami may have allegedly made, Mayer Labs had then and continues to have an exclusive supply and distribution relationship with Sagami that gives Mayer Labs the right to be Sagami's exclusive North American agent and exclusive North American distributor.

71.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that, notwithstanding any representations that a representative of Sagami may have allegedly made, Mayer Labs had then and continues to have an exclusive supply and distribution relationship with Sagami that gives Mayer Labs the right to be Sagami's exclusive North American agent and exclusive North American distributor.

72.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 72 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that, notwithstanding any representations that a representative of Sagami may have allegedly made, Mayer Labs had then and continues to have an exclusive supply and distribution relationship with Sagami that gives Mayer Labs the right to be Sagami's exclusive North American agent and exclusive North American distributor.

73.  Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 73 of the Complaint and on that basis denies such allegations, except that Mayer Labs avers that Church & Dwight now markets and distributes thin latex condoms manufactured by Sagami.

74.  To the extent that paragraph 74 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof.  In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 74 of the Complaint and on that basis denies such allegations.

75.  To the extent that paragraph 75 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof.  In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 75 of the Complaint and on that basis denies such allegations.

76.  Mayer Labs admits, upon information and belief, that no representative of Mayer Labs has ever provided Church & Dwight a copy of a written contract or other document that shows that Mayer Labs has an exclusive contract with Sagami.  Mayer Labs lacks sufficient information to form a belief as to the truth of the remaining allegations contained in paragraph 76

22

of the Complaint and on that basis denies such allegations, except that Mayer Labs denies that it has never provided Church & Dwight with proof that it has an exclusive supply and distribution arrangement with Sagami.

77.  To the extent that paragraph 77 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 77 of the Complaint and avers:  (a) that it has an exclusive relationship with Sagami that gives it the right to be Sagami's exclusive North American agent and distributor; and (b) that Church & Dwight has tortiously interfered with that relationship.

78.  To the extent that paragraph 78 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto, except that Mayer Labs avers:  (a) that it has an exclusive supply and distribution relationship with Sagami that gives it the right to be Sagami's exclusive North American agent and distributor; and (b) that Church & Dwight has tortiously interfered with that exclusive supply and distribution arrangement.

79.  To the extent that paragraph 79 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof.  In all other respects, Mayer Labs lacks sufficient information to form a belief as to the truth of the allegations contained in paragraph 79 of the Complaint and on that basis denies such allegations.

80.  Mayer Labs admits the allegations contained in paragraph 80 of the Complaint.

### Mayer Labs' Responses To Church & Dwight's Allegations Denominated "A Real and Immediate Controversy Between the Parties"

81.  Mayer Labs admits that Mark Jansen, Esq., a member of the law firm of Townsend

23

and Townsend and Crew, contacted Susan Goldy, Esq., the General Counsel and Executive Vice President of Church & Dwight, on or about October 29, 2008, and advised Ms. Goldy, *inter alia*: (a) that Mayer Labs had retained his firm to investigate and advise Mayer Labs with respect to Church & Dwight's interference with Mayer Labs' existing contracts and business and also with respect to Church & Dwight's marketing and other conduct in the United States regarding the condom market; (b) that he would send Church & Dwight a letter with a draft complaint the following day; and (c) that Mayer Labs' objective was to commence negotiations with Church & Dwight to resolve the claims set forth therein.

82.   To the extent that paragraph 82 of the Complaint purports to describe or interpret one or more written documents, no response is required and Mayer Labs refers Church & Dwight to that document or those documents for the contents thereof.

83.   Mayer Labs admits that it retained Mr. Jansen and the law firm of Townsend and Townsend and Crew to investigate and advise it with respect to Church & Dwight's interference with Mayer Labs' existing contracts and business and also with respect to Church & Dwight's marketing and other conduct in the United States regarding the condom market, and to evaluate any potential claims.

84.   Mayer Labs admits that, as evidenced by the counterclaims set forth below, it has and is pursuing real, current and substantial claims against Church & Dwight for economic injuries caused by Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices as alleged therein, but denies the remaining allegations contained in paragraph 84 of the Complaint.

85.   Mayer Labs admits that, as evidenced by the counterclaims set forth below, it has and is pursuing real, current and substantial claims against Church & Dwight for economic injuries caused by Church & Dwight's anticompetitive combinations, conspiracies, agreements,

programs, schemes, acts and practices as alleged therein, but lacks sufficient information to form a belief as to the truth of any other allegations contained in paragraph 85 of the Complaint and on that basis denies such allegations.

86. Mayer Labs denies the allegations contained in paragraph 86 of the Complaint.

**Mayer Labs' Responses To Church & Dwight's Allegations Denominated "COUNT I – DECLARATORY JUDGMENT:   Church & Dwight's Planograms Do Not Violate Section 2 of the Sherman Antitrust Act"**

87. Mayer Labs' responses to the allegations contained in paragraphs 1 through 86 of the Complaint are hereby incorporated by reference.

88. To the extent that paragraph 88 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 88 of the Complaint.

89. To the extent that paragraph 89 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 89 of the Complaint, except that Mayer Labs admits that, as evidenced by the counterclaims set forth below, it has and is pursuing real, current and substantial claims against Church & Dwight for economic injuries caused by Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices as alleged therein.

90. To the extent that paragraph 90 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations

contained in paragraph 90 of the Complaint.

91. To the extent that paragraph 91 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 91 of the Complaint.

92. To the extent that paragraph 92 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 92 of the Complaint.

WHEREFORE, Mayer Labs respectfully requests that this Court enter a judgment:

a. Dismissing the Complaint in its entirety;

b. Awarding Mayer Labs costs and reasonable attorney's fees; and

c. Awarding Mayer Labs such other and further relief as the Court deems just and proper.

### Mayer Labs' Responses To Church & Dwight's Allegations Denominated "COUNT II – DECLARATORY JUDGMENT:   Church & Dwight's Planograms Do Not Violate Section 1 of the Sherman Antitrust Act"

93. Mayer Labs' responses to the allegations contained in paragraphs 1 through 92 of the Complaint are hereby incorporated by reference.

94. To the extent that paragraph 94 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 94 of the Complaint.

95. To the extent that paragraph 95 of the Complaint contains asserted legal conclusions,

no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 95 of the Complaint.

96. To the extent that paragraph 96 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 96 of the Complaint, except that Mayer Labs admits that, as evidenced by the counterclaims set forth below, it has and is pursuing real, current and substantial claims against Church & Dwight for economic injuries caused by Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices as alleged therein.

97. To the extent that paragraph 97 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 97 of the Complaint.

98. To the extent that paragraph 98 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 98 of the Complaint.

99. To the extent that paragraph 99 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto. In all other respects, Mayer Labs denies the allegations contained in paragraph 99 of the Complaint.

WHEREFORE, Mayer Labs respectfully requests that this Court enter a judgment:

a. Dismissing the Complaint in its entirety;

b. Awarding Mayer Labs costs and reasonable attorney's fees; and

c. Awarding Mayer Labs such other and further relief as the Court deems just and proper.

**Mayer Labs' Responses To Church & Dwight's Allegations Denominated
"COUNT III – DECLARATORY JUDGMENT:   The Sagami Agreement
Does Not Constitute Intentional Interference With Contractual Relations"**

100. Mayer Labs' responses to the allegations contained in paragraphs 1 through 99 of the Complaint are hereby incorporated by reference.

101. To the extent that paragraph 101 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 101 of the Complaint.

102. To the extent that paragraph 102 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 102 of the Complaint, except that Mayer Labs admits that, as evidenced by the counterclaims set forth below, it has and is pursuing real, current and substantial claims against Church & Dwight for economic injuries caused by Church & Dwight's tortious interference and other anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices as alleged therein.

103. To the extent that paragraph 103 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the

28

allegations contained in paragraph 103 of the Complaint.

104.   To the extent that paragraph 104 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 104 of the Complaint.

105.   To the extent that paragraph 105 of the Complaint contains asserted legal conclusions, no response is required and Mayer Labs refers Church & Dwight to the applicable statutes and decisional law for its response thereto.  In all other respects, Mayer Labs denies the allegations contained in paragraph 105 of the Complaint.

WHEREFORE, Mayer Labs respectfully requests that this Court enter a judgment:

a.  Dismissing the Complaint in its entirety;

b.  Awarding Mayer Labs costs and reasonable attorney's fees; and

c.  Awarding Mayer Labs such other and further relief as the Court deems just and proper.

## SEPARATE AND/OR AFFIRMATIVE DEFENSES

1.   The Complaint fails to state a claim upon which relief can be granted.

2.   This Honorable Court lacks subject matter jurisdiction over the claims alleged in the Complaint.

3.   This Honorable Court lacks *in personam* jurisdiction over the claims alleged in the Complaint.

4.   The claims alleged in the Complaint for declaratory judgments under the Declaratory Judgment Act, 28 U.S.C. § 2200, *et seq.*, are not adjudicable.

5.   This Honorable Court should abstain from jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2200, *et seq.*

29

6.      Venue is improper in this judicial district.

7.      This Honorable Court should dismiss the complaint in this action based on the equitable doctrine of unclean hands.

## COUNTERCLAIMS

### INTRODUCTION

1.      These counterclaims are brought by counterclaimant Mayer Laboratories, Incorporated ("Mayer Labs") to redress and ameliorate substantial harm that Mayer Labs and the consuming public have suffered and continue to suffer as a result of unfair, monopolistic, anticompetitive, predatory and tortious acts and practices by counterdefendant Church & Dwight Co., Inc. ("Church & Dwight").

2.      Church & Dwight has obtained and currently holds a monopoly position in relevant markets in California, and in the United States generally, for male contraceptive, prophylactic products known as "condoms."  On information and belief, Church & Dwight currently holds a share of these relevant markets that exceeds 75%.

