**\*NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                :

CHURCH & DWIGHT,               :

                                :      Civil Action No. 08-5743 (FLW)

              Plaintiff,      :

                                  :           **OPINION**

        v.                      :

                                  :

MAYER LABORATORIES, INC.,   :

                                  :

             Defendant.     :
_____:

**WOLFSON, District Judge:**

On November 21, 2008, Plaintiff Church & Dwight ("Plaintiff" or "C&D") initiated a declaratory judgment action against Defendant Mayer Laboratories, Inc. ("Defendant" or "Mayer") after Plaintiff received a letter, along with a draft complaint, from Defendant claiming that Plaintiff has been engaging in monopolistic activities in the condom business.  In the present matter, Defendant, a relatively small distributor of condoms located in California, moves to dismiss this action pursuant to 28 U.S.C. § 2201, or in the alternative, to transfer the action to the Northern District of California.  Among its arguments, Defendant urges the Court to exercise its discretion and transfer this case because California is the venue where it would have brought its action but for Plaintiff's conduct of racing to the courthouse.  Having reviewed the record, the Court finds that equity weighs in favor of transferring this case to the Northern District of California.

**I.**        **BACKGROUND AND PROCEDURAL HISTORY**

For the purposes of this transfer motion, the Court will only recount relevant facts.  Located in Berkeley, California, Mayer is a small closely held corporation which markets, distributes and

sells latex male condoms.  Mayer Decl., ¶¶ 2, 4.  In particular, 60% of Mayer's business involves the Kimono brand, which is an ultra-thin latex condom.  Id., ¶ 4.  According to Mayer, Kimono condoms have a market share in the United States of less than ½ of 1%.  In California, however, they have a market share of about 5%; roughly 50% of all sales of Kimono condoms occurs in California.  Id. at ¶ 7.  Mayer touts that it pioneered the ultra-thin condoms in the United States by introducing "Kimono" and "Kimono MircoThin" made by Sagami Rubber Industries, a Japanese manufacturer. Id., ¶¶ 42-43.  Mayer asserts that it contracted with Sagami for the right to be its exclusive North America agent and distributor.  Id., ¶ 48.

C&D is a publicly traded company, headquartered in New Jersey.   It manufactures and distributes, inter alia, Trojan and other brand-name condoms.  Daniels Decl., ¶ 3-4.  According to Mayer, which is not disputed by C&D, C&D branded condoms account for over 75% of all retail condom sales in the United States.[1]  Mayer Decl., ¶ 12.

The majority of condoms are sold in drug stores, food and grocery stores, and mass merchandisers.  Mayer Decl., ¶ 16; Daniel Decl., ¶ 6.  Condoms are a unique product that rely on point of sale advertising because they have minimal television and print advertising.  Daniels Dec., ¶ 7.  In that respect, condoms are generally displayed on, and sold from, pegboards and shelves in one area of a store where consumers can quickly glance at them at once.  Daniel Decl, ¶ 6; Mayer Decl., ¶ 17.  Because of how condoms are displayed in retail stores, the competition for selling condoms is focused on acquiring space in retailers' display sections.  Mayer Dec. ¶¶ 17-18; Daniel

---

[1]    Also according to Mayer, the largest selling brand of condom in the United States is Trojan, which with other C&D condoms account for over 75% of all retail condom sales.  The next is Durex brand, marketed by SSL Americas, Inc., with approximately 15.3%, and the third is Lifestyle brand, marketed by Ansell Healthcare with approximately 7.7%.  In sum, condoms sold by these three companies account for over 98% of the condom market.  Mayer Decl., ¶¶ 12-15.

Decl., ¶¶ 6-7.

In the context of this type of competition, Mayer alleges that C&D engages in anti-competitive activities.  Specifically, Mayer alleges that C&D offers "Condom Planogram Agreements" to large chain retailers, and such agreements give the chain the opportunity to receive a substantial kickback or "rebate" on its purchases of C&D condoms; rebates are given if the retailer accepts and follows a planogram designed by C&D, or maintains its display space so that C&D's condoms fill a specified percentage of the available facings on its in-store display.  Mayer Decl., ¶¶26-29.  C&D's conduct, Mayer avers, has caused retail chains to devote increasing percentages of their condom display to C&D products,  Id., ¶¶ 31-32, and as a result, C&D's dominant market share has grown substantially over the years.[2]  In addition, Mayer asserts that in 2006, C&D began targeting the Japanese-made, ultra-thin condom market segment.  Initially C&D distributed "Trojan Ultrathin" condoms manufactured by Okamoto Industries.  However, Mayer proclaims that C&D was unable to produce high quality ultra-thin condoms, and as such, in November 2007, C&D tortiously induced Sagami to begin supplying it with condoms.  Id., ¶¶ 52-54.  In that connection, Mayer alleges that C&D's condom Planogram Agreements violated federal and state anti-trust laws, as well as statutory provisions against secret rebates.  Mayer also asserts that C&D's tortious inducement of Sagami to provide it ultra-thin condoms interfered with Mayer's contractual relationship with Sagami.

