1
2
3
4
5        UNITED STATES DISTRICT COURT
6        NORTHERN DISTRICT OF CALIFORNIA
7

8   CHURCH & DWIGHT CO., INC.,                No. C-10-4429 EMC
9            Plaintiff,
                                             **ORDER GRANTING IN PART AND**
10       v.                                   **DENYING IN PART PLAINTIFF'S**
                                             **MOTION TO DISMISS DEFENDANT'S**
11  MAYER LABORATORIES, INC.,                 **SECOND AMENDED**
                                             **COUNTERCLAIMS**
12           Defendant.
    _____/      **(Docket No. 71)**
13
14
15            I.    **FACTUAL AND PROCEDURAL BACKGROUND**

16        Counterclaimant Mayer Laboratories, Inc. is a closely held corporation located in Berkeley,

17  California which markets, distributes and sells latex male condoms.  Second Amended Counterclaim

18  ("SAC") (Docket No. 68) ¶¶ 15, 19.  Mayer's business involves the marketing and sale of, *inter alia*,

19  its Kimono brand of ultra-thin latex condoms.  ¶ 15.  Mayer was allegedly "instrumental in

20  establishing the ultra-thin condom segment in the United States market," which now "comprises

21  approximately 22% of the overall retail market."  ¶¶ 22, 35.  According to Mayer, Kimono condoms

22  have a retail market share in the United States of less than 1%.  ¶ 19.  In California, however, they

23  have a market share of about 5%; roughly 50% of all sales of Kimono condoms occurs in California.

24  *Id.*  Mayer touts that it pioneered the ultra-thin condoms in the United States by introducing

25  "Kimono" and "Kimono MicroThin" made by Sagami Rubber Industries, a Japanese manufacturer.

26  ¶¶ 21, 147.  Mayer began using the term "MicroThin" for its Japanese-made, ultra-thin latex condom

27  products in 1992.  ¶¶ 144, 146.  In June 2009, Mayer registered the mark "MICROTHIN" for

28  condoms with the U.S. Patent and Trade Office, receiving registration number 3,641,977 (the "'977

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

registration").  ¶ 162.  Mayer also asserts that it contracted with Sagami for the right to be its exclusive North America agent and distributor.  ¶¶ 23, 121.

Counterdefendant Church & Dwight ("Church" or "C&D") is a publicly traded company, headquartered in New Jersey.  ¶ 16.  It manufactures and distributes, *inter alia*, Trojan and other brand-name condoms.  *Id.*  Mayer claims that C&D branded condoms account for over 75% of all retail condom sales in the United States, such that it holds a monopoly position in the nationwide condom market as well as in California.[1]  ¶¶ 2, 16.  The vast majority of condoms are sold in drug stores, grocery stores, and mass merchandisers.  ¶¶ 31-34.  Notably, Mayer claims there is an "extreme concentration of ownership of nationwide drug store chains: the three largest chains – Walgreens, Rite-Aid, and CVS – account for approximately 86% of all condom sales at drugstores.  ¶ 32.  Mayer also claims that there are considerable barriers to entry in the condom market, including costs of FDA and state regulatory approval and compliance, production minimums, and retailer program participation fees.  ¶ 36.

Most formidable among the barriers to entry is the "difficulty in acquiring display in major retailers' condom retailing sections."  Mayer claims this problem is exacerbated by the concentration of ownership of large chains, which decide what products to carry on a chain-wide basis.  ¶¶ 36, 39. According to both parties, condoms are a unique product that rely heavily on point of sale advertising because they have minimal television and print advertising.  ¶ 38.  In that respect, condoms are generally displayed on, and sold from, pegboards and shelves in one area of a store where consumers can quickly glance at them at once.  ¶ 37.  Because of how condoms are displayed in retail stores, the competition for selling condoms depends heavily on acquiring space in retailers' display sections.  ¶¶ 38, 148.  Display is of critical importance in marketing because of the private nature of the transaction and the speed by which buying decisions are made.  *See* ¶¶ 37-38, 148.

---

[1] According to Mayer, Trojan is the largest selling brand of condom in the United States. SAC ¶ 27.  C&D's condoms account for over 75% of all retail condom sales.  *Id.*  The next most popular brand is Durex, marketed by SSL Americas, Inc., with approximately 15.3% of sales, and the third is Lifestyle, marketed by Ansell Healthcare, with approximately 7.7%.  *Id.* ¶¶ 28-29. Together, condoms sold by these three companies account for over 98% of the nationwide market. *Id.* at 30.

**United States District Court**
For the Northern District of California

1    In this context, Mayer alleges that C&D engages in several distinct but related

2    anticompetitive activities that have the combined effect of "greatly diminishing and in some cases

3    eliminating competition in the relevant markets." ¶¶ 5-11; *see also* Mayer's Opp'n Br. (henceforth

4    "Opp'n") at 19-20 (describing five types of anticompetitive conduct alleged in the counterclaim).

5    First, Mayer alleges that C&D offers "Condom Planogram Agreements"[2] to large chain

6    retailers, which together account for nearly 100% of condom sales nationwide.[3]  ¶¶ 5-6, 52-53.  Such

7    agreements give the chain the opportunity to receive a substantial kickback or rebate on its

8    purchases of C&D condoms.  Rebates are given if the retailer accepts and follows a planogram

9    designed by C&D and guarantees that C&D's condoms occupy a specified minimum percentage of

10   the available facings on its in-store display.  *Id.*  C&D "inherited" this "Planogram Program" in

11   2001 by acquiring the Trojan brand.  ¶ 73.  At the time, the Program had three "tiers" – a 55% tier

12   (awarding a 4.0% rebate for 55% or more of a retail chain's display space), a 65% tier (awarding a

13   7% rebate for 65% or more of the display space), and a 70% tier (awarding a 7.5% rebate for 70% or

14   more of the display space).  ¶¶ 59-60.  In 2006, and again in 2008, C&D "ratcheted up" its

15   Planogram Program, introducing 75% and 80% tiers (providing 8.0% and 8.5% rebates,

16   respectively) and eliminating the 55% and 65% tiers.  ¶¶ 62-63.  According to Mayer, "not a single

17   major retail chain chose to forego the rebates."  *Id.*  Mayer avers that C&D's conduct has caused

18   retail chains to devote increasing percentages of their condom displays to C&D products (*id.* ¶ 7),

19   and as a result, C&D's dominant market share has grown substantially over the years, from

20   approximately 64% in 2001 to over 75% in 2010.  ¶ 65.  While C&D's market share grew, there was

21   a drop in the share of the Kimono brand from 0.5% in 2003 to 0.4% in 2008.  ¶¶ 81,86.  Mayer

22   alleges its share in the ultra-thin condom market segment has been reduced substantially.  ¶ 48.  As a

23   specific example of harm to competition, Mayer claims that in 2006 both Safeway Stores and Target

24   Stores reduced the number of condom brands they carry from three to two.  ¶ 83.  Mayer also

---

26   [2] A planogram is "essentially a diagram showing where specific products are to be positioned
27   in the space allotted by a retail store for a particular category of products."  SAC ¶ 6.

28   [3] Mayer also alleges that C&D does not offer Planogram Agreements to small independent
     retailers or small retail chains.  ¶ 66.

**United States District Court**

For the Northern District of California

1  complains that Longs Drug Stores ("Longs") removed Mayer's products from store displays "to

2  make room for [C&D's] condoms. . . . despite specific [] data showing that the discontinued Mayer

3  Labs condoms were better selling, and more profitable on a per unit basis, than many of the Trojan

4  brand condoms that were continued in the Longs planogram." ¶ 84. Thus, the reallocation of

5  display space to C&D was not based on the merits (*e.g.*, relative sales volume) but rather was the

6  consequence of C&D's program. Mayer also alleges that C&D has succeeded in raising prices for

7  its products. ¶ 85 (describing an average increase of 18% (or $1.57) in Safeway's prices for a box of

8  twelve Trojan condoms between 2006 and 2008, when C&D occupied 81.8% of Safeway's condom

9  display space).

10       Second, according to Mayer, C&D entrenched and strengthened its market dominance via its

11  role as a "category captain" for most large retail chains. ¶¶ 8-10, 41, 67. Retailers allegedly have

12  agreed to give C&D the "ability to decide and influence which brands of condoms are included in a

13  chain's stores, where individual condom [products] are placed in the store displays, which condom

14  [products] are discontinued, and which new condom [products] are added." ¶¶ 68-71. C&D

15  purportedly uses this position "to obtain preferential display locations for its products, to

16  recommend replacement of competing brands with [C&D] products, and to reduce visibility for (or

17  exclude altogether) competing brands, including Mayer Labs' products." ¶ 70.

18       Third, Mayer alleges that C&D has exclusive dealing arrangements with some retail chains,

19  including 7-Eleven, obligating them to sell only C&D condoms. ¶¶ 11, 57.

20       Fourth, Mayer asserts that in 2006, C&D began targeting the Japanese-made, ultra-thin

21  condom market segment. ¶ 151. Initially C&D distributed "Trojan Ultrathin" condoms. *Id.* Mayer

22  asserts C&D began using the term "ultra-thin" which had previously associated with Mayer's

23  products. C&D allegedly began using the term "microthin" for its Trojan brand Ultrathin condoms

24  in 2007, and for its Thintensity condoms in 2008. ¶¶ 123, 151-153. As a result, Mayer alleges that

25  its sales of Kimono Microthin condoms declined 33% (from $1,167,000 in 2006 to $1,120,000 in

26  2007 due to C&D's anticompetitive conduct. ¶ 154; *see also* ¶ 150 (stating that sales of Kimono

27  Microthin condoms rose from $860,000 in 2004 to approximately $1,480,000 in 2005). Mayer also

28

**United States District Court**
For the Northern District of California

1   claims that in 2007, C&D tortiously induced Sagami to begin supplying it with condoms in violation

2   of an exclusive contract Mayer had with Sagami.  *¶* 123.