3.      Church & Dwight has obtained and continues to maintain and expand its monopoly position through the use of unfair, anticompetitive, predatory and tortious acts and practices, including contracts with major retailers designed to have, and which in fact have, the effect of dramatically reducing, and excluding, competition.

4.      Moreover, Church & Dwight has wielded and is continuing to wield its monopolistic market power in ways that have enabled it to charge unreasonably high prices and to obtain supracompetitive profits on its sales in the market that it has successfully monopolized, to the injury of Mayer Labs, other competitors and consumers generally.

5.      One of the primary although by no means exclusive methods by which Church &

30

Dwight has unfairly and illegally obtained—and is unfairly and illegally maintaining and

expanding—its dominant market position is through the use of anticompetitive, restrictive rebate

agreements with major drug chain and other chain store retailers, which together account for

nearly 100% of the total condom sales in California and the United States.

6.     Church & Dwight calls these restrictive rebate agreements "Condom Planogram

Agreements," and collectively its "Planogram Program". (A "planogram" is essentially a

diagram showing where specific products are to be positioned in the space allocated by a retail

store for a particular category of products.) For example, under Church & Dwight's 8.5%

"Condom Planogram Agreement," a retailer receives a kick-back equal to 8.5% of its purchases

of Church & Dwight condoms if it devotes at least 80% of its condom pegboard or other display

space to condoms marketed and distributed by Church & Dwight.

7.     The direct effect of these schemes has been and still is to force retailers to devote

ever-increasing in-store display space to condoms distributed and marketed by Church &

Dwight, while diminishing the in-store display space allocated to competing brands, thereby

unfairly restricting the number of competing brands a store can reasonably carry, and greatly

diminishing and in some cases eliminating competition in the relevant markets. On information

and belief, most if not all of the major drug, supermarket, and mass merchandising chains (other

than Wal-Mart) participate in Church & Dwight's "Condom Planogram Agreements."

8.     Another means by which Church & Dwight has unfairly and illegally obtained—

and is unfairly and illegally maintaining and expanding—its dominant market position is through

its power and influence as "category captain." As described below, a major retailer and a leading

manufacturer of products in a particular category will often agree to have the manufacturer be a

"category captain," and thereby decide or participate in the decisions regarding:  (a) the selection

of products in that category to be carried and sold by the retailer; (b) the design of planograms,

and thus the position of those products in the retailer's in-store display space; and (c) in some instances even the prices that the retailer will charge for each of those products. Church & Dwight is typically the condom category captain for retail chains.

9.      By using its power as category captain, Church & Dwight has ensured that major retail chains carry condoms distributed by Church & Dwight, and that they accord those condoms prime display space to the exclusion of condoms distributed by smaller distributors, such as Mayer Labs.

10.      By combining its power as category captain with its Planogram Program, Church & Dwight has obtained, maintained and expanded its monopoly power in the relevant markets for condoms, and has unfairly restricted and dictated the lines of condoms sold by retailers, and thereby illegally restrained trade in the relevant markets.

11.      Church & Dwight has also specifically targeted a niche segment developed by Mayer Labs for high quality, Japanese-made, ultra-thin latex condoms.  This market sector, pioneered by Mayer Labs, is one of the fastest growing segments in the overall condom market.

12.      In furtherance of its attempt to extend its monopoly power into this market, Church & Dwight has used its anti-competitive Condom Planogram Agreements and its power and influence as category captain not merely to restrict and eliminate Mayer Labs and other condom manufacturers as competitors in this profitable segment, but also to interfere tortiously with Mayer Labs' exclusive supply and distribution relationship with Sagami Rubber Industries Co., Ltd. ("Sagami"), the world's leading manufacturer of high-quality ultra-thin latex condoms.

**THE PARTIES**

13.      Plaintiff Mayer Laboratories, Inc. ("Mayer Labs") is a corporation organized under the laws of the State of California with its principal place of business in the County of

Alameda, Berkeley, California. Mayer Labs has been engaged in the marketing and distribution of latex condoms in the United States under the Kimono®, Kimono® MicroThin™ and MAXX® brands since 1987.

14.     On information and belief, defendant Church & Dwight Co., Inc. ("Church & Dwight"): (a) is a corporation organized, existing and doing business under the laws of the State of Delaware, with its corporate headquarters and principal place of business in the United States located in Princeton, New Jersey; (b) is the dominant United States manufacturer, marketer and distributor of condoms through its Trojan, Elexa, Magnum, Class Act, Supra and Naturallamb brands; (c) holds a market share of over 75 percent of the relevant markets for condoms in both California and the United States; (d) has obtained, and is maintaining and attempting to expand, its monopoly position in those markets unfairly and illegally; and (e) has restrained and suppressed, and is continuing to restrain and suppress, competition in those markets unfairly and illegally through the agreements, programs, schemes, acts and practices described below.

15.     Each of the additional defendants on the counterclaims, denominated "DOES I through XX" in the caption (the "DOE Counterclaim Defendants") is: (a) a principal of, or person directed by, Church & Dwight; (b) an agent of Church & Dwight acting in the course and scope of such agency with regard to the matters described herein; (c) a person who or that has combined, conspired or contracted with Church & Dwight to engage in the agreements, programs, schemes, acts and practices described herein; or (d) in some other way responsible for the agreements, programs, schemes, acts and practices described herein. The precise names and capacities of the DOE Counterclaim Defendants, and the precise role or roles they played in the events recited here, are matters known to Church & Dwight but not currently to Counterclaimant Mayer Labs, which therefore brings these Counterclaims against them by fictitious names. Counterclaimant Mayer Labs will amend its Counterclaims to reflect the true names and

33

capacities of the said DOE defendants, and the precise nature of their relationships with Church & Dwight, when such information has been ascertained.

## JURISDICTION

16.     These counterclaims seek injunctive and equitable relief and damages for violations of the antitrust and trademark laws of the State of California and of the United States, as well as violations of other California statutory law, and common law, as hereinafter set forth. Subject matter jurisdiction is therefore proper under 15 U.S.C. §§ 1, 2, 15, 26 and 1125(a), based on federal question jurisdiction, 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the California statutory claims, and common law claims, 28 U.S.C. § 1367. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## BACKGROUND

17.     Mayer Labs has been marketing latex condoms under the Kimono®, Kimono® MicroThin™ and MAXX® brands for more than 20 years. The Kimono brand has accounted for approximately 5% of the California market and less than 1% of the total United States market in retail sales of condoms. Mayer Labs' share would be substantially higher in California and the total United States but for Church & Dwight's anticompetitive agreements, programs, schemes, acts and practices described herein.

18.     Mayer Labs is and has been an innovator in the condom market. It has established the Kimono brand in the marketplace by offering high quality latex condoms that are ultra thin. Kimono brand condoms range in thickness from 49 microns to 60 microns. In contrast, the condoms sold by most competing brands range in thickness from approximately 55 to 80 microns. Mayer Labs established a segment in the condom market for high-quality ultra-thin condoms made by Japanese manufacturers, and promoted its products in that segment using

its "MicroThin" and "Kimono" trademarks on its packaging and by directly advertising that Kimono condoms are made in Japan.

19.     As a critical part of its branding and competitive strategy, Mayer Labs needed, and obtained, an exclusive source of supply for high-quality latex condoms made by a Japanese manufacturer. The ultra-thin latex condoms distributed and sold by Mayer Labs under the Kimono and Kimono MicroThin brands are manufactured by Sagami, a Japanese manufacturer and distributor of high quality condoms. Only a few Japanese manufacturers, such as Sagami, have the technology, quality control, know-how and experience to manufacture ultra-thin latex condoms to a high level of quality to consistently meet the rigorous standards of the United States Food and Drug Administration ("FDA").

20.     Using Sagami as a supplier beginning in 1987, Mayer Labs became an innovator in the ultra-thin condom segment of the overall condom market. Mayer Labs was instrumental in establishing the ultra-thin condom segment in the United States market in 1987, with its products branded as Kimono. At that time, these condoms were 20% thinner than average condoms. Mayer Labs continued its advancement introducing even thinner condoms in 1992, branded as Kimono MicroThin condoms. Most recently, in 2007, Mayer Labs introduced an even thinner, improved Kimono MicroThin condom, which was the first condom to be widely distributed in the United States market that is less than 50 microns thick.

21.     Based in part on Mayer Labs' initial success in establishing demand for ultra-thin condoms, Sagami elected to open its own offices in Chicago and apply its greater resources to expand the market. Sagami's efforts to sell ultra-thin condoms in the United States market independently, however, were unsuccessful—in large part because of the anticompetitive practices of other condom companies. After years of significant financial losses in its United States business efforts in 1998, Sagami elected to suspend its United States operations. Mayer

35

Labs acquired Sagami's United States product lines, later replacing them with its Kimono brand products. At that time, Mayer Labs also contracted with Sagami for the rights to be Sagami's exclusive North American agent and exclusive North American distributor.

22.     In reliance on its exclusive supply, agency and distribution relationship with Sagami, Mayer Labs then:   (a) invested the substantial time, energy, effort, creativity, know-how and financial resources necessary to build the Kimono brand and the market for ultra-thin condoms; and (b) heavily marketed and promoted condoms manufactured by Sagami as the highest quality product available.   Until recently, when Church & Dwight tortiously interfered with Mayer Labs' exclusive supply, agency and distribution relationship with Sagami, Mayer Labs was the only United States distributor of ultra-thin latex condoms manufactured by Sagami.

23.     Sagami honored its exclusive contract with Mayer Labs until late 2007, when Church & Dwight willfully, intentionally, knowingly and tortiously interfered with that exclusive relationship and induced Sagami to supply latex condoms manufactured by Sagami to Church & Dwight as part of Church & Dwight's anticompetitive, agreements, programs, schemes, acts and practices described herein.