Based on these allegations, on October 30, 2008, Mayer's counsel, Mark Jansen, spoke by telephone with Susan Goldy, C&D's General Counsel, and advised her of Mayer's draft complaint

---

[2]    Mayer estimates that due to C&D's anti-competitive practices, Mayer's condom sales have declined from $1.95 million in 2005 to $1.50 million in 2008.  Mayer Decl., ¶ 5.

alleging various laws that C&D has violated.  Jansen Decl., ¶¶ 1-8.  Jansen informed Goldy that Mayer desired to resolve the claims amicably, and encouraged Goldy to investigate the allegations pled in Mayer's draft complaint.  Id.  At that time, Jansen stated that Mayer would provide C&D three weeks to adequately review the matter.  Jansen then sent Goldy a letter memorializing the conversation.  Along with that letter was a copy of Mayer's draft complaint, which was captioned for the Northern District of California.  See Mayer's Draft Compl.

Thereafter, on November 21, 2008, three weeks later, Goldy left Jansen a voice message stating that C&D had reviewed the claims in the draft complaint, but had found them to be without merit, and would proceed accordingly.  Jansen Decl., ¶ 11.  C&D reasons that because of the seriousness of the allegations and the extent of the business practices challenged by Mayer, C&D was eager to have a formal, final and prompt resolution of the issues raised.  In that regard, on November 21, 2008 – the same day Goldy left Jansen the message – C&D filed a declaratory action in this District seeking a judicial determination that C&D's conduct was legal under applicable federal and state laws.  Indeed, in that complaint, C&D acknowledges Jansen's letter and draft complaint, and seeks a declaratory judgment as to the conduct that Mayer had raised in its draft complaint.  See Original Complaint, ¶¶ 81-86.

On February 17, 2009, Mayer filed an Answer together with Counterclaims that tracked Jansen's draft, including claims for violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, California's Cartwright Act, and other California statutes, and tortious interference and unfair competition under common law.  Mayer amended its counterclaim on March 9, 2010, to add claims for violations of the Clayton Act as amended by the Robinson Patman Act, 15 U.S.C. § 13(a), (d), (e), the Lanham Act, 15 U.S.C. § 1125(a), and additional California statutory and common law claims.  On March

4

29, 2009, Mayer filed the instant transfer motion.

On May 8, 2009, C&D filed a motion to dismiss Mayer's Amended Counterclaims.  On September 2, 2009, C&D filed a motion for leave to file the First Amended Complaint wherein C&D asserted three affirmative claims against Mayer for knowingly using false, deceptive, and misleading advertisement with regard to the thinness of its condoms.  Mayer consented to the filing of the First Amended Complaint, which the Court accepted and filed on January 12, 2010.

On September 10, 2009, because the parties agreed to mediate this matter, the Magistrate Judge terminated all pending motions filed by the parties  – including the transfer motion, C&D's motions to dismiss and leave to amend.  On November 12, 2009, a mediation session was held for a full day at the law office of court appointed mediator Robert Bartkus, Esq.  In attendance were C&D's counsel and vice president of sexual health, along with Mayer's president, who traveled from California, and his New Jersey based counsel.  The parties did not reach a settlement.  As a result, the Magistrate Judge issued Orders deeming all the motions previously terminated as re-filed.

On February 4, 2010, with the consent of Mayer, C&D filed a Second Amended Complaint wherein C&D asserts four additional affirmative claims against Mayer: three affirmative claims based on Mayer's false statements with regard to the strength of its condoms, and one affirmative claim seeking cancellation of a trademark based on, inter alia, fraud upon the United States Patent and Trademark Office.[3]

---

[3]        The Court further notes that, on February 5, 2010, C&D submitted a surreply to chambers.  For some reason, this surreply was not filed on ECF or recorded on the docket.  Because the arguments in the surreply do not alter the Court's analysis, the Court will consider it.  Its arguments will be specifically referenced where appropriate.

## II.    Anticipatory Filing and the First-Filed Rule

Mayer argues that the instant action should be dismissed as an anticipatory filing. Declaratory judgment actions, Mayer contends, are matters that may be heard in the Court's discretion.  Because, in Mayer's view, C&D mislead Mayer as to its intentions and then raced to the courthouse to bring this action in its favored forum, the Court should dismiss or "abstain" from hearing C&D's complaint.  Mayer relies on "first-filed rule" case law in support of its argument. The central case it cites is <u>EEOC v. Penn</u>, 850 F.2d 969 (3d Cir. 1988).

"The first-filed rule gives a court the power to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." <u>EEOC v. Penn</u>, 850 F.2d at 971 (internal quotation marks omitted) (citation omitted).  It is an equitable doctrine rooted in the principle of comity.  <u>Id.</u> at 977.  "[T]he rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments."  <u>Id.</u>

Courts have declined to enforce the first-filed rule where the first-filing plaintiff filed in bad faith, engaged in forum shopping, and/or "instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum."  <u>Id.</u> at 976; <u>id.</u> at 978 ("Because the first-filed rule is based on principles of comity and equity, it should not apply when at least one of the filing party's motives is to circumvent local law ....").  Overall, the rule rests on the court's discretion.  It is to be applied "with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result."  <u>Id.</u> at 977 (quoting <u>Langnes v. Green</u>, 282 U.S. 531, 541 (1931)).