3   On November 21, 2008, C&D filed a declaratory action in the District of New Jersey seeking

4   a judicial determination that C&D's conduct was legal under applicable federal and state laws.  In

5   that complaint, C&D seeks a declaratory judgment as to the conduct that Mayer alleged in a draft

6   complaint conveyed by Mayer's counsel to C&D in October 2008.  *See* Original Compl.  ¶¶ 81-86.

7   On February 17, 2009, Mayer filed an Answer together with Counterclaims.  Mayer amended its

8   counterclaims on March 9, 2009.  As it stands, the SAC includes claims for violations of the

9   Sherman Act, 15 U.S.C. §§ 1 and 2 (Claims I & II); California's prohibition against trusts (Claim

10  III), Cal Bus. & Prof. Code §§ 16700, *et. seq.*; California's prohibition against exclusive dealing

11  (Claim IV), Cal. Bus. & Prof. Code §§16727, *et. seq.*; California's prohibition against secret rebates

12  (Claim V), Cal. Bus. & Prof. Code § 17045, tortious interference with contractual relations (Claim

13  VI), tortious interference with prospective economic advantage (Claim VII), and unfair competition

14  under common law (Claims VIII & XII).  The SAC also asserts claims for infringement under

15  California common law (Claim XI) as well as the Lanham Act, 15 U.S.C. § 1114(a) (Claim X), and

16  a claim for false  designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Claim IX).

17  In terms of relief, the counterclaim requests (1) a declaratory judgment that C&D's Condom

18  Planogram Agreements are unenforceable, (2) a comprehensive permanent injunction, (3) punitive

19  and treble damages, (4) restitution and disgorgement of profits with interest, and (5) attorneys' fees

20  and costs.  SAC ¶¶ 102-106.

21  C&D filed a motion to dismiss the SAC.  (Docket No. 71).  The district court for the District

22  of New Jersey transferred the case, including C&D's pending motion to dismiss Mayer's

23  counterclaims, to this Court.  *See* Docket No. 76 (Order transferring case).  On February 2, 2011, the

24  Court held a hearing on C&D's motion to dismiss and invited the parties to provide supplemental

25  briefs, which were filed on February 9, 2011.[4]

26

27

28  _____

[4] After the supplemental briefs were filed, C&D filed a further supplemental letter brief
without leave of court.  Such a filing is out of order and stricken.

United States District Court

For the Northern District of California

## II.   PLEADING  STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"[5]  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  A motion to dismiss tests the sufficiency of a complaint or counterclaim, facilitating dismissal to the extent the pleading fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The pleading is construed in the light most favorable to the non-moving party and all material allegations in it are taken to be true.  *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir.1986).  However, even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly,* 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986) (internal brackets and quotation marks omitted)).  Hence, the Court need not assume unstated facts, nor will it draw unwarranted inferences.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

Under *Twombly,* a plaintiff (or counterclaimant) must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly,* 550 U.S. at 556).  "The plausibility standard is

---

[5] There is no requirement that the elements of an antitrust claim be pled with special specificity.  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.2d 1038 (9th Cir. 2008).  "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect."  *Id.*

United States District Court

For the Northern District of California

1   not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant

2   has acted unlawfully. . . .   When a complaint pleads facts that are merely consistent with a

3   defendant's liability, it stops short of the line between possibility and plausibility of entitlement to

4   relief." *Id.* (quoting *Twombly,* 550 U.S. at 556-57) (internal quotation marks omitted).  In sum, if the

5   facts alleged raise a reasonable inference of liability – stronger than a mere possibility – the claim

6   survives; if they do not, the claim should be dismissed.  *See Iqbal*, 129 S. Ct. at 1949-50.

### III.   FEDERAL ANTITRUST CLAIMS

8   A.      The Sherman Antitrust Act

9          Mayer's first two counterclaims (Claims I & II) allege violations of Sections 1 and 2 of the

10  Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 ("The Sherman Act" or "the Act").

11         1.      Sherman Act § 1

12         Section 1 of the Sherman Act prohibits, in broad terms, contracts or agreements that

13  unreasonably restrain trade or commerce.  It provides:  "Every contract, combination in the form of

14  trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

15  foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  *See Advanced Health-Care Servs.*

16  *v. Radford Community Hosp.*, 910 F.2d 139, 144 (4th Cir. 1990).  To state a claim under § 1, a party

17  must allege (1) an agreement, conspiracy, or combination between two or more entities,[6] (2) an

18  unreasonable restraint of trade, (3) anticompetitive effects within the relevant market, and (4) a

19  resulting antitrust injury suffered by the claimant.  *See generally Queen City Pizza v. Domino's*

20  *Pizza*, 124 F.3d 430, 442 (3d Cir. 1997).

21         Vertical restraints on trade, including those alleged by Mayer, are subject to analysis under

22  the "rule of reason."[7]  *See Continental T.V. v. GTE Sylvania*, 433 U.S. 36 (1977) (concerted action

---

24  [6] Sherman Act § 1 does not reach unilateral conduct.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984).  It covers only "concerted action" between "at least two separate persons or entities."  *United States v. Trenton Potteries Co*., 273 U.S. 392 (1927). Concerted action may take the form of "an 'understanding' or 'agreement' to take joint action." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984).

27  [7] It bears noting that Mayer alleges unlawful combinations or agreements only between C&D and its retailers.  *See* SAC ¶¶ 88-93.  Mayer does not allege that C&D has entered into an agreement with an input supplier, or with Sagami, in violation of Sherman Act § 1.  Nor does Mayer allege that C&D is vertically integrated such that it exerts control over the supply or price of inputs to the

**United States District Court**
For the Northern District of California

on non-price restrictions is subject to rule of reason analysis, requiring a showing of an adverse effect on competition in the relevant market); *Bus. Electr. Corp. v. Sharp Electr. Corp.*, 485 U.S. 717, 723-36 (1988) (holding that a vertical restraint of trade is not *per se* illegal under § 1 of the Sherman Act unless it includes some agreement on price or price levels). The key question in this analysis is whether the agreement is one that promotes or suppresses competition. *National Soc'y of Prof. Engineers v. United States*, 435 U.S. 679, 691 (1978). "The legality of an agreement . . . cannot be determined by so simple a test as whether it restrains competition. . . . The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. . . . the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Board of Trade v. United States*, 246 U.S. 231, 238 (1918). Whether a vertical restraint constitutes an "unreasonable restraint" on trade and suppresses competition within the relevant market often turns on whether the restraint forecloses competition in a substantial share of the line of commerce affected. *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 592 F.3d 991 (9th Cir. 2010) ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to foreclose competition in a substantial share of the line of commerce affected.") (internal quotation marks and citation omitted); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (explaining that an exclusive dealing arrangement violates § 1 only if its effect is to "foreclose competition in a substantial share of the line of commerce affected.").

The antitrust plaintiff "carr[ies] the initial burden of showing that the challenged conduct has an actual adverse effect on competition as a whole in the relevant market." *R.J. Reynolds Tobacco Co. v. Philip Morris*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002) (internal quotation marks and citation omitted). If the plaintiff succeeds, the burden shifts to the defendant "to establish the pro-competitive redeeming virtues of the action." *Id.* If the defendant sustains that burden, the claimant "can still prevail by showing that the same pro-competitive effect could be achieved

_____

detriment of its competitors.

United States District Court

For the Northern District of California

1  through an alternative means that is less restrictive of competition." *Id.* (quotation marks and

2  citation omitted).

3          There is no dispute that the counterclaim adequately alleges that C&D possesses market

4  power in the relevant market. *Id.* (explaining that firms lacking market power cannot rationally

5  adopt restraints that have anticompetitive effects if they wish to survive). Thus, Mayer must

6  establish that C&D's conduct has adversely affected competition. As noted above, in a vertical

7  restraint case such as this, claimants may establish a § 1 violation by demonstrating that the conduct

8  "substantially forecloses" competition in the relevant market. *See, e.g., Concord Boat Corp. v.*

9  *Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (applying substantial foreclosure test to

10  manufacturer's discount programs tied to volume purchases). Relevant to this case, substantial

11  foreclosure is a test commonly applied to claims challenging advertising programs alleged to restrain

12  trade. *See, e.g., Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d

13  804, 816 (E.D. Ky. 1999) (applying the substantial foreclosure analysis to retailer's agreement to

14  advertise only defendant's brands); *Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.*, 653 F. Supp.

15  1144, 1153-54 (S.D. Ohio 1986) (applying substantial foreclosure test to a supermarket's agreement

16  to run only defendant's advertisements).

17          Under this test, "the competition foreclosed by the contract must be found to constitute a

18  substantial share of the relevant market." *Tampa Elec.*, 365 U.S. at 328. "Thus, the [claimant]

19  'must show that competing manufacturers are excluded from a substantial share of the relevant

20  market because that portion of the market is controlled by' the vertical restraint at issue." *R.J.*

21  *Reynold's*, 199 F. Supp.2d at 389 (quoting *Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*,

22  810 F.2d 1289, 1293 (4th Cir. 1987). "The share of the market foreclosed is important because, for

23  the contract to have an adverse effect upon competition, 'the opportunities for other traders to enter

24  into or remain in that market must be significantly limited.'" *United States v. Microsoft Corp.*, 253

25  F.3d 34, 69 (D.C. Cir. 2001) (quoting *Tampa Elec.*, 365 U.S. at 328). There is no hard-and-fast rule

26  for determining the point at which market foreclosure becomes "substantial." *See United States v.*

27  *Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("[A] monopolist's use of exclusive contracts, in

28  certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than

United States District Court
For the Northern District of California

1   the roughly 40% or 50% share usually required in order to establish a § 1 violation."); *compare, e.g.,*

2   *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1301, 1304 (9th Cir.