## THE RELEVANT MARKETS

24.     The relevant geographic markets consist of:   (a) the State of California; and (b) the entire United States.

25.     The overall market for condoms is highly concentrated in three manufacturers and distributors.   The largest selling brand of condoms in the United States is Trojan which is marketed by Church & Dwight, and together Trojan and other Church & Dwight branded condoms account for over 75% of all retail condom sales.

26.     The next largest selling brand of condoms is the Durex brand, with a market share

in the United States of approximately 15.3%. Durex condoms are marketed in the United States by SSL Americas, Inc., a subsidiary of SSL International, plc, a United Kingdom company ("SSL").

27.     The third largest selling brand of condoms is the Lifestyles brand, with a market share in the United States of approximately 7.7%. Lifestyles condoms are marketed in the United States by Ansell Healthcare, Inc. and Ansell Healthcare Products, L.L.C., subsidiaries of Ansell Limited, an Australian company (collectively, "Ansell").

28.     Condoms manufactured and distributed by Church & Dwight, SSL and Ansell— the top three manufacturers and distributors—account for approximately 98.3% of all sales in the overall United States condom market.

## CONCENTRATION IN RETAIL SALES

29.     The overall retail market for condoms is also highly concentrated. Condoms are sold primarily by national drug store chains such as Walgreens, Rite-Aid and CVS, as well as large regional chains such as Long's Drugs in California. Such drug store chains account for approximately 64% of all condom sales in the United States.

30.     Moreover, there is an extreme concentration of ownership of nationwide drug store chains: the three largest chains—Walgreens, Rite-Aid and CVS—account for approximately 86% of all condom sales at drugstores. Thus, of all the condoms sold by all retailers (drug stores, supermarkets, mass merchandisers and other stores) in the United States, an estimated 58% are sold at Walgreens, Rite-Aid and CVS.

31.     Major supermarket chains such as Safeway Stores, Kroger, Publix, Giant Food & Drug and others constitute the second largest United States distribution channel for condoms. Major supermarket chains account for approximately 21% of all retail condom sales in the

United States.

32.     Major mass merchandisers such as Wal-Mart, Target, K-Mart, Meijer and others constitute the third largest United States distribution channel for condoms.  Major mass merchandisers account for approximately 15% of all retail condom sales in the United States.

## THE ULTRA-THIN SEGMENT OF THE CONDOM MARKET

33.     As noted above, Mayer Labs has been an innovator in the condom market, in particular with respect to developing demand for ultra-thin condoms, which include the trademarked Kimono® MicroThin™ condoms marketed and distributed by Mayer Labs.  The ultra-thin segment of the market comprises approximately 22% of the overall retail market, and accounts for approximately $66 million in sales per year.  As a result of the pioneering development and promotional efforts of innovators such as Mayer Labs, the ultra-thin segment is a growth segment of the overall condom market, in that demand for—and sales of—ultra-thin condoms are growing as compared to the remainder of the condom category in which unit sales are declining.

## BARRIERS TO ENTRY AND FACTORS INHIBITING COMPETITION

34.     There are enormous barriers to entry into, and other factors inhibiting competition in, the market for condoms in the United States.  The most formidable of these is the difficulty of acquiring space in major retailers' condom retailing sections, which is exacerbated by the limited number of large retail chains, in large part due to the progressively increasing concentration of ownership in the retail drug, supermarket and mass merchandiser businesses, with large national and regional chains having largely displaced small, independent pharmacies and other retailers.  Other barriers to entry include but are not limited to:  the costs associated with FDA and State of California regulatory approval and compliance; production minimums; and retailer program

38

participation fees.

35.     Condoms are typically displayed and sold at drug stores, supermarkets, and mass merchandisers using wall-mounted pegboard displays or spring-loaded slider displays. (A spring-loaded slider display allows the store to place a number of units of each individual product in a separate spring-loaded slider, which automatically pushes another unit of the product to the front of the display when a consumer removes the front unit in order to examine or purchase it.) Both pegboard displays and slider displays typically allow a store to display, in one location where consumers can quickly view them, all the different packages of the various individual products ("stock keeping units" or "SKUs") in a particular category offered by the store.

36.     It is impossible to compete in the retail condom market without receiving adequate display space in the retail stores, a fact well known to Church & Dwight. Condoms are only minimally advertised in print, television, newspaper inserts and other media. The only significant means of promoting or advertising condoms to retail consumers is through their display at the point of sale. Thus, as a practical matter, the points of sale—pegboard, slider and shelf displays—constitute the focal point of nearly all competition in the market.

37.     Moreover, the large drug, supermarket and mass merchandising chains responsible for the overwhelming majority of retail condom sales make their decisions about which products to carry on a chain-wide basis. They also typically decide, on a chain-wide basis, the way that their stores will arrange these products in their display space, which they record and communicate by means of planograms. (As noted above, "planograms" are essentially diagrams showing where specific products are to be positioned in the space allocated by a retail store for a particular category of products.)

38.     This means that once the chain decides on the specific products to carry in a

category, those products will be displayed in essentially the same way in all of its stores, according to the centrally created "planogram." By the same token, if a chain decides to discontinue carrying a specific product, none of its stores will thereafter sell that product. As a result, and in light of the concentration of ownership in the retail drug, supermarket and mass merchandising industry, a national or regional chain's decision to exclude a product will generally have a significant effect on that product's national and regional share of the market.

39.     In addition, a practice has evolved in the last fifteen or so years whereby large retail chains enter into agreements with large manufacturers in a particular product category to allow those manufacturers to perform "category management" services for the retail chain. These services typically involve the formulation of a plan for a category of products specifying which SKUs in that category the chain will carry, as well as the layout of a planogram for the chain showing how each store in the chain will display those SKUs. In some instances the plan will also specify the price that the stores should charge for each of the SKUs, as well as steps that the stores will take in promoting them.

40.     In most instances in which a large manufacturer provides such category management services for a retail chain, it is called the "category captain" for that particular category of products. The category captain typically employs a team of employees who collect and analyze information about the individual brands in a category, and formulate the category management plan for that particular chain. (Sometimes, the employee who heads that team is called the "category captain." And in some instances, the manufacturer engages, at its own expense, a third-party to provide category management services for a retail chain.)

41.     On information and belief, most retail chains have category management arrangements for condoms. Typically, Church & Dwight is the condom category captain.

42.     Such arrangements have increased and continue to increase the enormous barriers

to entry into the condom markets in California and the United States, and have had other anti-competitive effects in these markets as well. Typically, the category captain usually obtains: (a) the most desirable and most valuable locations for its products in the in-store display space; (b) the ability to insure that its new products are included among the products carried by the retailer; and (c) the ability to retain undeserved continued positions on the displays even for its marginally selling items.

43.     Moreover, Church & Dwight has used its position as condom category captain—together with the other anticompetitive agreements, programs, schemes, acts and practices described herein—to obtain, maintain and extend its monopoly power in the condom market, and to suppress competition from other manufacturers, especially smaller manufacturers like Mayer Labs.

## CHURCH & DWIGHT'S ANTICOMPETITIVE CONDUCT
### Introduction

44.     The majority of Mayer Labs' sales of branded condoms are in the ultra-thin segment of the California and United States condom markets. Focusing on this segment, Mayer Labs was able to obtain, as of 2005, a market share of approximately 3.3% of the market in the United States, and approximately 25% of the market in California, for ultra-thin latex condoms.

45.     Church & Dwight, recognizing this segment as a growth segment, then entered into this market segment with products like Trojan Ultra Thin, Trojan ThinTensity and recently the Trojan Magnum Thin. Through the predatory, unfair and anticompetitive agreements, programs, schemes, acts and practices described herein, Church & Dwight has forced retailers to reduce the volume and numbers of Kimono condoms that they carry—and in some cases to discontinue carrying them entirely—and replace them with new Church & Dwight products.

46.     As a consequence of Church & Dwight's predatory, unfair and anticompetitive

agreements, programs, schemes, acts and practices—as opposed to fair competition on the merits

of product quality and appeal to consumers—Mayer Labs' market share in this segment has been

and continues to be reduced substantially.

## Church & Dwight's Monopoly Position and Power

47.     As noted above, Church & Dwight controls in excess of 75% of the United States

wholesale and retail condom markets as defined, and its market share is continuing to grow as a

result of the anticompetitive conduct described herein.

48.     On information and belief, Church & Dwight offers approximately 36 different

condom products comprising over 85 SKUs under its Trojan and other brands.  These products

differ by features such as materials, thickness, size, lubricant and texture.  Church & Dwight's

products are offered in packages containing varying numbers of condoms.

49.     Church & Dwight's market share, although always at or close to monopoly levels,

was somewhat lower before it began the course of anticompetitive conduct alleged herein.

Church & Dwight has successfully used the anticompetitive agreements, programs, schemes, acts

and practices described herein to obtain, maintain and expand its monopoly of the relevant

markets, and to substantially reduce competition therein.  On information and belief, Church &

Dwight's market share was approximately 64% as of October 2001, approximately 71% as of

September 2004, and in excess of 75% as of September 2008.

## Church & Dwight's Condom Planogram Agreements

50.     To maintain and expand its monopoly position, Church & Dwight has used and is

continuing to use a series of anticompetitive, restrictive kick-back or rebate schemes, which it

calls "Condom Planogram Agreements," to effectively force major retail chains (including but

42

not limited to Longs Drugs, Rite-Aid, CVS, Walgreens, Duane Reade, Safeway Stores, Target, Kroger, Meijer, Fred Meyer, and others) to devote ever-increasing in-store display (or "planogram") space to Trojan brand condoms and other condoms distributed and marketed by Church & Dwight, while diminishing the display space available to competing brands, and thereby unfairly restricting the number of competing brands that a store can reasonably carry, and in many instances causing the chain's elimination of one or more competing brands.