While <u>EEOC v. Penn</u> and other cases cited by Mayer underscore the serious manner in which

courts of this circuit treat anticipatory filings, in my view, they do not suggest that the Court should abstain from hearing C&D's claims.  In its purest form, the first-filed doctrine applies where there are two co-pending district court actions.  Mayer has pointed to no cases in this circuit where a court has applied the first-filed rule where, as here, there is no second pending action.[4]  In my view, and as suggested by the Third Circuit in EEOC v. Penn, a motion to transfer venue to the natural plaintiff's preferred forum is the better method for dealing with declaratory judgment actions filed in anticipation of suit.  850 F.2d 976 n.4 ("We are puzzled by the [natural plaintiff's] failure to move to transfer ....").

Accordingly, I decline to "abstain" from adjudicating C&D's action under the first-filed rule. I consider, instead, Mayer's alternative argument that the action should be transferred to the Northern District of California.  Accord Blechman v. Ideal Health, Inc., 668 F.Supp.2d 399, 404 (E.D.N.Y 2009) ("Courts weigh the same factors in balancing the competing interests for the purposes of assessing the applicability of the first-filed rule and deciding a motion to transfer venue; thus, a single analysis will resolve both issues."); Keating Fibre Intern., Inc. v. Weyerhaeuser Co., Inc., 416 F.Supp.2d 1048, 1053-54 (E.D.Pa. 2006) ("The purpose of the 'first-to-file' rule is to 'encourage[ ] sound judicial administration and promote[ ] comity among federal courts of equal rank.' Transfer will accomplish this.") (internal citation omitted).  The import of C&D's anticipatory filing will be addressed in connection with the motion to transfer.

---

[4]     Indeed, in Crown Cork & Seal Co. v. USW, No. 03-CV-1381, 2004 U.S. Dist. LEXIS 760 (W.D. Pa. 2004), a case cited by Mayer, that court acknowledged that courts abstain from hearing declaratory judgment actions where there is a pending state or federal court action.  Id. at *8.

### III.     Motion to Transfer Venue

#### A.     Standard of Review

When venue is proper in a particular district, a motion by a party seeking to transfer is governed by 28 U.S.C. § 1404(a).  Section 1404(a) vests a district court with discretion "to adjudicate motions to transfer according to an individualized, case by case consideration of convenience and fairness."  Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 23 (1998) (quoting Van Dusen v. Barrack, 376 U.S. 612, 616 (1964)).  Specifically, section 1404(a) provides: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district ... where it might have been brought."  28 U.S.C. § 1404(a).

The purpose of section 1404(a) is to protect litigants, witnesses and the public against unnecessary inconvenience and expense.  Van Dusen, 376 U.S. at 616.  When deciding a motion to transfer venue, "courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of [the] parties, convenience of witnesses, or interests of justice)."  Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).  Instead, courts have considered "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."  Id.; see also Clark v. Burger King Corp., 255 F. Supp. 2d 334, 337 (D.N.J. 2003).  Consequently, the "analysis is flexible and must be made on the unique facts of each case."  Calkins v. Dollarland, Inc., 117 F. Supp. 2d 421, 428 (D.N.J. 2000) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249-50 (1981)).  Finally, the burden of establishing the need for transfer rests on the moving party.  Jumara, 55 F.3d at 879.

The first step in a court's analysis of a motion to transfer is to determine whether venue would be proper in the proposed transferee district.  Clark, 225 F. Supp. 2d at 337.  If so, the court must

next establish whether the transfer is in the interest of justice.  Id.  To make that determination, the court "must consider both the private and public interests effected by the transfer."  Id; see also Gulf Oil v. Gilbert, 330 U.S. 501, 508-09 (1946) (evaluating private and public interest factors effected by transfer).  The private interests include: the plaintiff's forum preference; the defendant's forum preference; "whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)."  Jumara, 55 F. 3d at 879 (internal citations omitted).  Public factors to be considered include:  "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases."  Id. at 879-80 (internal citations omitted).

### B.   Delay in Filing Motion to Transfer

As an initial matter, C&D argues that Mayer unduly delayed filing its motion to transfer venue for over four months.  In C&D's view, Mayer's delay has caused this Court to unnecessarily expend judicial resources.  Citing Staats v. Robinson Helicopter Co., Civil No. 88-3601, 1989 U.S. Dist. LEXIS 1781 (D.N.J. Feb. 22, 1989), and Dibsie v. Gulf Stream Coach, Inc., No. 07-5798, 2008 U.S. Dist. LEXIS 41652 (D.N.J. May 28, 2008), C&D contends that the Court should deny Mayer's motion on account of the delay.  Mayer argues, in response, that its delay was justified—it encountered difficulty in securing New Jersey counsel until after the time to answer nearly expired,

so it opted to file an answer, amend that answer, and file its counterclaims "while it could do so as of right."  Def. Reply at 5.  Furthermore, Mayer argues, the cases upon which C&D relies are distinguishable.