3   1982) (24% foreclosure unlawful where contracts were long-term), *with Sewell Plastics, Inc. v.*

4   *Coca-Cola Co.*, 720 F. Supp. 1196, 1213, 1218-20 (W.D.N.C. 1989) (40% foreclosure lawful where

5   no anticompetitive harm shown).  "Substantial foreclosure depends on many factors – the parties'

6   market strength, the degree of exclusivity, business justifications for the agreement, duration of the

7   agreement, barriers to entry in the market, etc." *Novell, Inc. v. Microsoft Corp. (In re Microsoft*

8   *Corp. Antitrust Litig.)*, 699 F. Supp. 2d 730, 755 (D. Md. 2010) (citing *Tampa Elec.*, 365 U.S. at

9   328-29, 334-35); *see also R.J. Reynolds*, 199 F. Supp. 2d at 389 (noting that, in addition to

10  foreclosure percentage, courts "consider factors such as the duration of the agreement, barriers to

11  entry, the ability of consumers to comparison shop, and their propensity to switch products"); *United*

12  *States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("The test is not total foreclosure, but

13  whether the challenged practices bar a substantial number of rivals or severely restrict the market's

14  ambit.").

15       2.    <u>Sherman Act § 2</u>

16       Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize,

17  or combine or conspire with any other person or persons, to monopolize any part of the trade or

18  commerce among the several states, or with foreign nations."  15 U.S.C. § 2.  In its Third

19  Counterclaim, Mayer alleges three theories of liability under § 2:  monopolization, attempted

20  monopolization, and conspiracy to monopolize.  To prevail on its § 2 monopolization claim, Mayer

21  must prove:  (1) C&D's possession of monopoly power in the relevant market, (2) C&D's willful

22  acquisition or maintenance of that power (as opposed to success resulting from "a superior product,

23  business acumen, or historic accident"), and (3) a resulting antitrust injury.  *See Linkline*, 129 S. Ct.

24  at 1118 (citation omitted).

25       To prove an unlawful monopolization conspiracy under § 2, Mayer must show:  (1) the

26  existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the

27  conspiracy; (3) a specific intent to monopolize; and (4) causal antitrust injury.  *Paladin Assocs. v.*

28  *Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  A private party seeking damages under

**United States District Court**
For the Northern District of California

an attempted monopolization theory must demonstrate "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)*; Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (noting that a private party seeking damages for antitrust violations "must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior").

Each claim is similar, "differing primarily in the requisite intent and the necessary level of monopoly power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (on remand). The key question under § 2 in the context of C&D's motion to dismiss is whether Mayer has adequately alleged exclusionary conduct or anticompetitive acts. *See R.J. Reynolds*, 199 F. Supp. 2d at 394-395.

In the case at bar, Mayer alleges the same anticompetitive conduct (described above) as a basis for each of its Sherman Act claims. Such an overlap between § 1 and § 2 claims is not unusual. *See Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 448 (9th Cir. 1993) ("[A] § 1 claim insufficient to withstand summary judgment cannot be used as the sole basis for a § 2 claim."); *see also United States v. Socony-Vacuum Oil Co.*, 210 U.S. 150, 224 n.59 ("The two sections overlap in the sense that a monopoly under § 2 is a species of restraint under § 1.").

3.  <u>Antitrust Injury</u>

To assert a claim under the federal antitrust laws, including both § 1 and § 2 of the Sherman Act, a plaintiff must have suffered an "antitrust injury," meaning an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). *See In re Lorzepam and Clorazepate Antitrust Litig.*, 295 F. Supp. 2d at 38 (a plaintiff must show a "direct relationship between the claimed injury and the alleged anticompetitive conduct. . . . The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."). Here, Mayer must allege an injury to the market or to competition in general, not merely to itself. *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489

11

United States District Court

For the Northern District of California

(1977) ("The antitrust laws were enacted for the protection of *competition*, not *competitors*.")).

However, "convergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and discrete and the market participants are few." *Les Schockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508-09 (9th Cir. 1989). Injury can be shown by anticompetitive acts resulting in reduced output or raised prices. *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002) (internal quotation marks and citation omitted). The key question is whether Mayer suffered losses as a result of the defendant's anticompetitive acts, as opposed to other market forces. *See Safeway Inc. v. Abbott Labs.*, 2011 U.S. Dist. LEXIS 4985, (N.D. Cal. Jan. 14, 2011) ("To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior.") (citation omitted).

B.   Price-Based v. Non-Price Based Claims Under the Sherman Act

In its motion to dismiss, C&D's primary argument is that Mayer's Sherman Act claims fail because Mayer did not allege that C&D priced its products below its costs. Mot. at 11-12. C&D asserts that Mayer has not alleged any cognizable antitrust injury or anticompetitive conduct and has therefore failed to state a claim under the Sherman Act.[8] Mot. at 13. Relying on *Pacific Bell Telephone Co. v. Linkline Commc'ns., Inc.*, 129 S. Ct. 1109 (2009) and *Doe v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009), C&D argues that "when an essential part of an antitrust claim involves cutting prices (whether a rebate, discount, or straight price cut) . . . the price cut does not harm competition[9] (regardless of the effect on the competitor) unless the plaintiff can demonstrate

---

[8] C&D clarified that its argument applies to negate anticompetitive injury as well as the unreasonable restraint of trade and anticompetitive conduct.

[9] C&D couches *Linkline* as a ruling on the antitrust injury element of a federal antitrust claim, such that it is applicable to both sections of the Sherman Act *sub judice*. Mot. at 12. ("The Ninth Circuit confirmed this interpretation of *Linkline* when it relied entirely on *Linkline* to hold that below-cost pricing is the first prong of the test for a Section 2 'price-based claim'" in *Doe v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009)). In fact, neither *Linkline* nor *Abbott Labs* discusses the requirement in terms of an antitrust injury. *See Abbott Labs*, 571 F.3d 930, 935 (9th Cir. 2009) (reading *Linkline's* below-cost pricing requirement into the exclusionary conduct element of a § 2 price-based claim and declining to reach the issue of antitrust injury). However, *Brooke Group v. Brown & Williamson Tobacco Corp.*, upon which *Linkline's* predatory pricing holding was based, discusses the below-cost requirement both in terms of assessing the likelihood of monopolization and as a component of actual injury. 509 U.S. 209, 226 (U.S. 1993) ("these prerequisites to recovery . . . are essential components of real market injury."). For present purposes, the Court need not determine which statutory element is the most appropriate home for the below-cost

**United States District Court**
For the Northern District of California

that:  1) the prices are below an appropriate measure of cost; and 2) [] the defendant can recoup its

investment in the below cost prices."  *Linkline*, 129 S. Ct. at 1120.  According to C&D, any claim

involving a rebate must be analyzed through the predatory pricing framework established by *Brooke*

*Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993), wherein the Supreme

Court prescribed the below-cost and probable recoupment requirements for predatory pricing claims

observed in *Linkline*.  *See Southeast Missouri Hosp. v. C.R. Bard, Inc.*, No. 09-3325, 2010 WL

3220600, *2-3 (8th Cir. Aug. 17, 2010) *vacated for rehr'g*, No. 09-3325, Order (Oct. 19, 2010).[10]

     In *Brooke Group,* the plaintiff, Liggett, claimed that a rival cigarette manufacturer, Brown &

Williamson, "cut prices on generic cigarettes below cost and offered discriminatory volume rebates

to wholesalers to force Liggett to raise its own generic cigarette prices . . . ."  509 U.S. at 212.

Liggett brought a price discrimination claim under the Robinson-Patman Act, pointing to its losses

and arguing that Brown & Williamson was part of an oligopoly of six manufacturers whose prices

"increased in lockstep" and who "reaped the benefits of prices above a competitive level."  *Id.* at

213.  A majority of the Supreme Court held that Liggett had failed to demonstrate that the alleged

scheme "was likely to result in oligopolistic price coordination and sustained supracompetitive

pricing in the generic segment of the national cigarette market.  Without this, Brown & Williamson

had no reasonable prospect of recouping its predatory losses and could not inflict the injury to

competition the antitrust laws prohibit."  *Id.*

     In *Linkline*, the defendant, AT&T, was vertically integrated, in that it sold inputs (transport

service from the network into customers' homes/businesses) at wholesale and finished goods or

services (DSL service) at retail.  *Id.* at 1115.  The plaintiffs were independent internet service

providers ("ISPs") that competed with AT&T in the retail DSL market and also leased DSL

---

pricing/probable recoupment test.  At the hearing, C&D acknowledged its below-cost pricing
argument goes to both antitrust injury as well as anticompetitive conduct.

    [10] In *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 2010 WL 3220600, *2-3 (8th Cir. Aug. 17,
2010), a panel of the U.S. Court of Appeals for the Eight Circuit upheld a district court's grant of
summary judgment in favor of a defendant on a "bundled discount" claim, citing *Brooke Group*,
based on the plaintiff's failure to show below-cost pricing.  The month after C&D filed its reply
brief, however, the Eighth Circuit panel vacated its opinion and scheduled the case for rehearing.
*See id.*, Case No. 09-3325 (Order, Oct. 19, 2010).  It therefore carries no weight.

United States District Court

For the Northern District of California

1    transport service from AT&T at the wholesale level.  The ISPs argued that AT&T subjected them to

2    a "price squeeze" in violation of § 2 of the Sherman Act, whereby AT&T set high prices in the

3    wholesale transport market while keeping retail prices for its own DSL service low.  *Id.* at 1114-15,

4    1118-19.  The Court analyzed each market separately.  At the input or wholesale level, the Court

5    expressed skepticism as to whether AT&T had an "antitrust duty" to provide competitors with

6    access to its allegedly essential transport infrastructure since "such a duty requires a showing of

7    monopoly power" in the "quite competitive" market for high speed internet service.  *Id.* at 1118.