51.     Indeed, through such Condom Planogram Agreements, Church & Dwight has offered and given, and continues to offer and to give, major retailer chains extremely large kickbacks or "rebates" (as much as 8.5% of the chain's annual purchases of Church & Dwight condoms), but only if the chain accepts and follows a planogram designed by Church & Dwight, or implements and continuously maintains its display space so that Church & Dwight's condoms fill a specified percentage (typically from 75% to 80%) of the available space on the chain's pegboard or slider display of condoms.

52.     On information and belief, to receive the kick-back, the retail chain must sign a Church & Dwight Condom Planogram Agreement and must provide Church & Dwight with its planogram showing that it has allocated to Church & Dwight's condoms no less than the designated percentage of the total "facings" (*i.e.*, pegs in the pegboard displays and sliders in the slider displays) for all condom products.  For example, under Church & Dwight's 8.5% "Condom Planogram Agreement," a retail chain receives a kick-back equal to 8.5% of its purchases of Church & Dwight condoms if it devotes at least 80% of its condom pegboard or slider display space to condoms marketed and distributed by Church & Dwight.

53.     The purposes and direct effects of the Church & Dwight Condom Planogram Agreements have been and still are to force retailer chains to devote ever-increasing in-store display space to condoms distributed and marketed by Church & Dwight, and correspondingly to

progressively diminish the in-store display space that they allocate to competing brands, thereby limiting the number of competing products that the chain can offer and display, and greatly diminishing and in some cases eliminating competition in the relevant markets. Each retail chain has only a certain amount of display space that it is willing to devote to condoms. By committing to allocate to Church & Dwight 75% to 80% of its critical condom display space in return for a cash kick-back, the chain must of necessity limit the number of competing products that it can display and offer for sale, and in some cases eliminate competing products altogether.

54.     On information and belief, all of the major drug chains, and most of the supermarket and mass merchandising chains (other than Wal-Mart), have participated and continue to participate in Church & Dwight's "Condom Planogram Agreements."

55.     Over time, Church & Dwight has increased the amount of display space required to be devoted to its brands under its Condom Planogram Agreements. As a result, its market share has grown substantially from approximately 64% in 2001, to the more than 75% that it holds today. The Condom Planogram Agreements' requirement that retailers devote as much as 80% of display space to Church & Dwight products has had, and continues to have, the intended anticompetitive effect of allowing Church & Dwight not only to maintain, but also to increase and expand, its monopoly position.

56.     Moreover, on information and belief, Church & Dwight acts in an unfair, discriminatory and unlawful manner by offering its Condom Planogram Agreements only to certain retailers, principally major retail chains, and not to small independent retailers, or small retail chains.

57.     Church & Dwight has also obtained and exercised, and continues to obtain and exercise, additional control over the condom products made available to consumers through its position as condom category captain for most large retail chains. On information and belief,

44

Church & Dwight has been and continues to be the category captain for most major retail chains—either directly or through a third-party with which it has contracted—and has used this position to suppress and in some instances eliminate competition in the relevant markets.

58.     Because of this position, Church & Dwight has had and used, and continues to have and to use, the ability to decide and influence which brands of condoms are included in a chain's stores, where individual condom SKUs are placed in the store displays, which condom SKUs are discontinued, and which new condom SKUs are added.  Thus, as category captain Church & Dwight has had and used to its own advantage the ability:  (a) to obtain the most desirable and valuable locations for its SKUs in the in-store condom pegboard, slider and shelf displays; (b) to insure that the chain includes Church & Dwight's new products among the products carried by the chain; and (c) to insure that the chain retains undeserved continued positions in the displays even for Church & Dwight's marginally selling SKUs.

59.     On information and belief, Church & Dwight in its position as category captain also recommends to, and directs, the chains in selecting their assortment of condoms to offer for sale to consumers, designs their standard displays, and determines which Trojan and other Church & Dwight products (along with the mandated minimal number of competitor products) the chain will display and where.

60.     Church & Dwight has used its position to obtain preferential display locations for its products, to recommend replacement of competing brands with Church & Dwight products, and to reduce visibility for (or exclude altogether) competing brands, including Mayer Labs' products.

61.     The purpose and direct effect of Church & Dwight's Condom Planogram Agreements, together with its role as category captain for most major retail chains, has been that competing brands like Mayer Labs' Kimono brand have received progressively diminishing

space in numerous retail chains' displays, and have in some instances been removed from such displays and excluded entirely from the condoms carried by the chain. The display space that had previously been available to Mayer Labs and other competitors of Church & Dwight has instead been given to Church & Dwight for its Trojan and other brand condom products.

62.     In effect, Church & Dwight has been paying retailers to refrain from displaying and selling competing products.

63.     The combination of Church & Dwight's Condom Planogram Agreements and its role as condom category captain, together with its monopoly power, has enabled Church & Dwight to increase its market share by nearly 10% over the last seven years, to over 75% of the relevant markets, and has allowed Church & Dwight to increase its prices and profits substantially. Church & Dwight's market share is continuing to grow at a rapid rate as it demands ever higher display space commitments from retailers.

### Church & Dwight's Anticompetitive Introduction of New Products and Other Anticompetitive Conduct in the Ultra-Thin Segment

64.     Church & Dwight's anticompetitive conduct has also allowed it to grab market share for its new products in defined segments of the condom market, without competing on the merits with the established products. In this regard, Church & Dwight is now in the process of entering the market with various products including ultra-thin latex condoms. The ultra-thin market segment is one in which Mayer Labs' Kimono brand has established itself by building customer satisfaction for more than 20 years.

65.     Church & Dwight has launched two new product lines in this segment that it calls "Trojan ThinTensity" and "Magnum UltraThin." These new Church & Dwight products specifically target Mayer Labs' Kimono® MicroThin™ and Kimono® MicroThin Large™ products.

46

66.     Church & Dwight does not currently have the capacity or capability to produce ultra-thin condoms, and in order to enter the ultra-thin market segment identified Japanese manufacturers, including Sagami, as potential sources of ultra-thin condoms.

67.     In or about November 2007, as part of its effort to take over the ultra-thin market segment, Church & Dwight induced Sagami to breach Sagami's exclusive supply and distribution commitment to Mayer Labs.  Church & Dwight was able to do so based on its volume and market share.

68.     Church & Dwight has prominently labeled its new condom products as "MICRO THIN" and "Made in Japan" so as to target, copy and take unfair advantage of Mayer Labs' trademark and years of building customer knowledge and confidence in Japanese-made ultra-thin condoms.

69.     By simply purchasing retail display space and eliminating Mayer Labs' and other competitors' products through its Condom Planogram Agreement rebates and its role as category captain, Church & Dwight has been able to enter the ultra-thin segment of the relevant market without competing on the merits.  Indeed, Church & Dwight has used its Condom Planogram Agreement scheme and its position as category captain to replace and eliminate competitive ultra-thin condoms offered by Mayer Labs and other competitors with Church & Dwight's slower selling and less profitable (on a per unit basis) products.  In a competitive market, Church & Dwight would have had to earn retail display space by demonstrating that all of its products could sell as well as, and at least as profitably on a per unit basis as, Kimono brand and other competing ultra-thin products.

70.     If Church & Dwight's total allotted display space for its existing product portfolio had to be earned, not by rebate payments made according to its customers' total purchases of all Church & Dwight SKUs, but based on consumer demand for each of its products, Church &

Dwight would have had to elect to reallocate or discontinue a portion of its product line from older or under-performing products and allot that space instead to its new products. However, instead of introducing its ultra-thin products into the market in a competitive fashion, in which consumers can make choices, Church & Dwight is engaging in anticompetitive, exclusionary practices by paying the retailers a rebate for the display space. The consequence of these anticompetitive practices is that retailers must remove Kimono brand and other competing products from their display spaces, and replace them with Church & Dwight products that are less desirable to consumers.

## THE EFFECT OF CHURCH & DWIGHT'S
## ANTICOMPETITIVE PRACTICES ON COMPETITION

71.     The anticompetitive impact of Church & Dwight's practices on the market for condoms is clear. The chart below shows the increasing concentration of Church & Dwight's market share as compared to competitors' market shares in drug stores, supermarkets and mass merchandising stores in the United States at various points in time over the last five years. During that entire period, Church & Dwight has utilized its Condom Planogram Agreements.

| Brand | 9/7/2003 | 9/5/2004 | 9/4/2005 | 10/8/2006 | 9/9/2007 | 3/23/2008 | 9/7/2008 |
|-------|----------|----------|----------|-----------|----------|-----------|----------|
| Church & Dwight | 69.0% | 70.3% | 70.2% | 72.2% | 73.1% | 74.4% | 75.3% |
| Durex | 16.5% | 16.5% | 17.3% | 16.1% | 16.2% | 15.5% | 15.3% |
| Lifestyles | 13.0% | 11.3% | 10.2% | 9.7% | 9.0% | 8.3% | 7.7% |
| One | 0.6% | 0.6% | 0.9% | 0.4% | 0.6% | 0.8% | 0.6% |
| Inspiral | 0.3% | 0.6% | 0.6% | 0.7% | 0.6% | 0.6% | 0.4% |
| Kimono | 0.5% | 0.5% | 0.7% | 0.6% | 0.5% | 0.4% | 0.4% |
| Other Brands | 0.1% | 0.1% | 0.1% | 0.2% | 0.0% | 0.0% | 0.0% |

72.     The anticompetitive rebates and other practices engaged in by Church & Dwight

have had the anticompetitive effect of requiring retailers to stop carrying, and displaying for purchase by consumers, more popular (and hence more profitable) products offered by Church & Dwight's competitors, and of forcing retailers to instead carry and display Church & Dwight Trojan and other brand condoms that are less desirable to consumers, and that are less profitable to the coerced retailers on a per unit basis than the products offered by Church & Dwight's competitors, including Mayer Labs.