The Court finds C&D's citation to Staats unhelpful to its position.  In Staats, the district court *rejected* the plaintiff's argument that the defendant was estopped from bringing its motion to transfer:

> A motion to transfer should generally be brought early in the course of litigation. The court notes, however, that this [m]otion was brought almost four months before the date of the pretrial conference and that no trial date has been set. While defendants have indeed waited some time to assert their venue arguments, the court also notes that the five-month period has afforded plaintiffs ample time within which to gather evidence to argue against a transfer. The court cannot say that defendant's post-answer behavior has estopped it from moving under § 1404(a).

Id. at *10-11.  The court went on to cite a series of cases holding that a court may grant a motion to transfer at any time in the course of litigation:

> See Hoffman v. Blaski, 363 U.S. 335, 343 (1960) (holding that the court's power to transfer venue does not depend upon the "wish or waiver of the defendant"); Martin-Trigona v. Meister, 668 F. Supp. 1, 3 (D.D.C. 1987) (stating that "there is no time limit on when a section 1404) (a) motion can be made"); and see Snam Progetti S.p.A. v. Lauro Lines, 387 F. Supp. 322, 323 (S.D.N.Y. 1974) (holding that a motion to transfer under forum non conveniens "may be addressed to the discretion of the court at any time").

Id. at 11.  Thereafter, the court granted the defendant's motion to transfer.  Needless to say, Staats does not provide support for C&D's position here, but rather supports Mayer's position.

Dibsie, on the other hand, denied a defendant's motion to transfer.  C&D is correct that the Dibsie court mentioned the defendant's four-month delay in bringing the motion, and noted that the

defendant's "request[] would be more consistent with interests of judicial economy had it filed its motion before these judicial and litigation resources were expended." 2008 U.S. Dist. LEXIS 41652 at * 27, n.6.  However, the court did not rest its ruling on that ground.  Rather, the court held that "the vast majority of the public interests set forth in <u>Jumara</u> indicate that the case should not be transferred," <u>id.</u> at 26-7, and further, that the court to which the defendant sought to transfer did not have personal jurisdiction over another defendant in the suit.  <u>Id.</u> at 25.

In my view, Mayer's delay in filing its motion to transfer is a consideration that may weigh in the balance of equities in favor or against transfer.  It is not a dispositive consideration, but does relate to the <u>Jumara</u> public factor of "practical considerations that could make the trial easy, expeditious, or inexpensive." 55 F. 3d at 879.  As suggested in <u>Dibsie</u>, an earlier motion would have ensured that less resources were expended in New Jersey.  Yet, Mayer's difficulty in procuring New Jersey counsel and its good faith effort in engaging in mediation—a program that this Court strongly supports—militate against attributing great weight to its delay in moving to transfer venue.  Thus, I conclude that Mayer's delay does not weigh against transfer in this case.

### C.    Propriety of Venue in Transferee District

First, the Court must consider whether this action could have been brought in the Northern District of California.  Under 28 U.S.C. § 1391(b), when an action in federal court is not based solely on diversity, venue is proper only in the following circumstances:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

> (3) a judicial district in which any defendant may be found, if there is
> no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).  For venue purposes, "a defendant that is a corporation shall be deemed to

reside in any judicial district in which it is subject to personal jurisdiction at the time the action is

commenced."  Id. at § 1391(c).  Thus, venue is proper in the Northern District of California under

28 U.S.C. § 1391(b)(1) because Mayer, the only Defendant, is undoubtedly subject to personal

jurisdiction within that district.  Moreover, the Court notes that the parties do not dispute that venue

would be proper in California.

### D.    __Jumara__ Private and Public Factors

At the outset, the Court addresses Mayer's argument that the burden typically placed upon

the defendant, to demonstrate that transfer would be more convenient, should be shifted to C&D

because of the anticipatory nature of C&D's filing.  In Mayer's view, "any ruling that allows [C&D]

to benefit from its unseemly race to the courthouse would simply deter litigants in the future from

seeking to resolve disputes befofre filing court actions."  Def. Open. Br. at 30.  While I appreciate

the sentiment of Mayer's argument, Mayer has not cited to any case law in support of its position.

Furthermore, in my view, the anticipatory nature of C&D's filing is more properly taken into account

in the weight accorded its forum preference in the Jumara analysis.  Thus, I will not shift the burden

from Mayer to C&D for purposes of this motion.

With respect to the private Jumara factors, the parties center their arguments on the following

factors: plaintiff's forum preference, defendant's forum preference, where the claim arose, relative

financial impact of the litigation, convenience and unavailability of witnesses, and location of books

and records.  With respect to the public factors, the parties argue about practical considerations

affecting trial, local interest, and judge familiarity.  The Court addresses each factor in turn.