8    The Court reasoned that, "if a firm has no antitrust duty to deal with its competitors at wholesale, it

9    certainly has no duty to deal under terms and conditions that the rivals find commercially

10   advantageous." 129 S. Ct. at 1119 (finding *Trinko*, 540 U.S. at 407 to be controlling).  On the retail

11   end of the claim, the Court concluded that a price-squeeze should not be recognized where the

12   defendant's price remains above cost, lest firms might be encouraged to raise retail prices to avoid

13   potential antitrust liability.  *Id.* at 1120.  In sum, the Court held that price squeeze claims are not

14   viable where (1) there is no duty to deal at the wholesale level, and (2) there is no predatory pricing

15   at the retail level.  *Linkline* at 1120; *Doe v. Abbott Labs*., 571 F.3d 930, 934-35 (9th Cir. 2009) ("In

16   short, there is no independently cognizable harm to competition when the wholesale price and the

17   retail price are independently lawful." ).

18        Plaintiffs in *Doe* raised a claim "functional[ly] equivalent" to the "price-squeeze" theory

19   rejected in *Linkline*.  *Doe v. Abbott Labs*, 571 F.3d at 934-35.  They alleged that Abbott held a

20   monopoly in the market for Norvir, a protease inhibitor, and used it to boost its sales of Kaletra, a

21   product consisting of Norvir paired with another protease inhibitor, for which Norvir acted as a

22   "booster."  *Id.* at 932-33.  The plaintiffs' argued for liability based on a "monopoly leveraging"

23   theory, *i.e.*, that Abbott raised the price for Norvir so that it could force its competitors to charge

24   more, while holding the price of Kaletra steady.  A panel of the Ninth Circuit found *Linkline* to be

25   controlling, reasoning that there is no substantial difference between the plaintiffs' "monopoly

26   leveraging" theory and a "price squeeze."  *Id.* at 934-35.  The court therefore concluded that the

27   plaintiffs' "allegations of monopoly leveraging through pricing conduct in two markets" did not

28

**United States District Court**

For the Northern District of California

state a claim under § 2 "absent an antitrust refusal to deal (*or some other exclusionary practice*) in the monopoly market or below-cost pricing in the second market[.]" *Id.* at 931 (emphasis added).

Each of the above authorities on which C&D relies involved some form of predatory pricing – pricing of goods or services at a level with which competitors cannot compete – such that pricing itself operates as an exclusionary tool. *See also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008) (where a product or service is bundled, courts apply "discount attribution standard" wherein the full amount of discount on the bundle is applied to the competitive product at issue to determine if the discounted price is below the defendant's incremental cost of production); *NicSand, Inc. v. 3M Co*., 507 F.3d 442, 451-54 (6th Cir. 2007) (en banc) (holding upfront payments for multi-year exclusivity lawful where conceded not to amount to predatory pricing and where plaintiff failed to compete for the business); *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, No. 09-3325, 2010 WL 3220600, *2-3 (8th Cir. Aug. 17, 2010), *vacated pending rehr'g by* No. 09-3325 (Order, Oct. 19, 2010) (applying *Brooke Group* and upholding district court's grant of summary judgment in favor of the defendant on a "bundled discount" claim based on the failure to show below-cost pricing). *But see LePages v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003) (where products are bundled, rebates held unlawful where jury found exclusionary conduct cut plaintiff off from key retail pipelines necessary to permit it to compete profitably; noting that "[*Brooke Group*] does not discuss, much less adopt, the position that a monopolist does not violate § 2 unless it sells below cost"). *Cf. Safeway v. Abbott Labs.*, No. 07-5470, 2010 U.S. Dist. LEXIS 2145 at *21 (rejecting the argument that *Doe* overruled *Cascade Health* and holding that "liability under Section 2 can arise when a defendant voluntarily alters a course of dealing and 'anticompetitive malice' motivates the defendant's conduct.")[11] *Safeway*, 2010 U.S. Dist. LEXIS 2145, *12-13 (N.D. Cal. Jan. 12, 2010); *JBDL Corp. v. Wyeth-Ayerst Labs., Inc.* (rejecting the defendant's "somewhat simplistic argument that its lack of predatory pricing mandates dismissal of the Section 2 claims.").

---

[11] The Court went on to conclude that "[p]roof of a short-term sacrifice [in profits] is not an element of a Section 2 claim, but rather a means to show anticompetitive motives." *Safeway v. Abbott Labs.*, No. 07-5470, 2010 U.S. Dist. LEXIS 2145, *22 (N.D. Cal. Jan. 12, 2010) (citing *MetroNet Svcs. v. Qwest Corp.*, 383 F.3d 1124, 1131-32 (9th Cir. 2004).

United States District Court

For the Northern District of California

1    However, this line of cases is inapposite here because Mayer's claim is not a predatory

2    pricing claim.  Instead, Mayer asserts an entirely different species of Sherman Act violations.  As the

3    Supreme Court noted in *Trinko*, the means of illicit exclusion that fall under the ambit of the

4    Sherman Act are "myriad."  540 U.S. at 414.  Courts have long recognized many forms of

5    exclusionary conduct that do not involve below-cost pricing.  These include tying of

6    products/services (*e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001)); refusal

7    to deal (*e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-2 (1985), *Otter*

8    *Tail Power Co. v. United States*, 410 U.S. 366 (1973) (refusal to deal/denial of access to "essential"

9    facilities or resources), *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992)

10   (tying and refusal to deal)); exclusive dealing agreements (*Tampa Elec.*, 365 U.S. at 327, *Omega*

11   *Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), *Allied Orthopedic Appliances,*

12   *Inc. v. Tyco Healthcare Group LP*, 592 F.3d 991 (9th Cir. 2010), *Dentsply Int'l*, 399 F.3d 181, 190

13   (3d Cir. 2005)); and other tortious conduct targeting competitors (*e.g., Conwood Co., L.P. v. U.S.*

14   *Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)).

15   The pivotal question here is whether Mayer's Sherman Act claims allege a "price-based

16   claim" of predatory pricing.  The Court finds they do not.  The gravamen of the claims here is not

17   that the wholesale prices charged by C&D (net of the planogram rebates) are so low that Mayer

18   can't compete.  Rather than a "price-based claim," the complaint is "about the conditions that

19   Church & Dwight imposes in exchange for the rebates – namely, the exclusion of competitors (all

20   competitors, not just Mayer) from the vast majority of crucial display space in crucial retailers'

21   stores."  Opp'n at 31.  The claims focus on the tactics used by C&D to monopolize the display space

22   that the parties agree constitutes virtually the sole means by which condoms are marketed.  While

23   money is involved (the amount of money may be relevant in determining the coercive effect and

24   efficacy of C&D's Planogram Program in minimizing the proportion of display space devoted to

25   competitors), Mayer does not claim that the rebates (the closest element here akin to pricing)

26   themselves exclude competition.  Rather, it is the exclusive display space that C&D "buys" through

27   the rebates, as well as the exploitation of the category captain positions and exclusive dealing

28   arrangements, that harms competition.  The alleged anticompetitive conduct amounts to a vertical

restraint which does not involve predatory pricing.  It asserts the same kind of harm that occurs in exclusive dealing cases – the foreclosure of a substantial share of competition – via the variety of means described above.

Indeed, Mayer's claims are more akin to those in *Conwood* than to the price-based claims in *Brooke Group* or *Linkline*, as the defendant's conduct in *Conwood*, like C&D's conduct alleged here, targeted its competitor's display space.  In *Conwood*, U.S. Tobacco ("UST") and Conwood competed in the "moist snuff" market, with UST being the largest seller.  UST not only engaged in exclusive agreements with retailers, but its employees removed Conwood's package racks from stores without permission of store managers, destroyed or discarded the racks, buried Conwood products in UST's racks where they were less visible, trained sales representatives to deceive store clerks so the Conwood displays could be moved or destroyed, and provided misleading or erroneous sales information for moist snuff products to encourage retailers to stock more of its snuff and less of its competitors products.  The Sixth Circuit found this constituted willful anticompetitive conduct sufficient to submit to the jury.  The Sherman Act claims did not involve below-cost pricing, and the court employed no such analysis.

Although no such overtly tortious means are alleged here, the alleged effect in the instant case is the same:  control of an increasing share of display to increase sales and monopolize the market at the expense of competitors.  As in *Conwood*, no below-cost pricing is alleged.

Perhaps even more on point, courts that have examined Sherman Act claims challenging attempts to monopolize retail display space through vertical agreements have not analyzed them under a predatory pricing framework and have not scrutinized whether prices were set below cost. Rather, the focus has been on whether competition was substantially foreclosed.  *See, e.g., El Aguila Food Prods. Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 628-632 (S.D. Tex. 2003) *aff'd* 131 F. App'x 450 (5th Cir. 2005); *R.J. Reynolds Tobacco Co. v. Phillip Morris USA*, 199 F. Supp. 2d 362, 387 (M.D.N.C. 2002) *aff'd* 67 F. App'x 810, 811-812 (4th Cir. 2003); *Bayou Bottling Inc. v. Dr Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984); *Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804 (E.D. Ky. 1999); *Frito-Lay, Inc. v. Bachman Co.*, 659 F. Supp. 1129, 1134 (S.D.N.Y. 1986); (separately addressing § 1 and § 2 claims regarding shelf space

United States District Court
For the Northern District of California

1    program and Robinson-Patman Act claims which did focus on pricing practices).  *Cf. Beverage*

2    *Mgmt., Inc. v. Coca-Cola Bottling Corp.*, 653 F. Supp. 1144 (S.D. Ohio 1986) (applying substantial

3    foreclosure analysis to agreement to run only defendants' advertisements).