73.     Consumers have felt the effects of these changes in market share and have been injured by Church & Dwight's anticompetitive conduct.  For example, in 2006 both Safeway and Target Stores reduced the number of brands of condoms that they carry from three to two in order to accommodate Church & Dwight's anticompetitive demands.  Paradise Marketing, the largest distributor in the Adult Class of Trade in the United States, also reduced its recommended display, or planogram, from four to three brands by eliminating Lifestyles products.  Most of, if not all, other major retailers have similarly restricted the amount of competitive products that they carry and display for purchase.

74.     In July 2008, Longs Drug Stores Corporation ("Longs") implemented a new planogram as required by Church & Dwight's anticompetitive Condom Planogram Agreement. This new planogram required Longs to remove better selling Mayer Labs' products from store displays so as to make room for Church & Dwight's condoms, in order to satisfy the space allocation requirements of the Condom Planogram Agreement and thereby enable Longs to receive the rebate specified therein.  The removal of these Mayer Labs products was forced by Church & Dwight despite specific Longs data showing that the discontinued Mayer Labs condoms were better selling, and more profitable on a per unit basis, than many of the Trojan brand condoms that were continued in the Longs planogram.  This example illustrates the impact on market choices for consumers caused by Church & Dwight's anticompetitive rebate scheme.

75.     Church & Dwight's anticompetitive Condom Planogram Agreements and the other anticompetitive programs, schemes, acts and practices described herein have also resulted in higher prices to consumers.  As an example, data collected from Safeway Stores over the past three years shows that in 2006, when Church & Dwight controlled 74.1% of the total Safeway sales, its "Trojan Magnum 12 count" (SKU 64212), "Trojan Enz 12 count" (SKU 93750) and "Trojan Her Pleasure 12 count" (SKU 97350) products were sold for $9.03, $8.61, and $8.99 respectively.  By early 2008, when Church & Dwight received 81.8% of Safeway's total available display space through the anticompetitive Condom Planogram Agreements, the consumer prices of the above-mentioned SKUs had risen to $10.53, $10.32, and $10.48 respectively, an average increase of $1.57 per package, or a nearly 18% increase.  Consumers, therefore, have been subjected to significant price increases as a result of Church & Dwight's anticompetitive agreements, programs, schemes, acts and practices.

76.     An analysis of market share among condom distributors also shows anticompetitive effects in the form of decreased product variety.  Since September 7, 2003, Church & Dwight has watched its national market share increase from 69% to over 75%.  In contrast, Durex's market share has decreased from 16.5% to 15.3% (a 7.3% loss of market share) and Lifestyles' market share has decreased from 13.0% to 7.7% (a whopping 40.8% loss of market share).

## FIRST CLAIM FOR RELIEF
(Violation of Sherman Act § 1, Contracts and Combinations in Restraint of Trade)

77.     Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 76 of these Counterclaims above.

78.     Defendant Church & Dwight has combined, conspired and contracted, through the coercive and other anticompetitive means alleged above, with the retailers that control the

selection, display, promotion and retail sale of condoms in the relevant markets defined above, to restrain trade and commerce among the several states, and with foreign nations, and to suppress and prevent competition in the relevant markets defined above, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

79.     These combinations, conspiracies and agreements between and among Church & Dwight and the retailers that control the selection, display, promotion and retail sale of condoms in the relevant markets were undertaken with the express purpose and intent of unlawfully restraining competition and excluding Mayer Labs as a market competitor in the relevant markets defined above.

80.     Church & Dwight's anticompetitive agreements, programs, schemes, acts and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and unreasonably restrain, interstate and foreign commerce in the relevant markets.  No valid business reasons exist for Church & Dwight's anticompetitive agreements, programs, schemes, acts and practices.

81.     As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.

82.     Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.  To the extent that Church & Dwight seeks to initiate, renew, enforce or continue such anticompetitive combinations, conspiracies and agreements with the retailers that control the selection, display, promotion, and

retail sale of condoms, in a manner that unlawfully restrains trade and commerce in the relevant

markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such

anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices,

and its Condom Planogram Agreements should be held and declared to be illegal, void and

unenforceable.

> **WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

### SECOND CLAIM FOR RELIEF
(Violation of Sherman Act § 2, Unlawful Monopolization,
Attempted Monopolization and Combinations to Monopolize)

83.     Mayer Labs realleges and incorporates herein by reference paragraphs 1 through

82 of these Counterclaims above.

84.     Church & Dwight's anticompetitive conduct, agreements, programs, schemes,

acts and practices constitute intentional and unlawful monopolization of interstate and foreign

trade and commerce in the relevant markets defined above, and the intentional and unlawful

maintenance and use of monopoly power in the relevant markets defined above, in violation of

Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

85.     In addition, Church & Dwight's anticompetitive conduct, agreements, programs,

schemes, acts and practices constitute intentional and unlawful attempted monopolization of

interstate and foreign trade and commerce in the relevant markets defined above, in violation of

Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  Church & Dwight has acted with the

specific intent to attempt to monopolize the relevant markets, and has sufficient market power to

create a dangerous probability of success of monopolizing the relevant markets.

86.     In addition, Church & Dwight's anticompetitive conduct, agreements, programs,

schemes, acts and practices constitute combinations and conspiracies with other persons to

monopolize the interstate and foreign trade and commerce in the relevant markets defined above, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

87.     Church & Dwight has excluded, or attempted to exclude, competition in the relevant markets by preventing or impeding the distribution of competing products.

88.     Church & Dwight's anticompetitive conduct, agreements, programs, schemes, acts and practices have injured competition and consumers in the relevant markets, suppressed sales of condom products, and increased prices to retailers and consumers.

89.     As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.  Church & Dwight's anticompetitive conduct, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to consumers.

90.     Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.  To the extent that Church & Dwight seeks to initiate, renew, enforce or continue such anticompetitive combinations, conspiracies and agreements with the retailers that control the selection, display, promotion, and retail sale of condoms, in a manner that unlawfully restrains trade and commerce in the relevant markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements should be held and declared to be illegal, void and

unenforceable.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

## THIRD CLAIM FOR RELIEF
(Violation of Prohibition against Trusts in the
Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*)

91.     Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 90 of these Counterclaims above.

92.     Through its coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, Church & Dwight has combined—with various retailers, especially chain drug stores, chain supermarkets and other chain mass merchandisers with which it has contracted and combined—to restrain trade and prevent competition in, and to monopolize, the relevant markets as defined above in violation of the Cartwright Act of the State of California, Cal. Bus. & Prof. Code §§ 16700, *et. seq.* ("Cartwright Act").

93.     Church & Dwight has undertaken these coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, with the express purpose and intent of unlawfully restraining competition in the relevant markets and excluding Mayer Labs as a market competitor in those markets.  Church & Dwight has no valid business justification for its conduct.

94.     Church & Dwight's coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices are illegal "trusts" under the Cartwright Act in that they constitute combinations of capital, skill and acts by Church & Dwight and other persons for the following purposes:

(a) Creating and carrying out restrictions in trade or commerce in the relevant markets defined above;

(b) Limiting and reducing the production of, and increasing the price of, merchandise and commodities in the relevant markets defined above;

(c) Preventing competition in manufacturing, making, transportation, sale and purchase of merchandise, products and commodities in the relevant markets defined above; and

(d) Making, entering into, executing and carrying out contracts, obligations and agreements that:

  (i) Bind themselves not to sell articles and commodities, and articles of trade, use, merchandise, commerce and consumption, below a common standard figure; and

  (ii) Agree to pool, combine and directly and indirectly unite the interests that they have connected with the sale of articles and commodities, that their prices might be affected;

all in violation of Cal. Bus. & Prof. Code §§ 16726 & 16720.

95.     As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court. Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to

consumers.

96.     Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.  To the extent that Church & Dwight seeks to initiate, renew, enforce or continue such anticompetitive combinations, conspiracies and agreements with the retailers that control the selection, display, promotion, and retail sale of condoms, in a manner that unlawfully restrains trade and commerce in the relevant markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements should be held and declared to be illegal, void and unenforceable.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

### FOURTH CLAIM FOR RELIEF
(Violation of Prohibition against Contracts Providing
for Non-Use of Competitor's Goods or Services in the
Cartwright Act, Cal. Bus. & Prof. Code §§ 16727, *et seq.*)

97.     Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 96 of these Counterclaims above.

98.     Church & Dwight's coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, constitute sales (and contracts for the sale) of goods and merchandise for use within the State of California, as well as discounts from and rebates upon the price charged for such goods and merchandise, on the condition, agreement and understanding that the purchasers of such goods and merchandise (namely, retailers that buy condoms from Church & Dwight) shall not use or deal in the goods of another (namely small manufacturers and distributors of

condoms such as Mayer Labs).

99.    Moreover, the effect of Church & Dwight's coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, has been to substantially lessen competition and to create, tend to create, maintain and expand a monopoly in the relevant markets, which comprise a line of trade and commerce in the State of California.

100.    As a result, Church & Dwight's coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, violate section 16727 of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16727.

101.    As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court. Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to consumers.

102.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law. To the extent that Church & Dwight seeks to initiate, renew, enforce or continue such anticompetitive combinations, conspiracies and agreements with the retailers that control the selection, display, promotion, and

retail sale of condoms, in a manner that unlawfully restrains trade and commerce in the relevant

markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such

anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices,

and its Condom Planogram Agreements should be held and declared to be illegal, void and

unenforceable.

     **WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

**FIFTH CLAIM FOR RELIEF**
(Violation of Prohibition against Secret Rebates,
Refunds, Commissions and Unearned Discounts
in the Cal. Bus. & Prof. Code § 17045)

     103.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through

102 of these Counterclaims above.

     104.    Church & Dwight's coercive and anticompetitive combinations, conspiracies,

agreements, programs, schemes, acts and practices alleged above, and its Condom Planogram

Agreements, as described herein, have included secret payments and allowances to retail drug

chains and other retailers of rebates, refunds and unearned discounts, as well as the extension to

certain purchasers of special services and privileges not extended to all purchasers purchasing

upon like terms and conditions.