### 1.    Private Factors

*Plaintiff's Forum Preference*

"[C]ourts normally defer to a plaintiff's choice of forum ...." <u>Jumara</u>, 55 F.3d at 880.  Mayer argues that this deference should not be afforded when the plaintiff's filing was anticipatory, citing a host of persuasive authority in support of its position, including district court opinions within the Third Circuit and other circuit court opinions.  <u>See</u>, <u>e.g.</u>, <u>AmSouth Bank v. Dale</u>, 386 F.3d 763 (6th Cir. 2004); <u>Crown Cork & Seal Co. v. USW</u>, No. 03-CV-1381, 2004 U.S. Dist. LEXIS 760 (W.D. Pa. 2004).  The common theme in these cases is that "[c]ourts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum." <u>Dale</u>, 386 F.3d at 788.  Mayer has not pointed to any Third Circuit authority on this point, and my research has not revealed any other than those addressing anticipatory filings in connection with the first-filed rule.  <u>See</u> <u>EEOC v. Penn</u>, <u>supra</u>.  As indicated above, C&D's anticipatory filing does not suffice as a basis for "abstaining" from hearing C&D's claims.  That the Third Circuit has embraced the anticipatory filing doctrine in connection with the first-filed rule, however, suggests that it would likewise embrace the notion that little or no weight should be accorded to the forum preference of a plaintiff that files an anticipatory suit.  Therefore, the Court concludes that it may consider whether C&D's filing was anticipatory in connection with the plaintiff's forum-preference <u>Jumara</u> factor.

Here, though the parties argue about C&D's motives in connection with the filing of its complaint, it is undisputed that C&D filed its declaratory judgment suit shortly after receiving Mayer's draft complaint.  When Mayer's counsel, Jansen, sent C&D's counsel, Goldy, a copy of

Mayer's Northern District of California draft complaint, he stated that Mayer would provide C&D three weeks to adequately review the matter.  Three weeks later, Goldy left Jansen a voice message stating that C&D found Mayer's claims to be without merit.  That same day, C&D filed a declaratory action in this Court seeking a declaratory judgment as to the conduct that Mayer had raised in its draft complaint.

Based on these undisputed facts, I find that C&D filed its action "in anticipation of [Mayer's] imminent suit in another, less favorable, forum."[5]  <u>Id.</u> at 976. <u>See</u> <u>also</u> <u>Keating Fibre Intern., Inc. v. Weyerhaeuser</u>, 416 F.Supp.2d 1048, 1052 (E.D.Pa. 2006) ("Courts in this circuit have found evidence of bad faith when the parties are involved in settlement negotiations, one party lays out a deadline by which they will initiate litigation should settlement not be reached, and just prior to that deadline, the other party preemptively files a declaratory judgment action."). <u>Cf.</u> <u>Automotive Service Ass'n of New Jersey, Inc. v. Rockland Exposition, Inc.</u>, Civ. Action No. 08-3186, 2008 WL 5244282, *5 (D.N.J. Dec. 12, 2008) (finding anticipatory filing where plaintiff filed its complaint "one day after informing defendants that it needed more time to respond to defendants' planned litigation").

The Court acknowledges C&D's assertion in its brief that it filed suit "[b]ecause of the seriousness of the allegations" and its eagerness "to have formal, final, and prompt resolution of the issues raised." Pl. Opp. Br. at 7.  But, C&D does not point to a certification, affidavit, or declaration to support this assertion, and as such, the blanket assertion will not be considered by the Court.  Furthermore, even if the Court were to consider C&D's assertion, that C&D sought prompt

---

[5]     The Court concludes that the Northern District of California is a "less favorable forum" for C&D because C&D argues in connection with its opposition to the motion to transfer that the Northern District of California is an inconvenient forum.

resolution does not undermine this Court's finding that C&D filed in anticipation of Mayer's threatened litigation.  In addition, C&D argues in its brief that Jansen stated, in a call that occurred *after the instant suit was filed*, that Mayer sent over the draft complaint solely to encourage settlement and never intended to file suit.[6]  Id.  Again, this assertion is not supported by a certification, affidavit, or declaration.  Even if it were properly before this Court, it sheds no light on C&D's intention *at the time the suit was filed*.  Accordingly, I conclude that C&D's choice of the New Jersey forum should be afforded little or no weight in the Jumara balancing test.[7]

*Defendant's Forum Preference*

Conversely, Mayer's choice of forum, the Northern District of California, should be given greater weight than that typically granted defendants because Mayer's claims formed the basis for C&D's claims.

*Where the Claims Arose*

C&D's Complaint asserts two declaratory judgment claims—antitrust and interference with contractual relations.  The antitrust claim is based on Mayer's allegations that C&D's use of planograms violates the Sherman Act.  The contractual interference claim is based on Mayer's allegations that C&D interfered with Mayer's relationship with Sagami.  Similarly, Mayer's

---

[6]     Jansen's Declaration disputes making such a statement.  Jansen Decl. ¶¶ 2-4.