4    C.    Anticompetitive Conduct/Unreasonable Restraint of Trade

5          Having concluded that Mayer's Sherman Act claims are not precluded for their failure to

6    allege predatory below-cost pricing, the Court examines whether the allegations of anticompetitive

7    conduct and unreasonable restraint of trade are sufficient under *Twombly* and *Iqbal* to state claims

8    under § 1 and § 2 of the Sherman Act.  As noted above, given the nature of the claims, the critical

9    question is whether C&D's alleged conduct substantially foreclosed competition in the relevant

10   market.  Here, the Court finds the cases specifically addressing alleged monopolization of display

11   space persuasive.

12         In *El Aguila Food Prods.*, 301 F. Supp. 2d at 615, the plaintiff ("El Aguila") and defendant

13   ("Gruma") were rivals in the retail market for tortillas.  El Aguila brought § 1 and § 2 claims against

14   Gruma, alleging that it used customer marketing agreements ("CMAs") and its influence as a

15   "category captain" to obtain greater shelf space in grocery stores in exchange for "slotting fees."  *Id.*

16   at 628.  According to El Aguila, Gruma made payments to retailers pursuant to the CMAs in

17   exchange for control over the retail placement of competing products.  *Id.* at 615-616.  The evidence

18   indicated that Gruma's ratio of slotting fees for shelf space "ranged from one (1) percent to five (5)

19   percent of gross sales."  Plaintiffs couched Gruma's practice as a conspiracy in restraint of trade as

20   well as exclusive dealing.  El Aguila claimed that Gruma monopolized, or attempted to monopolize,

21   tortilla sales in violation of Sherman Act § 2 via the CMAs and its role as "category captain" in

22   preparing, providing or influencing the schematics or diagrams" governing placement on shelves of

23   El Agulia's and Gruma's brands of tortillas as well as those of their competitors.  *Id.* at 615-616.

24   The court granted summary judgment in favor of Gruma.  It noted that "[i]t is well known that the

25   retailers and manufacturers engage in negotiations that result in the payment of slotting

26   promotionals, co-op advertising, and other allowances or discounts that favor the retailers" (*id.* at

27   620) and found that "the evidence fails to quantify the extent of any exclusivity that Gruma allegedly

28   has in the marketplace."  (*Id.* at 621).  It also found there was no evidence that Gruma uniquely

18

United States District Court

For the Northern District of California

benefitted from the CMAs as compared with its competitors' similar agreements or that the CMAs proximately caused El Aguila to lose shelf space. *Id.* There was no evidence that Gruma was the recipient of shelf space lost by plaintiffs, or that Gruma's shelf space was disproportionate to its sales. *Id.* at 630. The court also found that Gruma had little or no control over the price of tortillas (*id.* at 628) and that the retailers set the price of tortillas. *Id.* at 631. Moreover, (1) competition had in fact intensified in the preceding decade (based, in part, on the fact that new tortilla manufacturers had entered the market during that period), (2) the price of tortillas had remained flat, (3) shelf space for tortillas had increased, (4) plaintiff's tortillas remained on the shelves even in stores accepting slotting fees, and (5) plaintiffs admitted that shelf space for exposure is negotiable. *Id.* at 629-630. Thus, not only did El Aguila fail to prove it was victimized by anticompetitive conduct (*e.g.,* Gruma's shelf space was proportionate to its sale and El Aguila lost no shelf space to Gruma), it failed to demonstrate injury to competition.

In *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. La. 1984) the plaintiff claimed Sherman Act violations based in part on alleged exclusionary conduct with respect to vending machines and shelf space. The court rejected the plaintiff's argument that its exclusion from a portion of shelf space constitutes an antitrust injury. The court explained that "[s]tores allot shelf space to the bottlers in proportion to market activity. A bottler with a popular product is given a greater portion of available shelf space than a bottler with a product which has less sales appeal." *Id.* The court found that the defendant "has only that portion consistent with its total share of the soft drink market." *Id.*

In *Louisa Coca-Cola Bottling Co.*, the Louisa Coca-Cola Bottling Co. ("Louisa") sued its competitor Pepsi-Cola Metropolitan Bottling Co. ("Pepsi Metro") alleging, *inter alia*, monopolization and contracts in restraint of trade in violation of § 1 of the Sherman Act. *Id.* at 809. Louisa sought an injunction prohibiting Pepsi Metro from engaging in Calendar Marketing Agreements ("CMAs") and "dealer loaders," which are sales incentive contests that reward retailers for meeting certain performance goals. *Id.* at 806, 808-809. At the time of suit, "Pepsi-Metro [had] an 80% share of the soft drink market in Louisa Coke's territory." *Id.* at 809. The court concluded that Louisa failed to demonstrate an antitrust injury. *Id.* at 817. Pepsi Metro did not control

United States District Court
For the Northern District of California

retailers' decision making; retailers were free to terminate CMA agreements whenever they wished. *Id.* at 815.  The CMAs were of "short duration and easy termination," and this "negate[d] their potential for foreclosing competition."  *Id.* at 816.  Most importantly, Louisa failed to claim or offer evidence that Pepsi Metro's allotted shelf space was "inconsistent with its market share."  *Id.* at 815. Nor was there any evidence that it or any other competitor "received less retail shelf space than other market demand or their service history justified."  *Id.*

In *Frito-Lay*, plaintiff challenged defendant's incentive plan, which granted a 10% trade allowance to retailers who already had a ratio of shelf space allocated to Frito-Lay products proportionate to its share of that retailer's sales volume.  The second part of the plan provided a profit guarantee to retailers who had underspaced Frito-Lay in exchange for a specified amount of additional shelf space.  *Id.* at 1132.  In rejecting the § 1 claim, the court noted that "a number of essential allegations are missing from defendant's counterclaims . . . . [including a] failure to allege that plaintiff obtained a greater share of shelf space than that equivalent to its share of the market or, conversely, that defendant's percentage of shelf space fell below its market share as a result of plaintiff's profit guarantee."  *Id.* at 1133-34.  The court refused to dismiss the § 2 claim which asserted that the profit guarantees were given to retailers where Frito-Lay faced its most effective competition, based partly on plaintiff's argument that by subsidizing the exclusion of competitors, defendant injured competition without increasing efficiency.  *Id.* at 1136.

In *R.J. Reynolds Tobacco Co. v. Phillip Morris Inc*., the plaintiff ("RJ Reynolds") brought suit against its competitor ("PM") under Sherman Act § 1 and § 2, challenging PM's "Retail Leaders Program," which provided higher promotional payments to retailers who agree to provide higher percentages of shelf space to PM's products.  199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd per curiam*, 67 F. App'x 810 (4th Cir. 2003).  Notably, the program tied display space requirements to local market share, and where PM's local market share exceeded 55%, the program required that the retailer dedicate a percentage of shelf-space to PM calculated as 90% of PM's local market share (*i.e.*, if PM's local share was 75%, the retailer would provide at least 67.5% – 90% of 75 – of the product space to PM).  PM did not demand a higher percentage of available product space than its market share, but under its contracts, restrictions were placed on competitive signage in stores;

however, competitors had several options to promote their products in these stores.  *Id.* at 372.  The district court granted summary judgment to PM, concluding that RJ Reynolds had failed to provide evidence that could establish (1) PM possessed market power in the relevant market, (2) the Retail Leaders program foreclosed competition in a substantial share of the market, or (3) antitrust injury.  Specifically, the court found that the challenged agreements did not control the display of competing products and did not provide defendant "with more than its market share of product space."  *Id.* at 387.  Retailers were free to carry as many competing brands as they chose.  *Id.* at 388.  Furthermore, plaintiff had ample opportunity to promote their product in stores.  Plaintiff's market share increased during certain periods.  *Id.* at 391.  Measuring plaintiff's foreclosure claims "against the full range of selling and advertising opportunities available," the court found plaintiff had other non-retail marketing opportunities to reach consumers.  *Id.* at 393.  The court found there was healthy competition in the retail cigarette market, as evidenced by the presence of new entrants and the continuing presence of competitor's products on the shelves of retailers.  *See id.* at 390-91.

The allegations in Mayer's counterclaims stand in contrast to the facts in *El Aguila Food Products*, *Bayou Bottling*, *Louisa Coca-Cola Bottling*, *Frito-Lay* and *R.J. Reynolds*.  In those cases, display space was based on the merits of competition:  the display space allocated to defendants was either proportionate to or less than given defendant's market share of sales.  Moreover, the challenged agreements did not necessarily limit display space devoted to the plaintiff.  Nor were alternative means of marketing significantly curtailed.  Furthermore, defendants were found in most of those cases to lack market or monopoly power to substantially foreclose competition and control prices.

In the instant case, as noted above, Mayer has alleged with great specificity:  (1) the market and monopoly power of C&D (whose sales account for over 75% of retail condom sales in the United States); (2) the uniquely important role in marketing played by in-store displays for condoms (and the relative lack of other non-retail means of reaching the consumer); (3) the concentration of ownership at the retail level and the high degree of penetration obtained by C&D through its

United States District Court

For the Northern District of California

1  Planogram Program; (4) the fact that under the Planogram Program,[12] there are hierarchies of rebates

2  that incentivize retailers to award display space to C&D disproportionate to its market share; (5) the

3  fact that under the Planogram Program, because it stipulates a minimum *percentage* of display space

4  be devoted to C&D (as opposed to *e.g.*, minimum lineal footage of display), the residual space

5  available to competitors is limited – retailers under the program cannot add space for Mayer without

6  increasing C&D's space by a multitude, and thus the likelihood of displacement is greater; (6) in

7  fact, Mayer's products have actually been displaced under the Planogram Program by C&D products

8  even where relative sales did not warrant it; (7) the fact that C&D has successfully ratcheted up its

9  Planogram Program, raising the percentage of display space guaranteed for its products; (8) that

10  there are significant barriers to entry into this market; (9) that C&D has successfully raised prices for

11  the products;[13] and (10) that while C&D's market share has gone up, Mayer's market share has

12  declined.