     105.    Church & Dwight's use of such secret payments and allowances of rebates,

refunds and unearned discounts, and its extension to certain purchasers of special services and

privileges not extended to all purchasers purchasing upon like terms and conditions, tend to

destroy competition and have injured Mayer Labs, which is a competitor of Church & Dwight.

     106.    Because of the foregoing, Church & Dwight's use of such secret payments and

allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of

special services and privileges not extended to all purchasers purchasing upon like terms and

58

conditions, constitute violations of section 17045 of the California Business and Professions Code.

107.    As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.  Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to consumers.

108.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.  To the extent that Church & Dwight seeks to initiate, renew, enforce or continue its use of such secret payments and allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, in a manner that unlawfully restrains trade and commerce in the relevant markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such practices, and its Condom Planogram Agreements should be held and declared to be illegal, void and unenforceable.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

## SIXTH CLAIM FOR RELIEF
(Violation of Section 2 of the Clayton Act as amended by the
Robinson Patman Act, 15 U.S.C. § 13(a), Illegal Price Discrimination)

109.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 108 of these Counterclaims above.

110.    Church & Dwight's use of secret payments and allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, constitutes unlawful discrimination in price between different purchasers of commodities—to wit, condoms—of like grade and quality, which are sold for use, consumption and resale within the United States.

111.    The effects of Church & Dwight's unlawful price discrimination among retailers to which it sells condoms are:  (a) substantially to lessen competition; (b) to tend to create a monopoly in the condom markets in the United States and the State of California; and (c) to injure, destroy, and prevent competition with Church & Dwight.

112.    Purchases of Church & Dwight condoms by retailers that receive and are offered rebates pursuant to Condom Planogram Agreements, as well as purchases of Church & Dwight condoms by retailers that do not receive and are not offered such rebates, are purchases in interstate commerce.

113.    Because of the foregoing, Church & Dwight's use of such secret payments and allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, constitutes a violation of section 2 of the Clayton Act, as amended by the Robinson Patman Act, 15 U.S.C. § 13(a).

114.    As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its

60

business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.  Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to consumers.

115.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.  To the extent that Church & Dwight seeks to initiate, renew, enforce or continue its use of such secret payments and allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, in a manner that unlawfully restrains trade and commerce in the relevant markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such practices, and its Condom Planogram Agreements should be held and declared to be illegal, void and unenforceable.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

### SEVENTH CLAIM FOR RELIEF
(Violation of Section 13(d) of Robinson Patman Act, 15 U.S.C. § 13(d),
Illegal Discrimination by Church & Dwight in Provision of Rebates)

116.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 115 of these Counterclaims above.

117.    Church & Dwight's use of secret payments and allowances of rebates, refunds

and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, constitute payments of things of value and consideration to and for the benefit of certain Church & Dwight customers—to wit, major retail drug, supermarket and mass merchandising chains—in the course of interstate commerce, as compensation and in consideration for services and facilities furnished by and through such customers in connection with the processing, handling, sale, and offering for sale of products and commodities—to wit, condoms—manufactured, sold, and offered for sale by Church & Dwight.

118.    Such payments and consideration by Church & Dwight are available only to certain Church & Dwight customers—to wit, major retail drug, supermarket and mass merchandising chains—and Church & Dwight does not make them available on proportionally equal terms to all of its other customers that compete in the distribution of condoms.

119.    Purchases of Church & Dwight condoms by retailers that receive and are offered rebates pursuant to Condom Planogram Agreements, as well as purchases of Church & Dwight condoms by retailers that do not receive and are not offered such rebates, are purchases in interstate commerce.

120.    Because of the foregoing, Church & Dwight's use of such secret payments and allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, constitute violations of section 13(d) of the Robinson Patman Act, 15 U.S.C. § 13(d).

121.    As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold

of this Court.  Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to consumers.

122.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.  To the extent that Church & Dwight seeks to initiate, renew, enforce or continue its use of such secret payments and allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, in a manner that unlawfully restrains trade and commerce in the relevant markets and harms Mayer Labs, Church & Dwight should be enjoined from continuing such practices, and its Condom Planogram Agreements should be held and declared to be illegal, void and unenforceable.

WHEREFORE, Mayer Labs prays for relief as hereinafter set forth.

## EIGHTH CLAIM FOR RELIEF
(Violation of Section 13(e) of Robinson Patman Act, 15 U.S.C. § 13(e),
Illegal Discrimination by Church & Dwight in Provision of Services)

123.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 122 of these Counterclaims above.

124.    Church & Dwight's extension to certain purchasers of special services and privileges, including category management services, which Church & Dwight does not extend to all purchasers purchasing upon like terms and conditions, constitutes discrimination in favor of

certain Church & Dwight purchasers that buy condoms for resale—to wit, major retail drug, supermarket and mass merchandising chains—against other purchasers that buy condoms for resale, in that it amounts to contracting to furnish, furnishing, and contributing to the furnishing of services and facilities connected with the processing, handling, sale and offering for sale of condoms so purchased upon terms not accorded to all purchasers on proportionately equal terms.

125.    Such special services and privileges, including category management services, are available only to certain Church & Dwight customers—to wit, major retail drug, supermarket and mass merchandising chains—and Church & Dwight does not make them available on proportionally equal terms to all of its other customers that compete in the distribution of condoms.

126.    Purchases of Church & Dwight condoms by retailers that receive and are offered special services and privileges, including category management services, as well as purchases of Church & Dwight condoms by retailers that do not receive and are not offered such services and privileges, are purchases in interstate commerce.

127.    Because of the foregoing, Church & Dwight's extension to certain purchasers of special services and privileges not extended to all purchasers purchasing upon like terms and conditions, constitutes a violation of section 13(e) of the Robinson Patman Act, 15 U.S.C. § 13(e).

128.    As a direct and proximate result of Church & Dwight's unlawful conduct as described herein, Mayer Labs has suffered economic injury and has been damaged in its business, property and other economic interests in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.  Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices have directly increased Mayer Labs' development, sales

and marketing costs, diminished Mayer Labs' future sales and profit opportunities, increased

Mayer Labs' operating costs, and prevented Mayer Labs from offering new products to

consumers.

129.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue

to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer

Labs and the general public have no adequate remedy at law.  To the extent that Church &

Dwight seeks to initiate, renew, enforce or continue its use of such secret payments and

allowances of rebates, refunds and unearned discounts, and its extension to certain purchasers of

special services and privileges not extended to all purchasers purchasing upon like terms and

conditions, in a manner that unlawfully restrains trade and commerce in the relevant markets and

harms Mayer Labs, Church & Dwight should be enjoined from continuing such practices, and its

Condom Planogram Agreements should be held and declared to be illegal, void and

unenforceable.

WHEREFORE, Mayer Labs prays for relief as hereinafter set forth.

### NINTH CLAIM FOR RELIEF
(Tortious Interference with Contractual Relations)

130.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through

129 of these Counterclaims above.

131.    At all times alleged herein, Mayer Labs had and continues to have a valid and

enforceable exclusive supply and distribution agreement with Sagami ("Sagami Agreement")

that gives Mayer Labs the right to be Sagami's exclusive North American agent and exclusive

North American distributor of latex condoms.  Pursuant to the Sagami Agreement, Sagami has

produced and supplied latex condoms for Mayer Labs on an exclusive basis in the United States

and Canada, and Mayer Labs has been Sagami's exclusive agent in the United States and Canada

with respect to Sagami's latex condom business.

132.    At all relevant times, Church & Dwight knew of Mayer Labs' exclusive relationship and exclusive contract with Sagami.

133.    Church & Dwight intentionally and tortiously interfered with, disrupted and induced Sagami to breach Sagami's performance of its obligations under the Sagami Agreement, for the purposes of achieving a competitive advantage over Mayer Labs and damaging Mayer Labs' economic interests.

134.    As a direct and proximate result of Church & Dwight's wrongful conduct, Sagami entered into a supply agreement with Church & Dwight, and Sagami breached and ceased performing its contractual obligations to Mayer Labs under the Sagami Agreement.

135.    As a further direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs has suffered and will continue to suffer economic losses in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.

136.    Moreover, Church & Dwight engaged in its wrongful conduct willfully and maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an amount to be determined at trial.

137.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

## TENTH CLAIM FOR RELIEF
(Tortious Interference with Prospective Economic Advantage)

138.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through

66

137 of these Counterclaims above.

139.    At all relevant times, Mayer Labs enjoyed beneficial economic relationships and reasonable economic expectations with numerous distributors and retailers of condom products, pursuant to which it sold a substantial volume of condom products, to its financial and economic benefit.

140.    At all relevant times, Church & Dwight had knowledge of Mayer Labs' actual and prospective economic relationships as described above.

141.    Church & Dwight intentionally and tortiously interfered with and disrupted the actual and prospective economic relationships described above by, among other things, its anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described above.

142.    As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs' actual and prospective economic relationships have been damaged.

143.    As a further direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs has suffered and will continue to suffer economic losses in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.

144.    Moreover, Church & Dwight engaged in its wrongful conduct willfully and maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an amount to be determined at trial.

145.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

## ELEVENTH CLAIM FOR RELIEF
(Violation of California Unfair Competition Act,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

146.     Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 145 of these Counterclaims above.

147.     Church & Dwight's coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, constitute unlawful, unfair, and fraudulent business practices in violation of the Unfair Competition Act of the State of California, Cal. Bus. & Prof. Code §§ 17200, *et. seq.*

148.     As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs has suffered and will continue to suffer economic losses in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.  Mayer Labs has been deprived of revenues and profits and has otherwise been harmed in its business, property and other economic interests.  Church & Dwight should be ordered to make full and complete restitution to Mayer Labs for its unlawful conduct and should further be ordered to disgorge any and all profits and other economic benefits obtained thereby.