[7]     In its surreply, C&D further argues that its filing is not anticipatory because Jansen did not set a date certain in his letter attached to the draft complaint.  C&D points to Maximum Human Perf., Inc. v. Dymatize Enterp., Inc., Civil Action 09-235, 2009 U.S. Dist. LEXIS 76994 (D.N.J. Aug. 27, 2009), in support of its argument.  Maximum Human is clearly distinguishable, however, because the correspondence from the party threatening potential suit, in that case, provided no timeframe for the other party to respond.  Here, by contrast, Jansen's letter explicitly set a three-week deadline.  Indeed, that C&D filed its suit on that deadline strongly suggests that it considered the three-week deadline a date certain.

counterclaims all sound in antitrust and contractual interference.  For example, one of Mayer's counterclaims is under the Cartwright Act, which is "California's antitrust statute."[8]  Thus, I simultaneously consider where C&D's declaratory judgment claims and Mayer's counterclaims arose.  Plaintiff's additional affirmative claims, however, essentially allege actions by Mayer that violate federal laws, such as the Lanham Act.  Those claims will be separately discussed.

In connection with the antitrust-related claims, Mayer argues that the claims arose in California because it felt the effects of C&D's allegedly anticompetitive conduct there.  Specifically, Mayer contends that 50% of its condom sales are in California and, while it has only 1% of the national market for condoms, it possesses 5% of the California market.  Mayer Decl., ¶ 78.  Further, Mayer asserts, it

> has suffered direct and dramatic harm from a Condom Planogram Agreement between [C&D] and Longs Drugs, a California drug store chain .... Longs previously sold Kimono condoms, which constituted a substantial portion of Longs' condom sales (as much as six percent). Beginning in 2006, Longs began removing better selling Mayer products from its pegboard displays to make room for Church & Dwight's condoms.

Id. at ¶¶ 79-80.  C&D argues, in contrast, that the antitrust-related claims arose in New Jersey because its decision to use planograms was made in New Jersey, and the agreements between it and the drug store distributors are approved by C&D at its headquarters in the state.  Mayer responds to

---

[8]      The Cartwright Act is California's antitrust statute.  Cases decided under the Sherman Act are applicable to interpreting the Cartwright Act.  Indeed, the analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act. Therefore, the analysis and conclusions would be the same under the Cartwright Act, as under the federal claims.

Stanislaus Food Products Co. v. USS-POSCO Industries, No. CV F 09-0560, 2010 WL 3521979, *29 (E.D.Cal.Sept. 3, 2010) (internal citations omitted).

this latter fact by contending that the planogram agreements are negotiated at the drug store chains in California.

There is, generally, a dearth of case law on the question of where an antitrust claim arises for purposes of a <u>Jumara</u> analysis, and the Third Circuit has yet to speak on this issue.[9]  Thus, I turn to persuasive case law for guidance.  In that connection, I find the decision in <u>Daniel v. Amer. Bd. of Emerg. Med.</u>, 428 F.3d 408 (2d Cir. 2005), instructive.[10]

<u>Daniel</u> involved an antitrust claim brought by several plaintiff medical doctors against the American Board of Emergency Medicine ("ABEM") and the doctors' respective hospital-employers. The plaintiffs challenged ABEM's decision to ban plaintiffs from taking a certification exam, and the defendant-hospitals' decisions to predicate pay increases on the certification.  <u>Id.</u> at 434.  The <u>Daniel</u> Court reasoned that the claims did not arise in New York because ABEM's decision to ban plaintiffs occurred out-of-state, and because none of the defendant-hospitals were located in the state. <u>Id.</u>; <u>id.</u> at 417, n.5 (indicating that no hospitals are located in New York).  The only connection to New York was that the plaintiffs received letters there indicating that they were precluded from taking the certification exam.  <u>Id.</u>  In this regard, the <u>Daniel</u> Court focused on where the

---

[9]      The only somewhat relevant authority this Court's research revealed is <u>In re Automotive Refinishing Paint</u>, <u>supra</u>, which addresses personal jurisdiction and venue in an antitrust action.  That case, however, addressed those issues in connection with a foreign defendant and at least one court interpreting it has declined to apply its analysis to domestic defendants.  <u>See</u> <u>e.g.</u>, <u>Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.</u>, 516 F.Supp.2d 324, 337-38 (D.Del. 2007).

[10]      While <u>Daniels</u> addresses where an antitrust claim arises for venue purposes under 28 U.S.C. § 1391(b)(2), the inquiries under that statute and <u>Jumara's</u> "where the claim arose" factor are analogous.  They both ask: "(1) What acts or omissions by defendant gave rise to plaintiff's claim? and (2) Of those acts, did a 'substantial part' of them take place in the chosen venue?"  <u>Daniels</u>, 428 F.3d at 432 (quoting <u>Jenkins Brick Co. v. Bremer</u>, 321 F.3d 1366, 1372 (11th Cir. 2003)) (internal brackets and quotation marks omitted).

anticompetitive conduct took place, not where its effect was felt.