13       These allegations are specific enough under *Twombly* and *Iqbal* to state plausible claims

14  under § 1 and § 2 of the Sherman Act.  Taken as true, and drawing reasonable inferences in Mayer's

15  favor, the extensive allegations establish anticompetitive conduct and the foreclosure of competition

16  in a substantial share of the condom market and resulting antitrust injury.  While there may be a

17  number of factors that may ultimately inform the question of substantial foreclosure (*see*, *e.g.*

18  *Novell, Inc. v. Microsoft Corp.*, *supra*, 699 F. Supp. 2d at 755; *R.J. Reynolds*, *supra*, F. Supp. 2d at

19  389), Mayer has pled enough to survive C&D's motion to dismiss.

20  _____

21       [12] In its supplemental brief, C&D contends that the Planogram Agreements may be
22  terminated without penalty with thirty days notice.  The Court disregards C&D's contention, as it is
   irrelevant to the analysis at this stage, where the Court, with limited exceptions, looks only to the
   four corners of the pleadings.

23  
24       [13] C&D contends that Mayer's example based on 2006-2008 data from Safeway Stores, "[i]n
   the absence of further context," is an insufficient allegation of "competition generally in the
   nationwide market."  Reply at 12-13; SAC ¶ 85.  In fact, ¶ 85 of the counterclaim alleges "higher
25  prices to consumers" and clearly states that the data collected from Safeway is "an example."
   Moreover, C&D's argument is premature; at this stage, the Court takes all plausible allegations in
26  Mayer's counterclaim as true, and merely considers whether it adequately states a claim for relief.
   Discovery is the mechanism for obtaining the "further context" that C&D refers to.  The Court
27  accordingly finds no material shortcoming in Mayer's allegations of antitrust injury.  *Cf. Doctor's
   Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301 (5th Cir. 1997) (holding
28  that the plaintiff's alleged injury from being shut out of the market as a "direct competitor" fell
   "easily within the conceptual bounds of antitrust injury.").

United States District Court

For the Northern District of California

1    Moreover, the allegations regarding the Planogram Program are bolstered by the additional

2    anticompetitive conduct alleged.  As noted above, Mayer also alleges that C&D entered into

3    "category management" agreements with large chain retailers (¶¶ 8, 41), giving C&D the ability to

4    obtain preferential display locations for its products (¶ 70).  Mayer also alleges, "The combination of

5    [C&D's Planogram Agreements] and its role as a condom category captain, together with its

6    monopoly power, has enabled Church & Dwight to increase its market share by nearly 10% over the

7    last seven years, to over 75% of the relevant markets, and has allowed Church & Dwight to increase

8    its prices and profits substantially.") (¶ 73).  Additionally, C&D has entered into exclusive dealing

9    contracts with some retailers, including 7-Eleven.

10    To be sure, viewed separately, each of Mayer's additional claims as alleged (other than the

11    Planogram Program claim) is problematic.  Mayer's allegations regarding the category captain

12    arrangements are not specific enough to establish an unreasonable restraint of trade or

13    anticompetitive/exclusionary conduct.  Such category management arrangements are evidently

14    commonplace among retailers of a wide variety of products.  *See El Aguila Food Prods.*, 301 F.

15    Supp. 2d at 628-632; *Conwood*, 290 F.3d 768, 775-76.  Mayer does not allege with any degree of

16    specificity how pervasive C&D's category captain agreements are, how they are coercive to

17    retailers, or how C&D uses the position to eliminate competition in the absence of any allegation

18    that these agreements are long term.  *Cf. R.J. Reynolds*, 199 F. Supp. 2d at 391-92 (agreements of

19    short duration less likely to foreclose competitors).

20    Mayer's allegations of exclusive dealing agreement appear to pertain solely to 7-Eleven.

21    Without allegations as to the portion of the relevant market foreclosed by the exclusive agreement,

22    the length of the agreements, etc., this claim standing alone does not adequately state a plausible

23    exclusive dealing claim under the Sherman Act.  *See Concord Boat*, 207 F.3d at 1059 (rejecting § 1

24    claim that discount program was exclusive when program did not require purchasers to commit to

25    manufacturer for any specified period of time) (citing *Tampa Elec. Co.*, 365 U.S. at 327); *Paddock*

26    *Publ'ns, Inc. v. Chicago Tribune* Co., 103 F.3d 42, 47 (7th Cir. 1996) (holding that the duration of

27    exclusive dealing contract is relevant to whether contract is illegal); *Masimo*, 2006 U.S. Dist. LEXIS

28    29977, 2006 WL 1236666 at 5 ("[E]xclusive dealing contracts . . . that are terminable on short notice

United States District Court

For the Northern District of California

1   are not anticompetitive because foreclosure is very unlikely."); *see also Jefferson Parish Hosp. Dist.*

2   *No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) (reasonableness of the restraint on

3   trade in exclusive dealing cases depends upon whether a "significant fraction of buyers or sellers are

4   frozen out of a market").

5          The tortious interference claim pertaining to Mayer's alleged exclusive supply contract with

6   Sagami does not substantially support its Sherman Act claim that Mayer is being shut out of the

7   retail market.  Mayer does not contend that it cannot obtain supplies of its product from Sagami.

8          Mayer's trademark infringement allegations, standing alone, are insufficient to establish

9   substantial foreclosure from competition, even if the alleged infringement were established and

10   found to be motivated by anticompetitive purposes.  Not every trademark violation by a competitor

11   constitutes an antitrust violation.  *Cf. Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 249 F.

12   Supp. 2d 463, 513-15 (M.D. Pa. 2003) (holding that merely "join[ing] together with others to

13   criticize [the plaintiff's] products falsely" did not constitute an unreasonable restraint of trade under

14   the Sherman Act); *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 645 F. Supp. 2d 734, 752 (D.

15   Minn. 2009) (rejecting antitrust claim based on the defendant's use of misinformation and false

16   statements).

17          On the other hand, C&D's argument that each of Mayer's allegations must be analyzed

18   separately is incorrect.  In assessing C&D's potential antitrust liability, the Court considers the

19   effects of its conduct in the aggregate, including, as appropriate, cumulative or synergistic effects.

20   *See Masimo Corp. v. Tyco Health Care Group, L.P.*, No. 02-4770, 1004 U.S. Dist. LEXIS 26916,

21   *19 (considering the combined effect of all of the defendant's allegedly exclusionary contracts,

22   including, *inter alia*, sole source contracts and "market share volume/loyalty discounts in

23   compliance-based contracts"); *Twin City Sportservice, Inc. v. Finley & Co., Inc.*, 676 F.2d 1291,

24   1302 (9th Cir. 1982) (upholding the district court's analysis, looking to the "overall effects of a

25   defendant's conduct in the relevant market"); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373,

26   1376 (9th Cir. 1992) ("it would not be proper to focus on specific individual acts of an accused

27   monopolist while refusing to consider their overall combined effect").  *Cf. Conwood*, 290 F.3d 768

28   (court examines a range of tortious conduct by defendant).  *Linkline* is not to the contrary.  Although

United States District Court

For the Northern District of California

the Court characterized the price squeeze claim as an "amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level," 129 S. Ct. at 1120, its analysis of predatory pricing at the retail level took into account the pricing at the wholesale level – the retail pricing was not below the elevated whole price. So viewed, the question is whether the Planogram Program, together with C&D's other conduct, constitutes an unreasonable restraint on trade and anticompetitive conduct. As the Court has found the allegations regarding the Planogram Program sufficiently state Sherman Act claims in satisfaction of the pleading requirements of *Twombly* and *Iqbal*, it follows perforce that the cumulative claims do as well,[14] even if the additional claims viewed separately were insufficient to state independent Sherman Act violations.[15]

## IV.   CARTWRIGHT ACT CLAIMS

A.   Claims III & IV: Cartwright Act §§ 16700, et. seq.

"California Business and Professions Code sections 16720 and 16726 outlaw, *inter alia*, conduct that 'prevent[s] competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.'" *Tele Atlas N.V. v. NAVTEQ Corp.*, 397 F. Supp. 2d 1184, 1189 (N.D. Cal. 2005). "'[S]ections 16720 and 16726 . . . were patterned after the Sherman Act,'" and thus the requirements for stating a claim under both federal and California antitrust statutes are similar. *Id.* (quoting *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc*., 101 Cal. App. 3d 532, 540-43, 161 Cal. Rptr. 811 (1980)). "In order for a private plaintiff to have standing to sue under the Cartwright Act, the plaintiff must prove antitrust injury, 'which is to say injury of the

---

[14] In reaching this conclusion, the Court is mindful that "[m]istaken inferences and the resulting false condemnations are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Verizon Communications v. Law Offices of Curtis Trinko, LLP*, 540 U.S. 398, 407, 414 (2004) (internal citations omitted); *Linkline*, 129 S. Ct. at 1122-23 (describing the interaction between wholesale and retail prices as a "moving target"). Indeed, Sherman Act violations should be identified in a reasonably clear manner that preserves appropriate incentives without creating perverse ones. Where, as here, alleged price increases purportedly result from vertical restraints created by an unintegrated monopolist, the analysis should be no more complex than cases involving, *e.g.,* a price-squeeze, which would require analysis of a monopolized input. *See generally* Steven C. Salop, Refusals to Deal and Price Squeezes by an Unregulated, Vertically Integrated Monopolist, 76 Antitrust L.J. 709-740 (2010) (suggesting a method for evaluating vertical restraints under the rule of reason and consistent with *Linkline*).

[15] To the extent Mayer seeks in its Second Amended Counterclaim to assert the additional claims as independent violations of the Sherman Act, they are dismissed without prejudice.