149.     Moreover, Church & Dwight engaged in its wrongful conduct willfully and maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an amount to be determined at trial.

150.     Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

## TWELFTH CLAIM FOR RELIEF
(Claim for Unfair Competition under the
Common Law of the State of California)

151.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 150 of these Counterclaims above.

152.    Church & Dwight's coercive and anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices, and its Condom Planogram Agreements, as described herein, constitute deliberate and willful unfair competition under common law.

153.    As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs has suffered and will continue to suffer economic losses in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court. Mayer Labs has been deprived of revenues and profits and has otherwise been harmed in its business, property and other economic interests. Church & Dwight should be ordered to make full and complete restitution to Mayer Labs for its unlawful conduct and should further be ordered to disgorge any and all profits and other economic benefits obtained thereby.

154.    Moreover, Church & Dwight engaged in its wrongful conduct willfully and maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an amount to be determined at trial.

155.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

**THIRTEENTH CLAIM FOR RELIEF**
(Claim for False Designation of Origin under
The Lanham Act, 15 U.S.C. § 1125(a))

156.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 155 of these Counterclaims above.

157.    As noted above, through the investment of substantial time, energy, effort, creativity, know-how and financial resources, Mayer Labs successfully established a place in the United States condom market for Japanese-made ultra-thin latex condoms.  Mayer Labs was one of the first manufacturers and distributors to measure, quantify and explicitly market condoms in this market, and in 1987 reported in its marketing literature that its Kimono brand condoms were 25% thinner than standard condoms, and more than 15% thinner than competing manufacturers' "Ultra Sensitive" products.

158.    In or about 1992, as part of its ongoing program of new product introduction, Mayer Labs began to distribute a new type of ultra-thin, Japanese-made latex condom and adopted the term "Kimono MicroThin" as a trademark to suggest to consumers an attribute of this particular product. Mayer Labs also described the product as "ultrasensitive", which is a descriptive term used in the industry for thin condoms.  It also identified Kimono MicroThin condoms as having been "Made in Japan."

159.    In 1992, at the time Mayer Labs adopted MicroThin as a trademark for use on its new type of ultrathin condom, the use of the term "microthin" was limited to the semi-conductor field.

160.    Indeed, Mayer Labs adopted the name Kimono MicroThin for its new type of Japanese-made, ultrathin latex condoms as a new, different and arbitrary name that would distinguish them from its other condoms bearing the Kimono brand, as well as from condoms sold by its competitors.  The term "microthin" was completely unique in the condom industry at

70

the time. At that time, and for approximately 15 years thereafter, only Mayer Labs used the term "MicroThin" as a mark in connection with condoms.

161. From 1992 to in or about 2006, only Mayer Labs used the term "microthin" in the condom industry, and it did so only for its Japanese-made, ultra-thin latex condoms. Consequently, during that time, the term "microthin" came to be associated solely with products sold and distributed by Mayer Labs.

162. Since 1992, Mayer Laboratories has spent an estimated $ 1 million in advertising and promotion of its Kimono MicroThin brand. The most significant means of promoting or advertising condoms to retail consumers is through their display at the point of sale. In this regard, Mayer Laboratories has spent over $ 300,000 on package design to highlight the MicroThin trademark.

163. Overall, Mayer Labs has spent more than $1.5 million on package design, advertising, and point of sale materials for its Kimono MicroThin products, greatly strengthening the brand identification and enabling the related goods to attract consumer attention where it matters most, *i.e.*, at the point of sale. As a direct result of Mayer Labs' marketing and branding efforts, the word "microthin" when applied to condoms has become primarily associated in the minds of the consuming public not merely with condoms, but rather, with Mayer Labs and the Kimono MicroThin brand.

164. As a result, consumers of condoms have come to view the term "microthin" as distinctive of Mayer Labs' Kimono MicroThin condoms, and have come to associate the term "microthin" with a single source of the product, even though they may not know the name Mayer Laboratories as the manufacturer or distributor.

165. Indeed, Mayer Labs has sold over $10 million in Kimono MicroThin condoms since 1992, and from the early 2000s through 2005, such sales grew rapidly. In 2003, sales of

Kimono MicroThin condoms amounted to $680,000. In 2004, sales rose to approximately $860,000, an increase of approximately 26.5%. In 2005, sales rose to approximately $1,480,000, an increase of approximately 72% over the prior year.

166.    On information and belief, sometime in 2006, as part of its efforts to target Mayer Labs' success in the ultrathin condom market and without any authorization, Church & Dwight began using the term "microthin" along with the words "Made in Japan" on one of its SKUs, namely, its Trojan Ultrathin condoms. Specifically, on the front of the "fifth panel" of the consumer packaging for those condoms, Church & Dwight added a yellow banner with the words "NOW WITH MICRO-THIN TECHNOLOGY" in the upper left-hand corner, and the words "Made in Japan" in the lower right-hand corner. (The "fifth panel" is an upward extension of the rear side of the consumer package, usually with a hole in its center for the purpose of supporting the package from a pegboard display.)

167.    On information and belief, sometime in 2007, again without authorization, Church & Dwight began using the term "microthin" on another of its SKUs, namely, its Trojan Ultrathin with Spermicide condoms. On the fifth panel for those condoms, Church & Dwight similarly added a yellow banner with the words "NOW WITH MICRO-THIN TECHNOLOGY" and the words "Made in Japan."

168.    On information and belief, sometime in 2008, again without authorization, Church & Dwight began using the term "microthin" on another of its SKUs, namely, its Trojan ThinTensity condoms. On the fifth panel for those condoms, Church & Dwight added a purple banner with the words "MICRO-THIN WITH A NEW SHAPE 0.5 MM" and the words "Made in Japan." Subsequent packaging for that SKU contains the words "WITH MICRO-THIN TECHNOLOGY."

169.    Beginning in 2006, at the same time that Church & Dwight began improperly

72

using the term "microthin" on its products, the growth in sales of Mayer Labs' Kimono

MicroThin condoms slowed markedly.  That year, its sales grew to $1,670,000, an increase of

only approximately 13% over the prior year.  And in 2007, sales of Mayer Labs' Kimono

MicroThin condoms decreased to $1,120,000, a drop of nearly 33% from the prior year.

170.    Church & Dwight's improper and unauthorized use of the word "microthin" on its

Trojan Ultrathin and Trojan ThinTensity products—especially in conjunction with the words

"Made in Japan"—falsely suggests to consumers that those products are affiliated, connected and

associated with, and related to Mayer Labs.

171.    Church & Dwight's improper and unauthorized use of the word "microthin" on its

Trojan Ultrathin and Trojan ThinTensity products—especially in conjunction with the words

"Made in Japan"—constitutes the use in interstate and foreign commerce of a word, term, name,

symbol and device that is likely:  (i) to cause confusion and mistake; (ii) to deceive and mislead

consumers into believing incorrectly that Church & Dwight's Trojan Ultrathin and Trojan

ThinTensity products are affiliated, connected and associated with Mayer Labs; (iii) to deceive

consumers as to the origin of Church & Dwight's Trojan Ultrathin and ThinTensity products;

and (iv) to deceive and mislead consumers into believing incorrectly that Church & Dwight's

Trojan Ultrathin and ThinTensity condoms enjoy the sponsorship and approval of Mayer Labs.

172.    Indeed, Church & Dwight's wrongful infringement of Mayer Labs' trademark

rights by using the term "microthin" on Church & Dwight products was a direct and proximate

cause of the reduction in the growth of Kimono MicroThin condom sales in 2006, and the

dramatic decrease in Kimono MicroThin condom sales in 2007.

173.    As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer

Labs has suffered and will continue to suffer economic losses in an amount currently

unascertained and to be determined at trial, but in any event well in excess of the subject matter

jurisdictional threshold of this Court.  Mayer Labs has been deprived of revenues and profits and

has otherwise been harmed in its business, property and other economic interests.  Church &

Dwight should be ordered to make full and complete restitution to Mayer Labs for its unlawful

conduct and should further be ordered to disgorge any and all profits and other economic

benefits obtained thereby.

174.    Moreover, Church & Dwight engaged in its wrongful conduct willfully and

maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an

amount to be determined at trial.

175.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue

to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer

Labs and the general public have no adequate remedy at law.

**WHEREFORE,** Mayer Labs prays for relief as hereinafter set forth.

## FOURTEENTH CLAIM FOR RELIEF
(Claim for Violation of California Unfair Competition Act,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

176.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through

175 of these Counterclaims above.

177.    For the reasons stated above, Church & Dwight's improper and unauthorized use

of the word "microthin" on its Trojan Ultrathin and Trojan ThinTensity products—especially in

conjunction with the words "Made in Japan"—falsely suggests to consumers that those products

are affiliated, connected and associated with, and related to Mayer Labs, and constitutes the use

in commerce of a word, term, name, symbol and device that is likely:  (i) to cause confusion and

mistake; (ii) to deceive and mislead consumers into believing incorrectly that Church &

Dwight's Trojan Ultrathin and Trojan ThinTensity products are affiliated, connected and

associated with Mayer Labs; (iii) to deceive consumers as to the origin of Church & Dwight's Trojan Ultrathin and ThinTensity products; and (iv) to deceive and mislead consumers into believing incorrectly that Church & Dwight's Trojan Ultrathin and ThinTensity condoms enjoy the sponsorship and approval of Mayer Labs.

178.    Church & Dwight's improper and unauthorized use of the word "microthin" on its Trojan Ultrathin and Trojan ThinTensity products—especially in conjunction with the words "Made in Japan"—therefore violates California's Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.*

179.    Church & Dwight willfully intended to trade on the image and reputation of the trademark "MicroThin," and acted with reason to know, or was willfully blind as to, the consequences of its conduct.