Here, that C&D's planogram program was created and developed in New Jersey suggests that the antitrust claim arose in New Jersey. However, that the planogram agreements here were negotiated at drug store chains in California suggests that the whole of the alleged anticompetitve conduct did not take place in New Jersey. It took place in both states. Thus, while Mayer's argument that the *effects* of C&D conduct occurred in California misses the mark, it is nonetheless correct that aspects of the anticompetitive conduct took place there. In my view, because C&D's program is created in New Jersey, but its negotiates planogram agreements in California with the California drug store chains, I conclude for the purposes of the <u>Jumara</u> analysis in this case that the antitrust claim arose in both New Jersey and California. Hence, where the antitrust claims arose neither weighs in favor of New Jersey nor California.

In connection with C&D's contractual interference claim, Mayer argues that the claim arose in California because Mayer negotiated its exclusive supply agreement with Sagami in Oakland, California and Japan. Mayer Decl., ¶ 48. C&D argues, to the contrary, that the claim arose in New Jersey, citing to a meeting between the three parties in Princeton. At that meeting, C&D alleges, "the parties discussed a possible relationship between Mayer and Church & Dwight to co-brand a condom, to be called Trojan Kimono." Compl. at ¶ 67. And, "[d]uring the course of the December 2007 dinner, David Mayer, President of Mayer, claimed that Mayer had an exclusive contract with Sagami for the provision of thin latex condoms." <u>Id.</u> at 69. At some point during 2007, C&D alleges that it began purchasing thin latex condoms from Sagami via purchase orders, and that its relationship with Sagami has not interfered with any Mayer-Sagami contractual relationship. <u>Id.</u> at 70.

For contractual interference claims, courts focus where the interference took place. See Tischio v. Bontex, Inc., 16 F.Supp.2d 511, 516 (D.N.J. 1998); Empire Gas Corp. v. True Value Gas of Florida, Inc., 702 F.Supp. 783, 786 (W.D.Mo. 1989). Here, the alleged interference occurred in New Jersey because that is where C&D decided to engage in a business relationship with Sagami, and it is from that location that it sent purchase orders to Sagami. Accordingly, for Jumara purposes, I conclude that this claim arose in New Jersey.[11]

Furthermore, C&D's allegations, made in connection with its affirmative claims for Lanham Act violations, *inter alia*, all point to conduct that took place in California where Mayer made its business decisions. For this reason, I conclude that C&D's affirmative claims arose in California. In short, the antitrust-related declaratory judgment and counterclaims occurred in both jurisdictions, but the tortious interference claims arose in New Jersey. On balance, then, this factor is neutral.

*Relative Financial Impact of the Litigation*

Mayer asserts that its total net sales for the past year are $2.5 million, which number includes a $71,000 loss, whereas C&D has $2.86 billion in sales during the past year with a 29% yearly increase from 2007. C&D does not dispute this estimate of its sales. Rather, despite the disparity in their relative financial position, C&D argues that it would incur significant hardship in litigating this case in California because it would be required to produce a large number of employee-witnesses in the distant forum. In addition, both parties argue that they would incur substantial cost in retaining local counsel and transporting expert witnesses to the remote forum. Thus, while both parties would incur financial burden by litigating in a forum outside its home state, on balance, this

---

[11]    Mayer disputes these allegations, asserting that no such meeting ever took place. In either case, the existence or non-existence of the meeting does not alter my analysis because all the remaining claims arose in California.

factor tips slightly in favor of Mayer in light of its smaller size and fewer resources.

*Convenience and Unavailability of Witnesses*

The convenience of witnesses factor is designed to take into account non-party witnesses who may be unavailable in the alternate fora. Santi v. National Business Records Management, LLC, -- F.Supp.2d ----, 2010 WL 2710557, *4 (D.N.J. Jul. 7, 2010).   Thus, the Court does not consider the parties' arguments with respect to its employees, nor availability of its counsel or expert witnesses, in connection with this factor.   Those arguments were considered supra in connection with the relative financial positions of the parties.

Mayer contends that it may need to call several non-party witnesses who reside in California, including employees of Longs Drugs and Safeway, both companies that participate in C&D's planogram program.[12]   Likewise, C&D states that it intends to call other drug store chain participants from locations "east of the Mississippi River."  Pl. Opp. Br. at 24 (citing Daniels Decl., ¶ 39). Because both parties intend to call third-party drug store chain witnesses located in various areas of the country, the potential unavailability of these witnesses is in equipoise.

In addition, Mayer claims that it may call witnesses from McKesson, Inc., a pharmaceutical distribution company located in San Francisco.  C&D challenges this assertion, arguing that there are several distribution companies that it may likewise call.  Again, any inconvenience to these witnesses does not tip the scale one way or the other for or against transfer.  Finally, C&D argues that one of its key non-party witnesses resides in France.  The Court finds that the inconvenience to

---

[12]     As to the Longs Drugs' employees, C&D points out that Longs' Drugs was bought out by CVS, "which is headquartered in Rhode Island."  That CVS' headquarters is located in Rhode Island does not undercut Mayer's contention that it intends to call employees who reside in California.

this witness does not materially differ between the two fora, in that he would be required to travel internationally in either case.  In short, this factor does not favor either forum.