United States District Court
For the Northern District of California

1   type the antitrust laws were intended to prevent and that flows from that which makes defendants

2   acts unlawful.'" *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302 (S.D. Cal. 2009) (citation

3   omitted).

4         Mayer alleges that C&D's Planogram Agreements constitute unlawful trusts under the

5   Cartwright Act. SAC ¶ 107. Mayer also alleges that they "substantially lessen competition." SAC

6   ¶ 110. C&D simply argues that these claims "should be dismissed for the same reason its Sherman

7   Act claims should be dismissed." Mot. at 30. Having found C&D's argument unpersuasive with

8   respect to Mayer's First Counterclaim, the Court rejects it here as well.[16]

9         C&D argues that monopolization claims are not cognizable under the Cartwright Act,

10   because the Act "does not address *unilateral* conduct" as Sherman Act § 2 does. Mot. at 32 (quoting

11   *Dimidowich v. Bell & Howell*, 803 F.2d 1517 (9th Cir. 1987). Mayer's opposition confirms that it

12   alleges only "combinations or conspiracies" in restraint of trade, and does not allege Cartwright Act

13   violations based solely on unilateral activity.

14   B.    <u>Claim V: Cartwright Act § 17045</u>

15         Mayer claims that C&D violated § 17045 of the Cartwright Act by offering its Planogram

16   Agreements only to certain retailers, principally major retail chains, and not to small independent

17   retailers. SAC ¶¶ 66,115-118; Opp'n at 52-3. To prevail on this claim, Mayer must show three

18   essential elements: (1) a "secret" allowance of an "unearned" discount, (2) "injury" to a competitor,

19   and (3) the allowance must tend to destroy competition. *Diesel Electric Sales & Service, Inc. v.*

20   *Marco Marine San Diego, Inc*., 16 Cal. App. 4th 202 (1993). With respect to its injury, Mayer must

21   allege a "loss that flows from an anticompetitive aspect or effect of the defendant's behavior." *See*

22   *Lorenzo v. Qualcomm Inc*., 603 F. Supp. 2d 1291, 1302-03 (S.D. Cal. 2009) ("Plaintiff must allege

23

24

25

26

27

28

---

[16] C&D asks the Court to disregard Mayer's allegation that California is a relevant geographic market. Mot. at 32. Even assuming C&D is correct, this would not a basis to dismiss Mayer's antitrust claims unless a regional market is implausible (or precluded as a matter of law), since generally the determination of a relevant market is a factual matter. *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Moreover, there is nothing in the counterclaim to suggest C&D's market power is materially different in California than it is nationally.

1    an injury that is not 'secondary, consequential, or remote' in order to have standing under the

2    Cartwright Act.").

3         C&D argues that Mayer fails to allege actual injury.  The basis of Mayer's claim appears to

4    be C&D's selective offer of Planogram Agreements to only certain retailers.  (SAC ¶ 66).  C&D

5    argues that the harm alleged by Mayer – loss of market share – would not flow from C&D's

6    selectively offered rebate .  Mot. at 33; Reply at 40-41.  Indeed, Mayer should suffer *less* harm to the

7    extent retailers are not offered rebates, as those retailers should have more undedicated display space

8    open to Mayer's products.  Thus, Mayer has not alleged that it suffers an injury resulting from the

9    alleged discriminatory pricing to retailers.  *See ABC Internat. Traders, Inc. v. Matsushita Electric*

10   *Corp*., 14 Cal. 4th 1247 (1997) (noting legislative intent to protect smaller, independent retailers,

11   e.g., grocers, against unfair competitive practices of the large chain stores).  Mayer therefore lacks

12   standing and injury cognizable under this claim.

13        Moreover, in light of the allegedly widespread and notorious nature of C&D's conduct, the

14   Court finds that Mayer has failed to adequately allege the "secret" nature of the alleged discounts.

15   *See Kunert v. Mission Financial Services Corp*., 110 Cal. App. 4th 242, 261 (Cal. App. 2d Dist.

16   2003); *Harris v. Capitol Records Distributing Corp*. (1966) 64 Cal 2d 454, 460 (holding § 17045

17   inapplicable because "the allowance was not secret.").  Mayer's conclusory allegations are

18   insufficient especially in the context of the widespread nature of C&D's Planogram Program.

19   *Twombly*, 550 U.S. at 555 (holding that a threadbare assertion of an unlawful agreement is a "legal

20   conclusion" not entitled to an assumption of truth); *In re: Netflix Antitrust Litig.*, 506 F. Supp. 2d

21   308, 320 (N.D. Cal. 2007) (dismissing Cartwright Act claims where allegations were conclusory).

22   *Cf. Frey v. Novartis Pharm. Corp.*, 642 F. Supp. 2d 787, 795 (S.D. Ohio 2009) (dismissing claim

23   where the complaint contained a formulaic recitation of elements rather than alleging facts

24   supporting an inference that an alleged defect was the proximate cause of the plaintiff's injuries).

25   The Court accordingly dismisses Mayer's Fifth Counterclaim with leave to amend although the

26   Court has serious doubts as to the viability of this claim.

27   ///

28   ///

**United States District Court**
For the Northern District of California

**V.    UNFAIR COMPETITION UNDER CALIFORNIA COMMON LAW:  VIII & XII**

Mayer asserts two claims for unfair competition under California common law (VIII & XII). C&D raises the same argument against Claim VIII as it has for each antitrust claim, *i.e.*, that Mayer has failed to alleged a likelihood of unfair competition because it has not alleged below-cost pricing. Mot. at 37.  In response, Mayer does not dispute that there is no common law claim for "monopoly," but argues that California common law has recognized tort actions for conspiracies in restraint of trade, which it alleges at SAC ¶ 137.  Opp'n at 57 (citing *Speegle v. Board of Fire Underwriters*, 29 Cal. 2d 34, 44 (1946)).  In *Speegle*, the California Supreme Court explained that the Cartwright Act "merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law."  Significantly, the Court approved the concurrent application of both the Cartwright Act and common law, noting that both "must be relied upon for the protection of the public against combinations in restraint" of trade.  *Id.* at 45.  *See also Oakland-Alameda County Builders' Exchange v. F. P. Lathrop Constr. Co.*, 4 Cal. 3d 354, 363 (Cal. 1971) (favorably quoting *Speegle*); *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (Cal. 1998) (acknowledging common purpose of common law tort for restraint of trade and Cartwright Act).  Mayer's Eighth Counterclaim is adequately stated, just as its Third Counterclaim is.  The motion to dismiss the Eighth Counterclaim is denied.

Mayer's Twelfth Counterclaim alleges that C&D's infringement of the term "microthin" constitutes "deliberate and willful unfair competition under [California] common law."  SAC ¶ 177. C&D challenges this claim, arguing that Mayer has failed to adequately allege a likelihood of consumer confusion.  Mot. at 43-47.  C&D also argues that the doctrine of laches should preclude any equitable relief on the claim.  Mot. at 46-47.  As discussed below, Mayer has sufficiently alleged likelihood of consumer confusion.  Because resolution of laches requires consideration of facts outside the four corners of the counterclaim, this defense does not warrant dismissal under Rule 12 of Mayer's pleading at this juncture.  The motion to dismiss the Twelfth Counterclaim is denied.

**VI.    TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS**

Mayer's Seventh Counterclaim is for tortious interference with its economic relations with retailers.  The elements of this tort are:  (1) an economic relationship between the plaintiff and a

1   third party with a likelihood of future economic benefit to the plaintiff, (2) the defendant's

2   knowledge of such a relationship, (3) intentional act designed to disrupt the relationship, (4) actual

3   disruption of the relationship, and (5) resulting economic harm.  *Korea Supply Co. v. Lockheed*

4   *Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).

5          Citing *E Z Sockets, Inc. v. Brighton-Best Socket Screw Mfg., Inc.*, 704 A.2d 1364 (N.J. Super.

6   Ct. 1996), C&D argues that the counterclaim fails to allege the requisite wrongful acts by C&D.

7   Mot. at 37.  Mayer responds that its allegations regarding anticompetitive conduct and agreements in

8   restraint of trade operated to disrupt its actual and prospective economic relationships with retailers.

9   Mayer further points to its allegation that C&D acted "wilfully and maliciously."  SAC ¶ 134.

10         In *E Z Sockets*, the court had already dismissed the plaintiff's antitrust allegations, such that

11  no allegations of wrongful conduct remained other than the alleged interference itself.  *Id.* at 1370.

12  Here, by contrast, the Court has not dismissed the antitrust claims.  C&D has not cited any

13  controlling authority that (1) C&D's anticompetitive conduct and agreements alleged by Mayer

14  cannot constitute an independently unlawful "intentional act" or (2) the resulting loss of market

15  share or exclusion from certain retailers cannot constitute "disruption" for purposes of the tort.

16  Accordingly, the Court denies C&D's motion with respect to Mayer's counterclaim for tortious

17  interference with economic relations.

18                **VII.    TORTIOUS INTERFERENCE WITH CONTRACT**

19         The elements of a tortious interference with contract claim are: (1) a valid contract between

20  plaintiff and a third party, (2) defendant's knowledge of this contract, (3) defendant's intentional acts

21  designed to induce a breach or disruption of the contractual relationship, (3) actual breach or

22  disruption of the contractual relationship, and (5) resulting damage.  *Pac. Gas & Elec. Co. v. Bear*

23  *Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (citing *Seaman's Direct Buying Service, Inc. v.*

24  *Standard Oil Co.* 36 Cal. 3d 752, 765-766 (1984).