180.    As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs has suffered and will continue to suffer economic losses in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court. Mayer Labs has been deprived of revenues and profits and has otherwise been harmed in its business, property and other economic interests. Church & Dwight should be ordered to make full and complete restitution to Mayer Labs for its unlawful conduct and should further be ordered to disgorge any and all profits and other economic benefits obtained thereby.

181.    Moreover, Church & Dwight engaged in its wrongful conduct willfully and maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an amount to be determined at trial.

182.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer

Labs and the general public have no adequate remedy at law.

## FIFTEENTH CLAIM FOR RELIEF
(Claim for Infringement under the
Common Law of the State of California)

183.    Mayer Labs realleges and incorporates herein by reference paragraphs 1 through

182 of these Counterclaims above.

184.    Church & Dwight's improper and unauthorized use of the word "microthin" on its

Trojan Ultrathin and Trojan ThinTensity products—especially in conjunction with the words

"Made in Japan"—constitutes deliberate and willful trademark infringement under the common

law of the State of California.

185.    As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer

Labs has suffered and will continue to suffer economic losses in an amount currently

unascertained and to be determined at trial, but in any event well in excess of the subject matter

jurisdictional threshold of this Court.  Mayer Labs has been deprived of revenues and profits and

has otherwise been harmed in its business, property and other economic interests.  Church &

Dwight should be ordered to make full and complete restitution to Mayer Labs for its unlawful

conduct and should further be ordered to disgorge any and all profits and other economic

benefits obtained thereby.

186.    Moreover, Church & Dwight engaged in its wrongful conduct willfully and

maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an

amount to be determined at trial.

187.    Unless enjoined, Church & Dwight's conduct is likely to persist and will continue

to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer

Labs and the general public have no adequate remedy at law.

## SIXTEENTH CLAIM FOR RELIEF
(Claim for Unfair Competition under the
Common Law of the State of California)

188.   Mayer Labs realleges and incorporates herein by reference paragraphs 1 through 187 of these Counterclaims above.

189.   Church & Dwight's improper and unauthorized use of the word "microthin" on its Trojan Ultrathin and Trojan ThinTensity products—especially in conjunction with the words "Made in Japan"—constitutes deliberate and willful unfair competition under the common law of the State of California.

190.   As a direct and proximate result of Church & Dwight's wrongful conduct, Mayer Labs has suffered and will continue to suffer economic losses in an amount currently unascertained and to be determined at trial, but in any event well in excess of the subject matter jurisdictional threshold of this Court.  Mayer Labs has been deprived of revenues and profits and has otherwise been harmed in its business, property and other economic interests.  Church & Dwight should be ordered to make full and complete restitution to Mayer Labs for its unlawful conduct and should further be ordered to disgorge any and all profits and other economic benefits obtained thereby.

191.   Moreover, Church & Dwight engaged in its wrongful conduct willfully and maliciously, thereby entitling Mayer Labs to an award of punitive and exemplary damages in an amount to be determined at trial.

192.   Unless enjoined, Church & Dwight's conduct is likely to persist and will continue to cause irreparable loss and damage to Mayer Labs and the general public, for which Mayer Labs and the general public have no adequate remedy at law.

## **PRAYER FOR RELIEF**

On the basis of all of the foregoing, Mayer Labs respectfully prays this Court for relief as follows:

A.  For an order declaring unlawful and unenforceable Church & Dwight's Condom Planogram Agreements, and all other contracts, contract provisions, or other agreements or understandings that require or induce retailers to devote any particular amount or percentage of display space to Church & Dwight's products, or which have the effect preventing or limiting retailers' purchase and display of Mayer Labs' and other competitors' condom products;

B.  For a preliminary and permanent injunction prohibiting Church & Dwight, DOES I through XX, and their successors, assigns, subsidiaries, transferees, officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of or in concert with any of them, from:

> (i)  offering or entering into Condom Planogram Agreements or any other contract, agreement, arrangement or joint practice requiring or inducing retailers to devote a particular or specified amount or percentage of product display space to Church & Dwight products;

> (ii)  engaging in the provision of discriminatory payments and allowances of rebates, refunds and unearned discounts not extended to all purchasers purchasing upon like terms and conditions, in a manner that substantially lessens competition, tends to create a monopoly in the condom markets in the United States and the State of California, and injures, restrains, destroys, and prevents competition, trade and commerce in the relevant markets;

> (iii) engaging in the provision of special services and privileges—including category management services—not extended to all purchasers purchasing upon like terms

and conditions, in a manner that substantially lessens competition, tends to create a monopoly in the condom markets in the United States and the State of California, and injures, restrains, destroys, and prevents competition, trade and commerce in the relevant markets;

(iv) engaging in any other preferential or discriminatory payment or other practice, including but not limited to rebates pursuant to which any retailers are compensated for devoting particular amounts or percentages of their product display areas to Church & Dwight's brands, or for otherwise limiting or excluding competitors' products from being carried or displayed;

(v) further engaging in any of the other anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices alleged herein;

(vi) further violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

(vi) further violating Section 2 of the Clayton Act as amended by the Robinson Patman Act, 15 U.S.C. §§ 13(a), 13(d) and 13(e);

(vii) further violating Sections 16726, 16720, and 16727 of the Cartwright Act and other provisions of the California Business and Professions Code, including Section 17045, and California's Unfair Competition Act, Section 17200, *et seq.*;

(viii) further interfering with Mayer Labs' exclusive supply and distribution agreements and relationship with Sagami Rubber Industries Co., Ltd.;

(ix) further interfering with the actual and prospective economic advantage that Mayer Labs' has derived from its relationships with retailers throughout the United States;

(x) using the term "microthin," or any variation of that term, on or in connection with any of its condom products;

(xi) using any other term or packaging that falsely suggests to consumers that those products are affiliated, connected or associated with, or related to Mayer Labs, or that are likely:  (A) to cause confusion and mistake; (B) to deceive or mislead consumers into believing incorrectly that Church & Dwight's Trojan Ultrathin and Trojan ThinTensity products are affiliated, connected or associated with Mayer Labs; (C) to deceive consumers as to the origin of Church & Dwight's Trojan Ultrathin and ThinTensity products; or (D) to deceive or mislead consumers into believing incorrectly that Church & Dwight's Trojan Ultrathin and ThinTensity condoms enjoy the sponsorship and approval of Mayer Labs;

(xii) further violating Section 1125(a) of the Lanham Act, 15 U.S.C. § 1125(a); and

(xiii) further violating California's Unfair Competition Act, Sections 17200 *et seq.* of the California Business and Professions Code, in connection with terms and designations of origin used on or in connection with its condom products;

C.  For an award of threefold the damages sustained by Mayer Labs as a result of Church & Dwight's anticompetitive combinations, conspiracies, agreements, programs, schemes, acts and practices alleged herein, in an amount according to proof at trial, plus costs, interest and reasonable attorneys' fees, under 15 U.S.C. § 15 and Section 16750 of the California Business and Professions Code;

D.  For an order that Church & Dwight make full restitution through a trust to be established by the Court for the protection of those members of the public who have been and continue to be injured by Church & Dwight's violation of Section 17200 of the California Business and Professions Code, pursuant to Sections 17203 and 17204 thereof;

E.  For an award of damages sustained by Mayer Labs as a result of Church & Dwight's tortious interference with Mayer Labs' exclusive supply and distribution agreement and

relationship with Sagami;

    F.   For an award of threefold the damages sustained by Mayer Labs as a result of Church & Dwight's misleading and deceptive use of the term "microthin" on and in connection with its condom products, in an amount according to proof at trial, plus costs, interest and reasonable attorneys' fees, under 15 U.S.C. § 1117;

    G.   For a disgorgement of the profits earned by Church & Dwight as a result of its misleading and deceptive use of the term "microthin" on and in connection with its condom products, under 15 U.S.C. § 1117;

    H.   For an award of punitive and exemplary damages based Church & Dwight's willful and malicious conduct;

    I.   For costs of suit; and

    J.   For such other and further relief as the Court may deem just and proper.

Dated:  March 9, 2009

                                         CARTUSCIELLO & ASSOCIATES, P.C.
                                         104 Mountainside Road
                                       Mendham, NJ  07945
                                       (973) 543-8200/fax (973) 543-8201

                                       By: _____
                                          Neil S. Cartusciello
                                       *Attorneys for Defendant and Counterclaimant*
                                       *Mayer Laboratories, Inc.*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and in compliance with
Local Rule 38.1 of the Local Rules of the District of New Jersey, Defendant and
Counterclaimant Mayer Laboratories, Inc. hereby demands a trial by jury on all issues, claims,
causes of action and defenses so triable that are raised by the pleadings herein.

Dated:  March 9, 2009

CARTUSCIELLO & ASSOCIATES, P.C.
104 Mountainside Road
Mendham, NJ  07945
(973) 543-8204/fax (973) 543-8201

By: _____
Neil J. Cartusciello

*Attorneys for Defendant and Counterclaimant*
*Mayer Laboratories, Inc.*

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Rule 11.2 of the Local Rules of the District of New Jersey, counsel for

Defendant and Counterclaimant Mayer Laboratories, Inc. hereby certifies that the matter in

controversy herein is not the subject of any other action pending in any court, or of any pending

arbitration or administrative proceeding.

Dated:  March 9, 2009

CARTUSCIELLO & ASSOCIATES, P.C.
104 Mountainside Road
Mendham, NJ  07945
(973) 543-8204/fax (973) 543-8201

By: _____
      Neil S. Cartusciello

*Attorneys for Defendant and Counterclaimant
Mayer Laboratories, Inc.*

## CERTIFICATION OF SERVICE

The undersigned counsel for Defendant and Counterclaimant Mayer Laboratories, Inc.

hereby certifies that the within Answer and Counterclaims were served upon Plaintiff and

Defendant on the Counterclaims Church & Dwight Co., Inc. through operation of this Court's

electronic filing system.


Dated:  March 9, 2009


_____
Neil S. Cartusciello