*Location of Books and Records*

Both parties argue that their corporate records are housed in their respective headquarters.  Thus, whether the suit remains here or is transferred to the Northern District of California, one party will be required to transfer its books and records to the forum.[13]  Further, in my view, the transport of documents is not unduly burdensome in this electronic age.  Thus, I find this factor in equipoise.  Accord Mercedes-Benz USA, LLC v. ATX Group, Inc., Civil No. 08-3529, 2009 WL 2255727, *4 (D.N.J. Jul. 27, 2009) ("The location of the disputed records is . . . neutral since there is nothing to suggest that the records, which are admittedly in electronic form, cannot be easily transmitted ....").

In sum, the private Jumara factors slightly weigh in favor of transfer to the Northern District of California.

### 2.  Public Factors

*Practical Considerations Affecting Trial/ Court Congestion*

For this factor, the parties generally repeat the arguments made in connection with the relative financial burden arguments in connection with the private Jumara factors.  As those arguments have heretofore been addressed, I need not take them into account a second time.  The only unique argument C&D makes is that the Northern District of California has a heavier case

---

[13]     C&D argues in its surreply that most of Mayer's documents have already been produced in New Jersey, thereby rendering this factor less relevant to the Court's consideration. Because I view this factor as neutral, in any event, C&D's argument does not affect my analysis.

load.[14]   While this argument is better analyzed under the "court congestion" factor, the Court considers it here.

C&D points to Northern District of California statistics indicating that, in 2008, the Northern District of California had 634 pending actions per judge whereas the District of New Jersey had 418 pending actions per judge.  C&D, further, points to disparities in the use of Magistrate Judges that indicates the District of New Jersey is more capable of handling its large case load.  Mayer retorts that the median time to trial is less in the Northern District of California.  There, it is 30.0 months while it is 38.5 months in New Jersey.  The Court notes that both districts are among the most congested in the country, thus, this factor is neutral.

*Local Interest*

Mayer argues that California has a greater interest in deciding the antitrust claim because Mayer is California-based, and California has a strong public policy of "encouraging free and open competition."  Mayer Open. Br. at 38 (quoting Cellular Plus v. Superior Court, 14 Cal. App. 4th 1224, 1243 (1993)). The Court agrees that California has an interest in adjudicating antitrust claims raised by one of its corporate entities.  That several of Mayer's antitrust-related counterclaims are brought under California law buttresses this conclusion.

C&D, in contrast, focuses on the interference with contractual relations claim, contending that New Jersey has an interest in adjudicating a dispute involving a New Jersey company's

---

[14]   C&D argues, in its surreply, that the matter should stay in New Jersey because discovery has progressed and because the suit has been mediated.  While the Court appreciates that the suit has progressed in this Court, the mediation was unsuccessful and the discovery that has been completed will be easily transferred to the Northern District of California.  To the extent that the Magistrate Judge here has become familiar with the case, that Judge's role primarily relates to the limited discovery the parties engaged in and/or any settlement discussion.  No decision on the merits has yet been made.  Thus, I conclude that the transfer will not waste judicial resources.

involvement in foreign commerce.  In addition, C&D points out, its purchase order with Sagami requires that any dispute and arbitration of any dispute be heard in New Jersey.  The Court disagrees with C&D's contention that the choice-of-law provision in the purchase orders is relevant.  The provision governs a claim between Sagami and C&D—not a claim relating to a third-party.  Even so, C&D is correct that New Jersey has an interest in adjudicating a contractual interference claim that affects foreign commerce with a company residing in its borders.  On balance, however, I find this factor favors transfer in light of the several antitrust claims affecting California, as compared to the one tortious interference claim affecting New Jersey.

*Judge Familiarity*

I find this factor in equipoise because federal judges are accustomed to applying the law of several states.  Mayer argues that the Northern District of California would be more familiar with California law, citing its counterclaims based on the Cartwright Act, inter alia.  As noted supra, law interpreting the Cartwright Act follows Sherman Act jurisprudence.  Mayer's other counterclaims alleging anticompetitive conduct would also be interpreted under California law.  With respect to C&D's interference with contractual relations claim, that claim is brought under New Jersey law. In the end, however, that federal judges are typically called upon to interpret the law of various states leads me to conclude that this factor is neutral.

Upon weighing both the public and private Jumara factors, I conclude that the scale tips moderately in favor of transferring this case to the Northern District of California.  Importantly, however, considering the timing of this action, the Court finds that Plaintiff's conduct of racing to the courthouse strongly suggests that it filed this case anticipating Defendant bringing a suit in California.  This fact, combined with the Court's analysis of the Jumara factors, support transferring

23

this matter.  See Cancer Genetics, Inc. v. Kreatech Biotechnology, B.V., No. 07-273, 2007 WL 4365328, at *7 (D.N.J. Dec. 11, 2007)("in addition to the [Jumara] factors . . . courts have general discretion, and can consider other factors to determine if a transfer is in the interest of justice." (citation omitted)).

## IV.    CONCLUSION

For the foregoing reasons, Mayer's motion to transfer venue to the Northern District of California is granted.

/s/    Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Dated: September 28, 2010