25         In its Sixth Counterclaim, Mayer contends that it had a distribution agreement with Sagami

26  to be its exclusive North American distributor of latex condoms, and that C&D induced Sagami to

27  breach the agreement by obtaining concurrent distribution rights despite C&D's knowledge of the

28  exclusive contract.  SAC ¶¶ 121-123.  C&D argues that Mayer fails to allege the existence of a valid

**United States District Court**

For the Northern District of California

1   contract.  Mot. at 42.  The Court disagrees.  Mayer has adequately alleged the existence of such a

2   contract.  *See* SAC ¶¶ 23-24, 121.  *Twombly* and *Iqbal* do not require the specifics of the contract be

3   pled at this stage.  Here, the gist of the alleged contract is plausible.  *See Phillips v. County of*

4   *Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (concluding that, taken as true, the allegations provide

5   "enough factual matter . . . to suggest the required element" of a contract) (quoting *Twombly*, 550

6   U.S. at 556).  The Court therefore denies C&D's motion to dismiss this claim.

7   **VIII.   FALSE DESIGNATION AND TRADEMARK INFRINGEMENT CLAIMS**

8   A.   Likelihood of Consumer Confusion

9        Mayer brings its Eighth and Ninth Counterclaims under the Lanham Act, alleging trademark

10  infringement[17] in violation of 15 U.S.C. § 1114(a) and false designation of origin[18] in violation of 15

11  U.S.C. § 1125(a).  Mayer also brings, in its Tenth Counterclaim, a claim for common law

12  infringement.  The Court need not evaluate each claim separately because C&D raises the same

13  argument with respect to each one (Mot. at 43-47) – that there is no likelihood of consumer

14  confusion as to who made the product(s).  *See M2 Software, Inc. v. Madacy Entm't Corp.*, 421 F.3d

15  1073, 1080 n.5 (9th Cir. 2005) (noting that "[t]he test of trademark infringement under state, federal,

16  and common law is whether there will be a likelihood of confusion" and that, "for [the plaintiff] to

17  succeed on each of its other federal, state, and common-law based claims [*e.g.*, false designation and

---

18

19        [17] To prevail on a claim for trademark infringement, a holder of a registered service mark
must show that another person is using: (1) any reproduction, counterfeit, copy or colorable
20  imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the
sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause
21  confusion, or to cause a mistake or to deceive. 15 U.S.C. § 1114(1)(a); *Century 21 Real Estate Corp.
v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  A "trademark" is any combination of words or
22  symbols used in commerce to identify and distinguish one's goods from those manufactured or sold
by others and to indicate the source of the goods.  15 U.S.C. § 1127. "The first to use a mark is
23  deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar
marks in the same industry and market or within the senior user's natural zone of expansion."
24  *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

25        [18] To prevail in an action for false designation of origin, a plaintiff must show that: (1) the
terms or logos in question are valid and protectable trademarks; (2) the plaintiff owns these marks as
26  trademarks; (3) the plaintiff used these marks in commerce; and (4) the defendant "used terms or
designs similar to plaintiff's marks without the consent of the plaintiff in a manner that is likely to
27  cause confusion among ordinary purchasers as to the source of the goods." *Chimney Safety Inst. Of
Am. v. Chimney King*, 2004 U.S. Dist. LEXIS 11985, 2004 WL 1465699, *2 (N.D. Cal. May 27,
28  2004) (citing *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 n.8
(9th Cir. 1999)).

United States District Court
For the Northern District of California

1   description of origin, federal and state trademark dilution, and unfair competition], it must establish

2   a likelihood of confusion"). *See also A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237

3   F.3d 198, 210 (3d Cir. 2000) (noting that a trademark infringement claim under 15 U.S.C. §

4   1114(1)(a) and a false designation of origin claim under 15 U.S.C. § 1125(a)(1)(A) are measured by

5   identical standards under the Lanham Act); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th

6   Cir. 2008)  (noting that the critical determination is "whether an alleged trademark infringer's use of

7   a mark creates a likelihood that the consuming public will be confused as to who made that

8   product.") (quoting *Brother Records, Inc. v. Jardine,* 318 F.3d 900, 908 (9th Cir. 2003)); *E. & J.*

9   *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) ("The core element of

10  trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is

11  likely to confuse customers about the source of the products.").  Neither intent nor actual confusion

12  are necessary to establish a likelihood of confusion.  *Century 21 Real Estate Corp. v. Sandlin*, 846

13  F.2d 1175, 1178 (9th Cir. 1988).  In this Circuit, the likelihood of confusion is analyzed using an

14  eight-factor test ("the *Sleekcraft* factors"):

15          (1) strength of the mark; (2) proximity of the goods; (3) similarity of
        the marks; (4) evidence of actual confusion; (5) marketing channels
16          used; (6) type of goods and the degree of care likely to be exercised by
        the purchaser; (7) defendant's intent in selecting the mark; and (8)
17          likelihood of expansion of the product lines.

18  *Surfvivor Media Inc. v. Survivor Productions*, 406 F.3d 625, 630 (9th Cir. 2005).

19          Mayer claims that, from 1992 to 2005 or 2006, it was the sole user of the term "microthin" in

20  the condom industry. SAC ¶ 146.  Mayer alleges that, in 2006, C&D began using the term

21  "microthin" as well as "Made in Japan" on one if its products, and continued using it on its other

22  products thereafter.  ¶¶ 151-154.  According to Mayer, this falsely suggests an affiliation with Mayer

23  Labs that deceived or is likely to deceive or confuse customers as to the origin of C&D's Trojan

24  Ultrathin and ThinTensity products.  ¶¶ 155-157.  C&D argues that Mayer fails to state any plausible

25  likelihood of customer confusion.  The Court disagrees.  Mayer describes its use of the term

26  "MicroThin" beginning in 1992 (¶¶ 22, 143-145); its exclusive use of that term in the condom

27  industry from 1992 to approximately 2006 (¶¶ 145-146); its investment in that term and consumers'

28  association of it with the Kimono brand (¶¶ 146-149).  The Court accordingly finds that the term

United States District Court

For the Northern District of California

"microthin" is plausibly alleged to be a protectable mark associated with Mayer.  Consumer confusion is generally a factual determination turning on an array of factors that cannot be made at this stage.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979) (setting forth non-exclusive eight factor test for assessing the likelihood of confusion); *Thane Int'l, Inc. v. Trek Bicycle Corp*., 305 F.3d 894, 901-02 (9th Cir. 2002) (reiterating the Ninth Circuit's admonition that district courts should grant summary judgment motions "regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record."); *Stanislaus Custodial Deputy Sheriffs' Ass'n v. Deputy Sheriff's Ass'n***,** 2010 U.S. Dist. LEXIS 59177, 29-30 (E.D. Cal. June 1, 2010) **(**faced with a motion to dismiss at in a trademark infringement case, the Court concluded that it "cannot make the factual conclusion at this stage of the proceedings that there was not a likelihood of confusion."); *Visual Changes Skin Care Int'l, Inc. v. Neways, Inc*., 2008 U.S. Dist. LEXIS 111554 (E.D. Cal. Oct. 24, 2008) (rejecting the defendant's argument that there is no likelihood of confusion despite conceding that "weighing evidence is inappropriate in a motion to dismiss" and stating that the defendant "oversteps a F.R.Civ.P. 12(b)(6) challenge by seeking consideration of improper extrinsic evidence as to but one factor to address likelihood of confusion.").  The Court finds that Mayer has adequately alleged a likelihood of confusion and infringement with respect to Counterclaims VIII, IX, and X.

B.     Laches

      C&D further argues that Mayer's infringement claims should be barred by the doctrine of laches because Mayer "sat on its hands for almost three years and took no action to protect its alleged trademarks until this [] case was initiated in 2009."  Reply at 49 (citing SAC ¶¶ 151-155).  The equitable defense of laches "embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights.  *Internet Specialties West, Inc. v. Milon-Digiorgio Enters*., 559 F.3d 985, 989-993 (9th Cir. 2009).  The laches analysis consists of two questions:  (1) Was the plaintiff's delay in bringing suit unreasonable? and (2) Was the defendant prejudiced by the delay?  *Id.  See also Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002); *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*, 465 F.3d 1102, 1108 (9th Cir. 2006).

United States District Court

For the Northern District of California

"[A] laches determination is made with reference to the limitations period for the analogous action at law." *Jarrow*, 304 F.3d at 835. If the suit was filed within the applicable limitations period, a presumption against laches applies. *See id.* at 835-36 ("If the Plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable. However, if suit is filed outside of the analogous limitations period, courts often have presumed that laches is applicable."). In Lanham Act claims, which have no federal limitations period, the court looks at the most analogous state statute of limitations. The analogous period is either that governing fraud, which is subject to a three-year limitations period in California, Cal. Code Civ. P. § 338(d) (*see Jarrow*, 304 F.3d at 838), or that governing California trademark or common law infringement claims, which are subject to a four-year statute of limitations. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). C&D does not claim Mayer's counterclaim was not brought within the limitations period. C&D has not shown at this stage anything to overcome the presumption against laches. In any event, a laches determination depends on facts outside the pleadings, and, as such, is not cognizable in the context of the pending motion. *See* Fed. R. Civ. P. 12(d) (converting motion to dismiss to motion for summary judgment).

The Court accordingly denies C&D's motion with respect to Counterclaims VIII, IX, and X.

///
///
///
///
///
///
///
///
///
///
///
///

## IX.   <u>CONCLUSION</u>

For the reasons stated above, the Court hereby **GRANTS** Plaintiff's motion with respect to Defendant's Fifth Counterclaim.  The Court **DENIES** Plaintiff's motion with respect to each of Defendant's remaining Counterclaims.  Defendant's Fifth Counterclaim is dismissed without prejudice.  Defendant is given leave to amend within 30 days.

This order disposes of Docket No. 71.


IT IS SO ORDERED.


Dated:  April 1, 2011

_____
EDWARD M. CHEN
United States Magistrate Judge