**United States District Court**
For the Northern District of California

1
2
3
4
5              UNITED STATES DISTRICT COURT
6              NORTHERN DISTRICT OF CALIFORNIA
7
8    CHURCH & DWIGHT CO., INC.,                No. C-10-4429 EMC
9              Plaintiff,                      **REDACTED**
10   v.                                        **ORDER GRANTING IN PART AND
                                               DENYING IN PART PLAINTIFF'S**
11   MAYER LABORATORIES, INC.,                 **MOTION FOR SUMMARY JUDGMENT**
12             Defendants.                     **(Docket No. 187)**
     _____/
13
14
15           Plaintiff/Counterdefendant Church & Dwight, Inc. ("C&D"), the maker of Trojan brand
16   condoms, moves for summary judgment on Defendant/Counterclaimant Mayer Labs, Inc.'s
17   ("Mayer's") counterclaims.  Docket No. 187, 198 (redacted version).  Mayer is the maker of
18   Kimono brand condoms.  The parties' primary dispute surrounds C&D's use of planogram[1]
19   agreements with condom retailers, whereby C&D offers a percentage rebate off its wholesale price
20   in exchange for a retailer's commitment to devote a certain percentage of the condom shelf space to
21   C&D products.  Mayer alleges that C&D's planogram rebate ("POG") program operates to foreclose
22   competition from vital retail display space and hence sales.  Mayer also alleges that C&D has
23   engaged in other anticompetitive conduct, including abusing its position as category captain for
24   certain retailers to exclude its rivals from, or at least disadvantage them in, the condom retail market.
25   Based on this and other alleged conduct, Mayer brought twelve counterclaims against C&D for

26   _____
27       [1] A planogram is "essentially a diagram showing where specific products are to be
     positioned in the space allotted by a retail store for a particular category of products."  Second
28   Amended Counterclaim ("SAC"), Docket No. 68, ¶ 6.  The Court will refer to C&D's planogram
     rebate program as its POG program.

**United States District Court**
For the Northern District of California

1   purported violations §§ 1 and 2 of the Sherman Act, the Cartwright Act, the Lanham Act, and

2   California unfair competition laws, as well as tort claims for tortious interference with contract and

3   economic relations.

4        The parties have engaged in over three years of hotly contested litigation.  This Court

5   previously denied C&D's motion to dismiss Mayer's counterclaims finding that Mayer's complaint

6   raised viable claims of anticompetitive conduct potentially violative of the Sherman Act.  *See*

7   Docket No. 105; *Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*, C-10-4029 EMC, 2011

8   WL 1225912 (N.D. Cal. Apr. 1, 2011).  The parties have conducted extensive discovery of over 15

9   million pages of documents and dozens of depositions.  Reply at 1.  Documents submitted in

10   conjunction with the parties' summary judgment briefing total over four thousand pages.

11        Despite this voluminous record, Mayer has been unable to proffer any direct, admissible

12   evidence of retailers switching or removing rival condom brands from their shelves as a result of any

13   coercive effect of C&D's planogram program.  Nor has Mayer submitted any admissible evidence

14   that C&D misused its category captain positions to the detriment of its rivals.  Surprisingly, Mayer

15   failed to take the deposition of – or obtain other direct evidence from – any retailer's employees or

16   other third parties who might have testified to the supposed coercive, anticompetitive effect of

17   C&D's conduct.  Indeed, the only direct (and unrebutted) evidence from third party retailers

18   indicates just the opposite: that the planogram program has little, if any, effect on retailers' shelf

19   space allocations, and that C&D had no undue influence over retailers' decisions as category

20   captain.  Without any such direct evidence, the Court is left largely with Mayer's (and its experts')

21   own theory based largely on a rough correlation between C&D's moderately increasing market share

22   and Mayer's moderately decreasing market share.

23        Accordingly, having considered the parties' briefs, accompanying submissions, oral

24   argument, and all evidence of record, the Court **DENIES** the motion for summary judgment as to

25   tortious interference with contract, and **GRANTS** the motion as to all other claims.

26              **I.**   **FACTUAL & PROCEDURAL BACKGROUND**

27        The evidence submitted by the parties reflects as follows. Where there are factual disputes,

28   they are so noted.

**United States District Court**
For the Northern District of California

A.      The Parties

Mayer Labs markets, distributes and sells latex male condoms.  Second Amended Counterclaim ("SAC") ¶¶ 15, 19.  Mayer's business involves the marketing and sale of, *inter alia*, its Kimono brand of ultra-thin latex condoms.  *Id.* ¶ 15.  Kimono condoms have a retail market share in the United States of less than one-half of 1%.  Silberman Report Ex. 1.  Between 2001 and 2007, Mayer's market share increased from .31% to .46%.  *Id.*  Starting in 2008, market share decreased to a low of .27% in 2009, and remained at .29% in 2010.  *Id.*  Its 2010 market share corresponds to annual revenue of $819,876.

Counterdefendant C&D manufactures and distributes, *inter alia*, Trojan and other brand-name condoms.  C&D branded condoms now account for over 75% of all retail condom sales in the United States.  Silberman Report Ex. 1.  C&D's market share has steadily increased from its 2001 share of 67.2% (or $143,630,000 in annual revenues) to its 2010 share of 75.43% (or $210,086,934 in annual revenues).  *Id.*  Its market share has been over 50% since 1985.  Wright Report Attachment 4.

The next largest condom brand is Durex, marketed by Reckitt Benckiser Group, with approximately 14% of sales as of 2010.  *Id.* Attachment 8.  Durex has maintained a steady market share of 14-15% since at least 2004.  *Id.*  The third largest brand is Lifestyles, marketed by Ansell Healthcare, with just under 10% market share as of 2012.  *Id.*  Its market share has ranged from a high of over 12% in 2004 to a low of 8% in 2008.  *Id.*  Together, condoms sold by the three largest companies account for over 99% of the nationwide market.  Wright Report Attachment 8.  Globally, Durex/Reckitt is the largest condom manufacturer with a 34% share of the global market, Lifestyles/Ansell is second with a 17% share, and Trojan/C&D is third with 11%.  Wright Report at 35.

B.      The U.S. Condom Industry

The vast majority of condoms in the United States are sold in one of three channels.  First, the food, drug, and mass merchandiser channel, absent Wal-Mart ("FDMx"),[2] accounts for about

_____
[2] FMDx refers to all retailers in the FDM channel except Wal-Mart, while FDM refers to the entire channel including Wal-Mart.  There is not as much data available on Wal-Mart's sales as for other retailers because Wal-Mart does not report to certain data-gathering companies.

**United States District Court**

For the Northern District of California

49% of the unit sales in the retail market. Wright Report Attachment 1. Second, Wal-Mart alone accounts for 33%. *Id.* Third, convenience stores ("c-stores") account for 14.9%. *Id.* The remaining sales occur in club stores (*e.g.*, Costco) and dollar stores (*e.g.*, Dollar General). *Id.*

These channels differ somewhat in their pricing and sales structure. For example, drug stores tend to carry the largest variety of condom brands, and their retail prices are on average twice as high as the mass merchandiser channel. Martineau Federal Trade Commission ("FTC") Depo., Mayer Ex.1, at 38-40. C-stores tend to carry only one or two brands of condoms in three-unit packs due to limited shelf-space, and typically seek exclusive contract bids from manufacturers. Baseman Report at 18; Wright Report at 4. Club stores and dollar stores may also use exclusive contracts, and club stores tend to sell bulk packs only. Wright Report 55-56.

The parties dispute the extent to which there are barriers to entry in the retail condom market. Mayer claims that there are considerable barriers, including costs of FDA and state regulatory approval and compliance, production minimums, and retailer program participation fees. *See, e.g.*, Baseman Report at 22-23; Wedel Decl. ¶¶ 15-19; Mayer Ex. 61. C&D argues that the FDA approval process is not overly rigorous and that the barriers to entry are not substantial. *See* Wright FTC Report at 14.

According to both parties, condoms are unique products that rely heavily on point of sale advertising because manufacturers face constraints in television and print advertising. In that respect, condoms are generally displayed on, and sold from, pegboards and shelves in one area of a store where consumers can quickly glance at them at once. The number and visibility of products available from a particular brand are therefore important in condom sales because of the private nature of the transaction and the speed by which buying decisions are made. Brand loyalty also plays a strong role in the industry, as 52% of customers will leave a store to find their preferred brand, while 48% will choose an alternative brand if their preferred brand is not available. Baseman Report at 6 n.13.

At the point of sale, condom manufacturers compete for retail space and sales marketing in a variety of ways. For example, they may pay retailer slotting fees for each condom "facing" on the

4

shelf.[3]  Baseman Report at 7-8; Wright Report at 58, 89.  Manufacturers may front the costs of a certain amount of new product so that they, rather than the retailer, carry the risk of meager sales. Wright Report at 176.  Retailers may require certain promotional budgets at manufacturer expense, including temporary price reductions (*i.e.*, short-term sales of a product in order to move inventory). Baseman Report at 7-8.  Manufacturers can also offer promotional packages in order to secure premium shelf space at eye-level and/or on the left-hand side of the planogram.[4]  Wright Report at 88-89.  Besides placement in the primary condom section, manufacturers may negotiate for promotional or ongoing placement in endcaps (the shelves located at the end of each aisle) and sidecaps, as well as other locations within the store.  Wright Report at 85-88.  Manufacturers might also negotiate volume discounts, whereby retailers benefit from lower wholesale prices the more they purchase of that manufacturer's brand.  Wright Report at 188.  As noted above, some retailers also negotiate exclusive deals with condom manufacturers whereby the retailer carries only one brand.  Wright Report 89-90.  This is especially common in the c-store channel.

C&D spends approximately 17-19% of its gross sales on discounts and promotions. Overall, C&D, Mayer, Durex, and Lifestyles each offer promotional discounts of approximately 10-13% off of the wholesale price to retailers like Rite Aid.  Wright Report Attachment 12.

Notwithstanding the importance of point-of-sale efforts, condom manufacturers also rely on other forms of marketing. Retailers look at a manufacturer's promotional budget as a factor in determining whether and how to stock their products.  Martineau Depo. at 80-81.  C&D, most notably, currently spends over $58 million per year on marketing, of which over $23 million is dedicated solely to advertising and media expenses.  Wright Report Attachment 5.  Mayer spends $127,000 and $23,000 respectively on these expenses.  *Id.*

C.     C&D's Conduct in the Industry

C&D engages in four types of conduct within the condom industry that are the source of the

---

[3]  A "facing" refers to one column of product seen on a retail shelf.  For example, if a customer looks at a shelf and sees five boxes of a product sitting side by side, those are five "facings."  Sometimes, a popular product may be "double faced" so that two columns are dedicated to the same product, thus ensuring twice the amount of in-store stock available for purchase.

[4]  C&D considers the left-hand side of a planogram to be the premium space.  Mayer does not dispute this assessment.

**United States District Court**
For the Northern District of California

1    parties' disputes.

2           First, in addition to offering a number of the discounts and promotions described above,

3    C&D offers planogram rebate agreements, described herein as its "POG program," to large chain

4    retailers.  C&D's POG program accounts for under $8 million of the $40 million it spent on

5    promotional discounts in 2010, or just 3.5% of gross sales.  Wright Report Attachment 11A.

6           The POG program gives the retailer an opportunity to receive a percentage rebate on its

7    purchases of C&D condoms.  The retailer gets the rebate if it dedicates a specified minimum

8    percentage of the available condom facings on its in-store display to C&D condom products.  C&D

9    "inherited" this POG program in 2001 by acquiring the Trojan brand from Carter-Wallace; the

10   program has been in existence since at least 1997.  Wright Report at 48.  In 2001, the Program had

11   three "tiers" – a 55% tier (awarding a 4.0% rebate for 55% or more of a retail chain's display space),

12   a 65% tier (awarding a 7% rebate for 65% or more of the display space), and a 70% tier (awarding a

13   7.5% rebate for 70% or more of the display space).  Baseman Report at 10.  In 2007, C&D changed

14   the terms of its program, introducing 75% and 80% tiers (providing 8.0% and 8.5% rebates,

15   respectively) and eliminating the 55% tier.  *Id.*  In 2009, C&D eliminated the 65% tier.  *Id.*

16   However, in 2010, C&D reinstated the 65% tier and eliminated the 80% tier.  *Id.*  Its current POG

17   program specifies levels of 65%, 70%, or 75%, corresponding to rebates of 7%, 7.5%, and 8%,

18   respectively.  *Id.*  About 91% of C&D's FDMx sales derive from retailers that participate in the

19   POG program.  Wright Report at 49.  Wal-Mart does not participate.[5]

20           [5] It is undisputed that Wal-Mart has no POG contract with C&D.  *See* Baseman Report at 12-
21   13.  However, Mayer's expert opines that Wal-Mart may be a *de facto* participant, based on certain
     internal C&D documents indicating that Wal-Mart dedicates a certain percentage of space to C&D.
22   *Id.*  However, C&D employees state unequivocally that Wal-Mart does not commit to the POG
     program, and C&D's charts do not list Wal-Mart as receiving a POG rebate.  *See* Wright Report
23   Attachment 11B.  Instead, C&D lists Wal-Mart as receiving a 2.1% cash promotion and 21.1%
     promotional discount off of gross invoice.  *Id.*  This is similar to the lump-sum discounts allotted to
24   other non-POG retailers, like Costco.  *Id.*  Mayer's expert also notes that C&D has sometimes
     negotiated discounts with Wal-Mart on the basis that Wal-Mart will add new C&D SKUs without
25   subtracting others.  Baseman Report at 14.  Such negotiations are more akin to the promotional tools
     described above and employed by all manufacturers.  In addition, none of Mayer's anecdotal
26   evidence regarding its and other small manufacturers' dealings with Wal-Mart indicates that a shelf-
     space agreement with C&D was responsible for their difficulty getting a Wal-Mart deal.  *See, e.g.*,
27   ▮▮▮Decl. ¶¶ 106-07 (▮▮▮ condom brand pitched Wal-Mart but was turned down because it was
     not a national brand); Mayer Depo. at 62-64 (Mayer pitched Wal-Mart but was turned down because
28   it was not a national brand).  The Court concludes Mayer has failed to raise a genuine issue of fact as
     to whether Wal-Mart has a POG contract – the record evidence establishes it does not.

1    Second, in channels in which retailers request exclusive contracts, C&D bids for exclusive

2    agreements with c-stores and dollar stores whereby the stores carry only one brand.  For example,

3    C&D holds an exclusive contract with 7-Eleven.  Wright Report at 51-53.  Overall, C&D has a 50-

4    60% share of c-store condom sales, lower than its 75% share in the market as a whole.  C-stores

5    account for 14.9% of unit sales 22.5% of revenues in the overall condom market.  Wright Report

6    Attachment 1.  Although the parties do not provide details, Durex and Lifestyles seem to account for

7    the bulk of the remaining 40-50% of the c-store channel and regularly bid against C&D for c-store

8    contracts.  *Id.* at 92-93.

9    Third, C&D sometimes serves as a "category captain" for certain large retail chains.

10   Category captains are appointed by some retailers to assist with shelf space allocation and provide

11   advice as to how best to present the category (in this case, condoms).  Wright Report at 105-06;

12   Martineau Depo. at 74.  Mayer alleges C&D has mis-used its category captaincy at certain retailers

13   to its own advantage, at the expense of Mayer and other rivals

14   Fourth, the parties compete directly in the micro- or ultra-thin segment of the condom

15   industry.  Mayer began making its Kimono MicroThin condoms, sourced from a Japanese supplier

16   named Sagami, in the 1990s.  The parties dispute whether Mayer has or had an agreement with

17   Sagami to be its exclusive North American condom distributor.  *See* Mayer Depo. at 37, 127-29.

18   Mayer claims it did and that C&D caused Sagami to breach that agreement.  Mayer also asserts a

19   trademark violation by C&D.  Mayer trademarked the term "microthin" in 2009, but the parties

20   dispute whether the mark is valid.  C&D began using the term "micro-thin" on its packaging in 2006

21   to describe its ultra-thin condoms.

22   D.    Procedural Posture

23   On November 21, 2008, C&D filed a declaratory action in the District of New Jersey seeking

24   a judicial determination that C&D's conduct was legal under applicable federal and state laws.  In

25   that complaint, C&D seeks a declaratory judgment as to the conduct that Mayer alleged in a draft

26   complaint conveyed by Mayer's counsel to C&D in October 2008.  *See* Original Compl. ¶¶ 81-86.

27   On February 17, 2009, Mayer filed an Answer together with Counterclaims. Mayer amended its

28   counterclaims on March 9, 2009. The SAC includes claims for violations of the Sherman Act, 15

1  U.S.C. §§ 1 and 2 (Claims I & II); California's prohibition against trusts (Claim III), Cal Bus. &

2  Prof. Code §§ 16700, *et. seq.*; California's prohibition against exclusive dealing (Claim IV), Cal.

3  Bus. & Prof. Code §§16727, *et. seq.*; California's prohibition against secret rebates (Claim V), Cal.

4  Bus. & Prof. Code § 17045, tortious interference with contractual relations (Claim VI), tortious

5  interference with prospective economic advantage (Claim VII), and unfair competition under

6  common law (Claims VIII & XII). The SAC also asserts claims for infringement under California

7  common law (Claim XI) as well as the Lanham Act, 15 U.S.C. § 1114(a) (Claim X), and a claim for

8  false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Claim IX).  Mayer's SAC

9  requests (1) a declaratory judgment that C&D's Condom Planogram Agreements are unenforceable,

10  (2) a comprehensive permanent injunction, (3) punitive and treble damages, (4) restitution and

11  disgorgement of profits with interest, and (5) attorneys' fees and costs. SAC ¶¶ 102-106.

12      C&D filed a motion to dismiss the SAC on June 18, 2012.  Docket No. 71. The district court

13  for the District of New Jersey transferred the case, including C&D's pending motion to dismiss

14  Mayer's counterclaims, to this Court.  *See* Docket No. 76 (Order transferring case). On April 1,

15  2011, the Court granted C&D's motion to dismiss with respect to Mayer's Fifth Counterclaim (§

16  17045) without prejudice, and denied the motion to dismiss with respect to all other counterclaims.

17  *See* Docket No. 105; *Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*, C-10-4029 EMC,

18  2011 WL 1225912 (N.D. Cal. Apr. 1, 2011).

19      C&D now seeks summary judgment on all of Mayer's counterclaims.  Docket No. 187, 198

20  (redacted version).  That motion is pending before the Court.

## II.  DISCUSSION

21

22  A.      Motion for Summary Judgment – Legal Standard

23      Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

24  the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

25  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

26  party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is genuine

27  only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See*

28  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where the plaintiff has the ultimate burden of proof, he or she may prevail on a motion for summary judgment only if he or she affirmatively demonstrates that there is no genuine dispute as to every essential element of its claim. *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992). In contrast, where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In the instant case, Plaintiff C &D moves for summary judgment on Defendant Mayer's counterclaims. Accordingly, the Court's inquiry will focus on whether Mayer has made a "showing sufficient to establish the existence of an element essential to [its] case." *Id.*

B.     Section 1 – Sherman Act

    1.     Legal Standard

Section 1 of the Sherman Act prohibits, in broad terms, contracts or agreements that unreasonably restrain trade or commerce. It provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 592 F.3d 991 (9th Cir. 2010). To state a claim under § 1, a party must allege (1) an agreement, conspiracy, or combination between two or more entities, (2) an unreasonable restraint of trade, (3) anticompetitive effects within the relevant market, and (4) a resulting antitrust injury suffered by the claimant. *See generally Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 442 (3d Cir. 1997).

Vertical restraints on trade, including those alleged by Mayer, are subject to analysis under the "rule of reason." *See Continental T.V. v. GTE Sylvania*, 433 U.S. 36 (1977) (concerted action on non-price restrictions is subject to rule of reason analysis, requiring a showing of an adverse effect

**United States District Court**
For the Northern District of California

1    on competition in the relevant market); *Bus. Electr. Corp. v. Sharp Electr. Corp.*, 485 U.S. 717, 723-

2    36 (1988) (holding that a vertical restraint of trade is not *per se* illegal under § 1 of the Sherman Act

3    unless it includes some agreement on price or price levels).  An example of a vertical restraint is an

4    exclusive dealing agreement.  "Under the antitrust rule of reason, an exclusive dealing arrangement

5    violates Section 1 only if its effect is to foreclose competition in a substantial share of the line of

6    commerce affected."  *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 592

7    F.3d 991 (9th Cir. 2010) (internal quotation marks and citation omitted); *Omega Envtl., Inc. v.*

8    *Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (explaining that an exclusive dealing

9    arrangement violates § 1 only if its effect is to "foreclose competition in a substantial share of the

10   line of commerce affected").

11        The antitrust plaintiff "carr[ies] the initial burden of showing that the challenged conduct has

12   an actual adverse effect on competition as a whole in the relevant market."  *R.J. Reynolds Tobacco*

13   *Co. v. Philip Morris*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002) (internal quotation marks and

14   citation omitted).  Such a burden is substantial, and requires the plaintiff to demonstrate that a firm

15   has market power within the relevant market, and that its conduct has actual anticompetitive effects

16   within that market.  *See Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir.

17   2001) ("The plaintiff bears the initial burden of showing that the restraint produces 'significant

18   anticompetitive effects' within a 'relevant market.'") (quoting *Hairston v. Pacific 10 Conference*,

19   101 F.3d 1315, 1319 (9th Cir. 1996); XI Areeda & Hovencamp, Antitrust Law, ¶¶ 1820-21 at 178-

20   80 (3d ed. 2011) (describing requirements for a *prima facie* case of illegality under the Rule of

21   Reason as including a showing of an exclusive agreement, market power in the relevant market, and

22   foreclosure "sufficient to warrant an inference of injury to competition"); *id.* ¶ 1822e at 220

23   (characterizing the plaintiff's *prima facie* burden as "substantial").  If the plaintiff succeeds, the

24   burden shifts to the defendant "to establish the pro-competitive redeeming virtues of the action."

25   *Reynolds*, 199 F. Supp. 2d at 380.  If the defendant sustains that burden, the claimant "can still

26   prevail by showing that the same pro-competitive effect could be achieved through an alternative

27   means that is less restrictive of competition."  *Id.* (quotation marks and citation omitted).

28

1    As set forth below, the Court concludes that Mayer has failed to carry its initial burden of

2   demonstrating that C&D's conduct in imposing a vertical contract has foreclosed competition from a

3   substantial share of any relevant market.  Accordingly, the Court does not evaluate whether C&D

4   has proffered sufficient pro-competitive rationales for its conduct, or whether those effects could be

5   achieved through less restrictive means.

6           2.    Adverse Effect on Competition

7           C&D argues that Mayer has failed to establish a genuine issue of material fact as to whether

8   C&D's planogram agreements violate § 1 of the Sherman Act.  C&D claims that (1) it lacks market

9   power in the relevant market because there is no evidence that it can charge supra-competitive prices

10  or that its competitors lack the capacity to increase their output in the short run; (2) the agreements

11  do not substantially foreclose competition under controlling Ninth Circuit precedent and other

12  persuasive authority; and (3) the agreements have pro-competitive effects that override any

13  competitive harm.

14              a.    Relevant Market

15          As a preliminary matter, the parties dispute the relevant market within which to analyze

16  C&D's market power and purportedly anticompetitive conduct.  *See Rebel Oil Co. v. Atlantic*

17  *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (defining the relevant market is the first step in

18  assessing a party's market power); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676

19  F.2d 1291, 1300 (9th Cir. 1982) ("A definition of a relevant market [i]s necessary in order to assess

20  possible Sherman Act violations.").

21          The Ninth Circuit has held that the "definition of the relevant market is a question of fact for

22  the jury."  *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1002 (9th Cir.

23  2008) (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997)).  "However, that an

24  issue is factual does not necessarily preclude summary judgment.  If the moving party shows that

25  there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden

26  of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the

27  burden at trial."  *Rebel Oil*, 51 F.3d at 1435.

28

**United States District Court**
For the Northern District of California

11

The relevant market encompasses "commodities reasonably interchangeable by consumers for the same purposes," and "all sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Id.* (citations omitted); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another."); *Rebel Oil*, 51 F.3d at 1434 ("A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers."). As the Ninth Circuit explained in more detail,

> Determining the relevant market can involve a complicated economic analysis, including concepts like cross-elasticity of demand, and "small but significant nontransitory increase in price" ("SSNIP") analysis. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal.2004) (Walker, C.J.). Cross-elasticity of demand measures the percentage change in quantity that consumers will demand of one product in response to a percentage change in the price of another. Forsyth, 114 F.3d at 1483 (Wallace, J., concurring). When demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market. *Forsyth*, 114 F.3d at 1477.
>
> Similarly, a SSNIP analysis asks whether a monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase. *Oracle*, 331 F. Supp. 2d at 1112. If a significant number of customers would respond to a SSNIP by purchasing substitute products, the SSNIP would not be profitable for the hypothetical monopolist. *Id.* If a monopolist could not profitably impose a SSNIP, the market definition should be expanded to include those substitute products that constrain the monopolist's pricing. *Id.*

*Theme Promotions*, 546 F.3d at 1002.

In the instant case, the parties agree that the relevant geographic market is the United States. They differ, however, as to the scope of the relevant product market. While Mayer's counterclaim had proposed a market of male condoms sold to retailers,[6] Mayer's expert now proposes a market definition of all male condoms sold to retailers in the FDM channels, excluding c-stores, club stores,

---

[6] Indeed, Mayer's counterclaim lists C&D's performance within the c-store chain and its exclusive contract with 7-Eleven as part of its antitrust claims, though it now seeks to exclude c-stores from the market entirely. *See* SAC ¶ 11.

United States District Court

For the Northern District of California

1    and dollar stores.  Mayer also proposes a submarket of drugstores specifically.  By contrast, C&D

2    proposes a market defined as all male condoms sold to retailers.

3         The Court agrees with C&D (and with Mayer's initial proposal) that the relevant market

4    consists of all male condoms sold to retailers.  Mayer conducts the wrong inquiry in assessing the

5    relevant market.  First, it focuses on the end-use consumers of condoms and argues that, for

6    example, the c-store channel is a separate market from the food, drug, and mass channel because the

7    retail price per unit in c-stores is higher and because consumers cannot avoid a per-unit price

8    increase in the FDM channel by moving to the c-store channel.[7]  However, for purposes of this case,

9    the relevant "consumers" are the *retailers* who buy and stock the manufacturers' products, and it is

10   their views as to the substitutability and interchangeability of products that matter.  *See Twin City*

11   *Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1297-99 (9th Cir. 1982) (finding

12   that the focus for market definition purposes was the level at which the parties compete); *Allied*, 592

13   F.3d at 998 (defining the market as the "U.S. pulse oximetry sensor market"); *Concord Boat*, 207

14   F.3d at 1044 ("[T]he relevant market is the market for inboard and stern drive marine engines.");

15   *Reynolds*, 188 F. Supp. 2d at 383 ("[T]he relevant product market for the purpose of this litigation is

16   all cigarette sales through retail outlets and [] the relevant geographic market is the United States.");

17   *El Aguila Food Products, Inc. v. Gruma Corp.*, 301 F. Supp. 612, 615 (S.D. Tex. 2003) (debating

18   between market definitions of the retail market for tortillas vs. retail market for broader category of

19   starches based on whether tortilla producers competed with producers in the broader category);

20   *Frito-Lay, Inc. v. Bachman Co.*, 659 F. Supp. 1129, 1137 (S.D.N.Y. 1986) (defining the market for

21   salted snack foods as retail sales of "corn chips, tortilla chips, potato chips, cheese puffs, pretzels

22   and popcorn").  Thus, the interchangeability and substitutability analysis must be conducted one

23   level up, at the wholesaler-retailer level, rather than the retailer-consumer level.

24        Second, Mayer attempts to segregate the market by separating certain types of consumers for

25   manufacturers' products.  However, the Ninth Circuit has held that "the relevant market must be a

26   *product* market.  The consumers do not define the boundaries of the market; the products or

27   

28        _____

     [7]  This, of course, also begs the question whether consumers could avoid a price increase in
     the c-store channel by purchasing their products in the food, drug, or mass channels.

13

United States District Court

For the Northern District of California

1    producers do." *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008)

2    (citing *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)); *see also Omega*, 127 F.3d at 1162

3    ("The relevant market for [the] purpose [of determining foreclosure effects] includes the full range

4    of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they

5    may readily compete for, using easily convertible plants and marketing organizations.") (quoting 2A

6    Phillip E. Areeda et al., Antitrust Law ¶ 570b1 at 278 (1995)).  Accordingly, the relevant question is

7    whether the products (in this case, condoms) are substitutable within the market, not whether certain

8    customers (*i.e.*, c-stores vs. drugstores) may make their purchasing decisions based on somewhat

9    different criteria.  *See Brown Shoe*, 370 U.S. at 326 ("Brown argues that the predominantly medium-

10   priced shoes which it manufactures occupy a product market different from the predominantly low-

11   priced shoes which Kinney sells. But agreement with that argument would be equivalent to holding

12   that medium-priced shoes do not compete with low-priced shoes. We think the District Court

13   properly found the facts to be otherwise.").

14          In another case involving condom manufacturers, a district court defined the relevant market

15   to include all retail sales of condoms.  *See Ansell Inc. v. Schmid Laboratories, Inc.*, 757 F. Supp.

16   467, 475 (D.N.J. 1991).  Addressing the differences between the retail market and the entire

17   wholesale sales market (including sales to government agencies and nonprofits), the court found that

18   all "retailers' decision to carry a product depends upon the product's proven or reasonably

19   anticipated product turnover," and that all retailers are focused on sales to the individual consumer.

20   *Id*. at 473.  The court also found the retail market to be the best market according to factors such as

21   industry recognition of the market and price sensitivity.  *Id*. at 473-74.

22          Mayer offers no evidence to demonstrate otherwise in this case.  Indeed, at the wholesaler-

23   retailer level, as in *Ansell*, it is undisputed that the parties herein compete with each other and with

24   other manufacturers for retailers' business, and that retailers view their products as substitutable.

25   *See* Martineau Depo. at 60-61, 117 (retailer decision-making process for what products to stock is

26   based on sales performance of the product and sales per shelf-space allocation).  There is also

27   unrebutted evidence that retailers pay attention to other retailers' prices, and attempt to demand

28   price equity from manufacturers.  *See* Martineau Depo. at 106 (when C&D raised prices in 2008,

United States District Court

For the Northern District of California

1    CVS confirmed that the increase would be applied to "all retailers" and then increased its own price

2    accordingly).  While Mayer points to significant retail price differences between channels, those

3    price differences are much less severe at the wholesale price level, the level at which the parties

4    compete.  For example, there is only a 10% difference in the wholesale price for drugstores over

5    mass merchandisers.  Wright Rebuttal Report at 9; Baseman Report at 20.  Mayer also provides no

6    evidence that prices in one channel do not constrain prices in another.  Mr. Baseman fails to cite to

7    any support for his contention that "condom prices in convenience stores are not a significant

8    constraint on the prices that prevail in FDM channels," and he fails to address the relevant prices for

9    purposes of this analysis: the *wholesale* prices retailers pay for manufacturers' products.  Baseman

10   Report at 18.  Mr. Baseman's later corollary argument, that there is "obviously price-based

11   substitution across the FDM channels," is similarly unsupported by citation or reference to evidence.

12   *Id*. at 19.  He provides no basis for the conclusion that Wal-Mart's low prices have taken market

13   share only from other FDM retailers and not from c-stores, dollar stores, and/or club stores.

14        Moreover, price equity is not dispositive.  *Twin City Sportservice*, 512 F.2d at 1274 ("[T]he

15   scope of the relevant market is not governed by the presence of a price differential.").  The Ninth

16   Circuit explained in *Rebel Oil* that cross-elasticity of both supply *and* demand are relevant to

17   defining a market.  *Rebel Oil*, 51 F.3d at 1434-35.  The Court applied this principle in concluding

18   that full-serve gasoline had to be included in the relevant market with self-serve gasoline even

19   though there were enduring price differences between the two segments, and even though consumers

20   did not necessarily switch readily from one service to the other.  The Court nevertheless found that

21   they were both part of the relevant market because of "[t]he ease by which marketers can convert

22   their full-serve facilities to increase their output of self-serve gasoline."  *Rebel Oil*, 51 F.3d at 1436;

23   *see also Ansell*, 757 F. Supp. at 475-76 (finding product substitution to be a key component in the

24   market definition analysis, where manufacturers could divert products from one segment of the

25   market to another).

26        Similarly, in this case, manufacturers can respond to limited opportunities or price increases

27   in one channel by directing their efforts to alternative channels and increasing output in those

28   channels.  For example, Durex has won exclusive contracts with retailers in the c-store and dollar

1  store segments, and both Durex and Lifestyles have competed for premium shelf space at Wal-Mart

2  in the mass segment.  *See, e.g.*, Wright Report at 55-56 & n.187, 191, 192 (Costco, Family Dollar

3  and Dollar General replaced C&D with Durex as the exclusive supplier); Wright FTC Report at 72

4  (internal documents reveal that C&D believed it had been "out maneuvered" by Durex and

5  Lifestyles for premium space in Wal-Mart).  Thus, as in *Rebel*, it may be "immaterial that consumers

6  do not regard the products as substitutes, that a price differential exists, or that the prices are not

7  closely correlated."  *Rebel Oil*, 51 F.3d at 1436.  Rather, what matters is that condom manufacturers

8  compete across these channels and that they can respond to changes in one channel through conduct

9  in another.

10  Mayer's claim that the different size of products offered across these channels – *i.e.*, 3-count

11  packs versus larger packs – warrants excluding c-stores from the relevant market is unpersuasive.  In

12  *Reynolds*, the court examined the different behavior of pack outlets – "comprised of convenience

13  stores and gas stations where primarily cigarette packs are sold" – as opposed to carton outlets –

14  "comprised of supermarkets and cigarette and tobacco stores where primarily cigarette cartons are

15  sold," but included both within the relevant market.  *Reynolds*, 188 F. Supp. 2d at 383.  Mayer fails

16  to explain why differences between the FDM and c-store channels are relevant (*i.e.*, the fact that c-

17  stores sell 3-count packs at higher per-unit prices), but differences between other retailers within the

18  FDM channel are not relevant (*i.e.*, the fact that mass merchandisers sell a substantial number of 36-

19  count packs and larger, at lower prices).  *See* Baseman Report at 18.  In addition, the fact that c-

20  stores carry largely 3-packs of condoms, while other channels carry 3, 12, 24, 36, and higher-

21  quantity packs is irrelevant to the market analysis, as the manufacturers compete for sales within all

22  channels.  That each channel may cater to certain distinct tastes or preferences for individual

23  consumers (*e.g.*, variety of brands offered, low price, bulk packs, etc.) does not separate the channels

24  into distinct markets vis à vis manufacturers – the pertinent arena for defining the relevant market

25  herein.

26  Mayer's remaining arguments in favor of a narrower market are similarly unavailing.  For

27  example, Mayer's expert argues that c-stores are not part of the relevant market because C&D does

28  not use its POG program and faces stiffer competition in that channel.  *See* Baseman Report at 18-

16

United States District Court

For the Northern District of California

19.  However, Mayer cannot simply eliminate all segments in which C&D does not (allegedly) exclude competitors so that it can generate a higher foreclosure rate in its antitrust analysis.  Instead, the fact that the POG program does not encompass all condom retailers may indicate a lesser degree of foreclosure for antitrust purposes.  *See Omega*, 127 F.3d at 1163 ("If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [restrictive arrangements] foreclose from competition *any* part of the relevant market.") (emphasis in original).  Thus, the fact that certain channels are untouched by C&D's planogram program does not render them distinct for purposes of defining the relevant market.  C&D competes with Durex and Lifestyles in c-stores.  As noted above, Durex and Lifestyles do relatively well, garnering approximately 40% of the c-store market.  Since a key inquiry of antitrust analysis is whether alternative channels of distribution exist through which businesses can compete, Mayer's attempt to exclude those channels in which competitors have the best success against C&D, simply on the basis of their success, is unwarranted.

Mayer has also failed to produce evidence of a relevant submarket consisting of drugstores only.  The existence of a submarket may be determined "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the products's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  In this case, the unrebutted evidence in the record suggests that drug retailers view the rest of the category as competitors.  *See* Martineau Depo. at 106.  As discussed above, Mayer has failed to explain how any distinctions between the drug segment and food and mass segment are more salient than distinctions within or between the food and mass segments, or between other segments of the retail market.  While Mayer notes certain differences between the drug channel and other channels (*e.g.*, higher retail prices), as noted above, it fails to account for the fact that other channels within its proposed market definition also vary in price.  Indeed, the *Ansell* court examined the *Brown Shoe* factors and concluded that all condom retail sales formed a relevant submarket; it did not note any salient distinctions within the retail market.  *Ansell*, 757 F. Supp. at 475-76.

United States District Court

For the Northern District of California

"In the context of antitrust law, if there are undisputed facts about the structure of the market that render [an] inference economically unreasonable, the expert opinion is insufficient to support a jury verdict." *Rebel Oil*, 51 F.3d at 1435-36 (citing *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 468-69 (1992)).  In the instant case, Mayer's expert opinion on the pertinent issues regarding the relevant market is without a factual basis.  In attempting to define the relevant market Mayer seeks to carve out channels in which C&D has been exposed to the most rigorous competition and in which Mayer has elected not to compete (*i.e.*, c-stores, dollar stores, and club stores),[8] and to create a separate category for the channel in which C&D appears to have had the most success with its POG program (*i.e.*, drugstores).  This bootstrap is not a proper basis for defining the relevant market.  The question is whether manufacturers compete with each other across these segments, not whether their inclusion or exclusion supports one party's case.

Accordingly, the Court finds that the relevant market is all male condoms sold to retailers in the United States.  However, the Court notes that even accepting Mayer's market definitions, the below analysis would largely yield the same outcome, as much of the parties' available data focus specifically on the FDM channels.

             b.    <u>Market Power</u>

C&D argues that Mayer has failed to provide evidence that C&D holds market power.  "Market power is the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464 (1992) (citation and quotation marks omitted).  Market power is required in order to demonstrate an adverse effect on competition, because without market power firms cannot rationally adopt restraints that have anticompetitive effects if they wish to survive. *R.J. Reynolds Tobacco Co. v. Philip Morris*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002) ("'A threshold inquiry in any Rule of Reason case is whether the defendant had market power' in the relevant product and geographic markets.") (quoting *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989)); *Church & Dwight Co.*, 2011 WL 1225912 at *6 (noting in the context of the

---

[8] *See* Mayer Depo. at 166 (stating that c-stores' "pricing structure is such that we don't choose to compete.").

United States District Court

For the Northern District of California

1  motion to dismiss that the counterclaim adequately alleged market power and that such a showing

2  would be necessary for a § 1 claim).  Market share alone does not establish market power, though it

3  is relevant to the analysis.  *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir.

4  1995) ("A mere showing of substantial or even dominant market share alone cannot establish market

5  power sufficient to carry out a predatory scheme.") (citing *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d

6  1215, 1232 (8th Cir.1987)).[9]  There are two ways of demonstrating market power: directly or

7  circumstantially.

8  i.    Direct Evidence

9        Under the direct method, Mayer must put "forth evidence of restricted output and

10  supracompetitive prices."  *Rebel Oil*, 51 F.3d at 1434 (citing *Federal Trade Comm'n v. Indiana*

11  *Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).  C&D claims that Mayer has failed to put forth any

12  evidence to satisfy the direct method of showing market power, as Mayer has not created a genuine

13  issue of fact as to either restrictive output or supracompetitive prices.  Mayer claims to have

14  produced evidence of supracompetitive pricing through C&D's documents indicating that it will not

15  engage in price competition "because it does not need to."  Opp. at 40.

16        Mayer has not produced the direct evidence necessary to demonstrate market power as

17  defined in *Rebel Oil*.  First, Mayer has not offered any evidence of restricted output.  Although it

18  claims that C&D's planogram agreement successfully drives some competitors out of the market, it

19  offers no evidence that C&D has used such a program to restrict its own, and hence the market's,

20  output.  *See Rebel Oil*, 51 F.3d at 1434 ("A predator has sufficient market power when, by

21  restricting its *own* output, it can restrict marketwide output and, hence, increase marketwide

22  prices.") (emphasis added).  Indeed, the only evidence in the record regarding supply indicates that,

23  while both parties have faced hiccups with their supply chain, C&D has never attempted to restrict

24  its supply.  *See* Mayer Depo., C&D Ex. 17, at 250 (discussing document in which Mr. Mayer had

25  noted the company's supply problems and the fact that competitors would point out to retailers that

26           [9]  Although the *Rebel Oil* court conducts this analysis in the context of a § 2 attempted

27  monopolization claim, it explicitly adopts the same analysis with respect to a § 1 claim.  *Rebel Oil*, 51 F.3d at 1444 ("[F]or the same reasons that we stated in our analysis of Rebel's claim under Sherman Act § 2, Rebel's evidence is insufficient for a jury reasonably to conclude that ARCO

28  possesses market power, or is dangerously close to obtaining it, under § 1.").

1   Mayer's supply was unreliable); Daniels Depo., Mayer Ex. 2, at 178-85 (C&D's head of Sexual

2   Health Marketing Department noting problems at certain points with fulfilling supply orders when

3   demand exceeded their expectations); C&D 11/9/10 Letter to Federal Trade Commission ("FTC"),

4   C&D Ex. 28, at 6 (stating in response to FTC inquiry that C&D's Colonial Heights plant is running

5   at capacity).  Mayer does not directly respond to C&D's arguments regarding output in its brief, nor

6   does it attempt to highlight any evidence in the record that would support this prong of the direct

7   evidence test.

8         Second, Mayer has not provided evidence of supracompetitive prices.  While Mayer alleges

9   broadly that C&D is able to charge high prices, it fails to note that its own prices are even higher.

10  *See* Opp. at 40 (citing Silberman Expert Rebuttal Report, Mayer Ex. 20, at 7 (noting that the

11  weighted average price for Trojans is 23% higher than Ansell and 2% higher than Durex, but failing

12  to note that Table R-1, on which Mr. Silberman relies, shows that Mayer's prices are even higher

13  than Trojan)); Mayer Depo. at 178 ("We've made some decisions about how we wish to position our

14  product. We price it high. End of story.").  Mayer also noted at oral argument that C&D enjoys a

15  higher profit margin in the U.S. condom market (65-67%) than it does in the Canadian market (51-

16  56%).  *See* Baseman Report at 46.  However, Mayer fails to provide any basis for comparison

17  between the two markets or account for the variety of factors that may affecting pricing and profit

18  margins, such that a jury might reasonably infer that this difference was an indication of

19  supracompetitive pricing.  More to the point, Mayer does not provide evidence as to its own or other

20  rivals' comparative margins.

21        In addition, high prices are not equivalent to supracompetitive prices.  The court in *Reynolds*

22  similarly concluded that plaintiffs had failed to demonstrate supracompetitive pricing when they had

23  merely alleged that defendants' prices were "artificially high" without providing evidence that they

24  were supracompetitive.  199 F. Supp. 2d at 382.  Similarly, a court in this district has rejected

25  evidence of price inelasticity and price increases over the relevant time period as insufficient to

26  withstand summary judgment as to direct evidence of market power.  *See In re Ebay Seller Antitrust

27  Litigation*, No. C 07-01882 JF (RS), 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010) ("Evidence

28  that eBay has raised prices over a period of years, and that several of its employees believe that the

1   company may have raised them too high, proves nothing with respect to whether the prices are

2   supracompetitive.").

3          Mayer also refers to C&D documents discussing C&D's ability to raise prices without

4   suffering lower sales, but the evidence it cites indicates that this inelasticity applies to the condom

5   market as a whole as well.  While C&D does appear to enjoy especially high price inelasticity, its

6   own research indicates that it is also at least somewhat vulnerable to price competition from its

7   rivals.  *See* Mayer Ex. 7 (2007 Nielsen report to C&D indicating that a regular price increase had

8   little impact because condoms are one of the most price inelastic categories in the FDM channel, and

9   Trojan in particular is even more inelastic; but noting that competitive influence accounts for 20-

10  30% of Trojan's elasticity).

11         Moreover, even assuming C&D's "high prices" are supracompetitive, they must also be

12  accompanied by output restrictions in order to constitute direct evidence of market power.  *See*

13  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("The plaintiffs submitted evidence

14  that Sunrise Hospital routinely charged higher than other hospitals while reaping high profits.

15  With no accompanying showing of restricted output, however, the plaintiffs have failed to present

16  direct evidence of market power.").  There is no such evidence in the record.

17         Accordingly, Mayer has failed to raise a triable issue of fact as to C&D's market power

18  under the direct evidence test.

19                    ii.    Circumstantial Evidence

20         Mayer has also failed to demonstrate market power via circumstantial evidence.  A plaintiff

21  can demonstrate market power circumstantially by: "(1) defin[ing] the relevant market, (2)

22  show[ing] that the defendant owns a dominant share of that market, and (3) show[ing] that there are

23  significant barriers to entry and show[ing] that existing competitors lack the capacity to increase

24  their output in the short run."  *Rebel Oil*, 51 F.3d at 1434.  As noted above, a large market share

25  alone does not in and of itself demonstrate such power.  *Id.* at 1439.  "A mere showing of substantial

26  or even dominant market share alone cannot establish market power sufficient to carry out a

27  predatory scheme. The plaintiff must show that new rivals are barred from entering the market and

28  show that existing competitors lack the capacity to expand their output to challenge the

United States District Court
For the Northern District of California

1   [defendant's] high price." *Id.* citing *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir.

2   1987). "To justify a finding that a defendant has the power to control prices" sufficient to warrant

3   judicial intervention, "entry barriers must be ... capable of constraining the normal operation of the

4   market to the extent that the problem is unlikely to be self-correcting." *Id.* (citing *United States v.*

5   *Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990)).

6        The Court has already addressed the first prong above. The second prong is not in dispute,

7   as regardless of how the parties define the relevant market, C&D holds a dominant share of

8   approximately 75%.

9        With respect to the third prong, the parties dispute the level of barriers to entry in the

10  condom market. The Ninth Circuit has defined entry barriers as "additional long-run costs that were

11  not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market

12  that deter entry while permitting incumbent firms to earn monopoly returns." *Western Parcel Exp.*

13  *v. United Parcel Service of America, Inc.*, 190 F.3d 974, 975 (9th Cir. 1999) (quoting *Los Angeles*

14  *Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993)). "The main sources of entry

15  barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3)

16  entrenched buyer preference; (4) capital market evaluations imposing higher capital costs on new

17  entrants; and, in some situations, (5) economies of scale." *Rebel Oil*, 51 F.3d at 1439.

18       Mayer claims that barriers are high because of the FDA approval and inspection process,

19  consumer brand loyalty, and C&D's POG program. *See* Baseman Report at 22-23; Wedel Decl. ¶¶

20  15-19. The parties do not dispute that consumer brand loyalty is high in this industry. *See* Baseman

21  Report at 6 n.13 (stating that Church & Dwight's Omnibus Study concluded 52% of consumers

22  would go to another store to purchase condoms if their preferred brand were not available); Wright

23  Rebuttal Report at 54 n. 154 (acknowledging same). This factor accordingly weighs in Mayer's

24  favor. As for regulation, C&D's expert characterizes the FDA approval process, which takes

25  anywhere from 6-24 months, as insubstantial, but it does not explain the basis for this opinion. *See*

26  Wright Report at 18. On the other hand, Mayer does not provide any data to quantify the extent of

27  costs associated with the FDA process. In addition, as the Court explains in detail below, the Court

28  disagrees with Mayer's claim that the POG program constitutes a substantial barrier to entry. *See*

*Western Parcel Exp.*, 190 F.3d at 975-76 (rejecting argument that purported "exclusive dealing contracts" constituted a barrier to entry where contracts were of short duration, easily terminable, and did not prevent consumers from also contracting with competitors).

However, it is undisputed that just three major players have long dominated the condom market, and that while numerous small players have entered the market, none have seriously challenged the big three in recent history. *See, e.g.*, Wright Report, Attachment 8. Such a market structure indicates that the combination of factors described above may prevent the market from self-correcting in the face of anticompetitive conduct. *See Rebel Oil*, 51 F.3d at 1440 ("Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals."). Accordingly, the Court concludes that Mayer has at least raised a question of fact as to the extent of barriers to entry.

Nonetheless, even assuming significant barriers to entry, Mayer has inexplicably failed to produce either evidence or argument as to the last portion of the third prong, whether "existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434. Mayer's opposition brief omits this language from its quotation of *Rebel*, stating only that it must "show that there are significant barriers to entry. . . ." Opp. at 40 (citing *Rebel Oil*, 51 F.3d at 1434). However, *Rebel* is clear that both are required. "Market power cannot be inferred solely from the existence of entry barriers and a dominant market share. The ability to control output and prices-the essence of market power-depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant." *Rebel Oil*, 51 F.3d at 1441.

Although Mayer's counsel stated at oral argument that C&D's competitors lacked capacity to increase output due to lack of access to shelf space, such an argument is unpersuasive for several reasons. First, Mayer does not claim that Durex, Lifestyles, and other rivals have *no* or mere *de minimus* shelf space. As indicated below, nearly 50% of the industry display space is not covered by the POG program, including non-POG retailers in the FDM channel, Wal-Mart, c-stores, dollar stores, and club stores. Moreover, Mayer seems to assume that the only way to increase output would be to increase shelf space, but it fails to account for (much less produce evidence regarding) a competitor's ability to increase output by, *e.g.*, increasing the sales velocity of each item they

United States District Court

For the Northern District of California

1    already have on the shelves.  *See* Martineau Depo. at 117 (noting the importance for CVS of sales

2    per shelf-space allocation); Daniels Depo., C&D Ex. 13, at 39-41 (noting that retailers can swap out

3    products for new ones with better sales velocity).

4         Second, Mayer does not argue that rivals lack the *capacity* to expand output.  Indeed, given

5    that Durex and Lifestyles have larger global market shares than C&D, it is obvious there is no

6    capacity limitation.  Mayer conceded at the hearing it makes no such claim.  Mayer cites no case

7    which establishes that the *Rebel Oil* requirement that rivals "lack the capacity to increase output in

8    the short run" can be based simply on marketing advantages of the dominant incumbent.

9         Accordingly, Mayer cannot demonstrate market power via circumstantial evidence as

10   defined by *Rebel*.

11        Notwithstanding Mayer's failure to produce evidence to satisfy the Ninth Circuit's tests for

12   market power, Mayer contends that the Court's analysis places excessive weight on *Rebel Oil*.

13   Mayer notes that its primary claim is that C&D can exclude rivals, regardless of whether C&D has

14   raised prices and thus the capacity to expand output to provide price competition is irrelevant.

15   Mayer also argues that other cases have employed a more flexible and practical method of analyzing

16   direct evidence of market power.  Indeed, the Supreme Court has suggested that market power can

17   include not only a firm's power to set prices, but also its ability to exclude competition.  *See, e.g.*,

18   *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464-65 (1992) (considering

19   evidence that certain parts were available exclusively through Kodak, that Kodak had restricted the

20   availability of used machines, "that consumers have switched to Kodak service even though they

21   preferred ISO service," that Kodak's services were higher priced and lower quality, and that certain

22   ISO's had been driven out of business as a result; concluding that this evidence was "sufficient to

23   entitle respondents to a trial on their claim of market power").  *Eastman* cautions that "[l]egal

24   presumptions that rest on formalistic distinctions rather than actual market realities are generally

25   disfavored in antitrust law," and that "in determining the existence of market power ... this Court has

26   examined closely the economic reality of the market at issue." *Eastman*, 504 U.S. at 466-67; *see also*

27   *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (finding that there was

28   "a genuine issue of material fact as to whether the plaintiffs' evidence shows direct evidence of a

United States District Court
For the Northern District of California

monopoly, that is, actual control over prices *or actual exclusion of competitors*") (emphasis added); *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper*, 462 F.3d 690, 695 (7th Cir. 2006) (the lower court erred in ruling on summary judgment that a 25% market share was "too small to create market power" for purposes of § 1, where a triable issue of possible market power was raised by evidence of brand differentiation, high market concentration, and the defendant's demonstrated ability to change prices of its brands substantially without affecting output).

Such a functional approach suggests that evidence of the ability to exclude some competitors from the market, even in the absence of market-wide restricted output or supracompetitive prices, could suffice to demonstrate market power in certain instances, especially given C&D's undisputed dominant market share.[10]  For example, although the district court in *Reynolds* cited *Rebel Oil* for its market power tests, it also entertained RJ Reynolds' argument – similar to the one advanced here – that Philip Morris's merchandising contracts excluded competition from the market and were thus evidence of market power.  199 F. Supp. 2d at 381.[11]  Despite the thin evidence produced by Mayer, because this inquiry essentially dovetails with Mayer's arguments and burden on the merits (*i.e.*, does Church & Dwight's conduct substantially foreclose competition), the Court assumes *arguendo* that Mayer has at least raised a triable issue fact as to C&D's market power and proceeds to the elements of its § 1 claim.

c.    Substantial Foreclosure

C&D argues that Mayer fails to raise a genuine issue of material fact as to whether C&D's planogram agreements "foreclose competition in a substantial share of the line of commerce affected."  *Allied Orthopedic*, 592 F.3d at 996 (quoting *Omega*, 127 F.3d at 1162).  Rather than merely potential foreclosure, *actual* foreclosure is required for Mayer's Sherman Act claim: "[I]n a

---

[10]  Flexibility in defining market powers seems particularly warranted in light of the fact, discussed below, that monopoly power – which is narrower than market power – may in some instances be inferred from dominant market share.  The Court must examine the economic realities of the particular situation.

[11]  In *Reynolds*, the court rejected such a theory on the basis that other entities besides defendants had successfully competed for the same merchandising space, and some had also obtained space in excess of their market share.  *Id.*  *Reynolds* also considered the fact that many firms made concessions to retailers in order to secure their desired merchandising agreements as evidence that weighed against a finding of market power.  *Id.* at 382.

United States District Court
For the Northern District of California

1    case under Section 1 of the Sherman Act, the plaintiff must prove that the exclusive dealing

2    arrangement actually foreclosed competition." *Id*. at 996 n.1 (citations omitted).

3           C&D claims that *Allied Orthopedic* renders its agreements permissible as a matter of law.

4    *See* Mot. at 21.  In addition, C&D argues that Mayer has failed to produce any quantitative or

5    qualitative evidence of substantial foreclosure.

6           The parties do not dispute that the vertical restraint imposed by the POG program should be

7    analyzed by the *Allied Orthopedic* test: foreclosure of competition in a substantial share of the

8    market.  That test is rooted in cases involving exclusive dealing agreements.  Although the POG

9    program here is not as inherently coercive as an exclusive dealing agreement – which, instead of

10   incentivizing the establishment of limits on retailers' display space or sales, completely precludes

11   rivals from sales – the POG program may have a similar anticompetitive effect by effectively

12   establishing a ceiling or quota on the amount of display space available to rivals, display space

13   essential to sales.  The percentage approach has the potential for functioning as a zero-sum game,

14   unlike, *e.g.*, discounts based on the number of facings or size of display space with no trade off

15   against space occupied by rivals.  The question then is whether Mayer has made a sufficient factual

16   showing of substantial foreclosure of competition to satisfy *Allied Orthopedic* and similar cases.

17                          i.      No Actual Foreclosure

18                                  (a)      *Allied Orthopedic*

19          In *Allied Orthopedic*, the Ninth Circuit found that market share agreements by which Tyco

20   gave "substantial discounts to customers that actually purchased a high percentage of their sensor

21   requirements from Tyco" did not foreclose competition in the pulse oximetry market.  592 F.3d at

22   996.  The court described Tyco's program as follows:

> Market-share discount agreements allowed customers, typically small
> hospitals or groups of small hospitals, to purchase Tyco's products at
> discounts off list prices if they committed to purchase some minimum
> percentage of their pulse oximetry product requirements from Tyco.
> The greater the percentage of the customer's requirements purchased
> from Tyco, the greater the discount Tyco gave. The agreements did
> not contractually obligate Tyco's customers to buy anything from
> Tyco. The only consequence of purchasing less than the agreed upon
> percentage of Tyco's products was loss of the negotiated discounts.

26

United States District Court

For the Northern District of California

1    *Id.* at 995.  In addition, Tyco offered "sole-source agreements, [in which] a [group purchasing

2    organization] agreed that it would not enter into a purchasing contract with any other vendor of

3    pulse oximetry products, and Tyco in return offered a deeper discount."  *Id.*

4         The court found that neither agreement foreclosed competition.  In analyzing these

5    incentives, the court found it "significant that the market-share discount and sole-source agreements

6    in this case did not contractually obligate Tyco's customers to purchase anything from Tyco."  *Id.* at

7    996.  Instead, Tyco simply offered a discount if and when a customer decided to purchase the

8    required percentage of sensors from Tyco.  The court noted that generic sensors were available at a

9    lower price, and that plaintiffs had failed to demonstrate that Tyco's program "forced customers to

10   purchase its sensors rather than generics."  *Id.* at 997.

11        In addition, the court found that because a customer could terminate its agreement with Tyco

12   at any time if it determined that a competitor offered a better deal, "a competing manufacturer

13   need[ed] only offer a better product or a [] better deal to acquire their [business]."  *Id.* (quoting

14   *Omega*, 127 F.3d at 1164).  Finally, the court found that because alternative channels of distribution

15   were open, even Tyco's sole-source agreements did not foreclose from competition "*any* part of the

16   relevant market."  *Id.* (emphasis in original) (quoting *Omega*, 127 F.3d at 1163); *see also Western*

17   *Parcel Exp.*, 190 F.3d at 975-76 (finding volume discount contracts did not constitute exclusive

18   dealing because they were short term, terminable for any reason, and "did not foreclose consumers

19   from entering into contracts with other delivery service providers").  For example, a buyer "could

20   simply forgo the negotiated discounts with Tyco and purchase less expensive generics instead."  *Id.*

21   In addition, although the buyers were precluded from accessing other discounts through non-Tyco

22   group purchasing organizations, the Court concluded that there was no foreclosure because "[t]here

23   is no evidence . . . that HealthTrust members were unable to access less expensive generic sensors

24   through other means," including "potential," rather than just already-established, channels of

25   distribution.  *Id.*

26        *Allied* reaffirmed the Ninth Circuit's treatment of contracts which are not fully exclusive, but

27   which merely reward a buyer for dedicating a certain volume or portion of its business to one seller

28   while still permitting the buyer to purchase the remainder of its products from other sellers.  In

27

*Omega*, for example, the Ninth Circuit held that a manufacturer's contract prohibiting a distributor from becoming the *authorized* distributor of any competing petroleum dispensers, but still permitting the distributor to sell competing dispensers, did not foreclose competition.  Previewing the themes repeated in *Allied*, the court held that because there were alternative sources of distribution for the products and the contracts were of short duration and easily terminated for any reason, there was no probable effect of substantial foreclosure.  *Omega*, 127 F.3d at 1162-64.  Significantly, the *Omega* court conducted its foreclosure analysis under the Clayton Act, which requires only a *probable* effect of substantial foreclosure.  *Omega*, 127 F.3d at 1162.  In contrast, as noted above, the Sherman Act requires *actual* foreclosure.  *Allied*, 592 F.3d at 996 n.1.

Similarly, in *Western Parcel Express*, the Ninth Circuit held that agreements were not actually "exclusive dealing contracts" where UPS merely used volume discount contracts that did "not preclude consumers from using other delivery services" in addition to UPS.  *Western Parcel Express*, 190 F.3d at 976.  The court also found that the contracts "had termination provisions that allowed a customer to terminate the contract for any reason with very little notice," which "substantially negated" any foreclosure effect.  *Id*. (quoting *Omega*, 127 F.3d at 1163).

The Ninth Circuit case law is not unique.  The prevailing rule in districts and circuits across the country is that where exclusive or semi-exclusive contracts are short in duration, easily terminable, incentive-based, and leave open alternative channels to competitors, they are not exclusionary.  *See* XI Areeda & Hovencamp, Antitrust Law ¶ 1821, at 186 (3d ed. 2011) ("[M]any courts hold that 'market share' agreements or discounts, which require or reward a firm for using a particular firm's goods for a specified percentage but less than all of its needs, do not amount to exclusive dealing.") (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)); *see also id.* (distinguishing further between market-share *discounts*, which still allow competitors to "steal" the customer by matching the discount and are therefore even less exclusive, from market-share *contracts*, which may be of long duration and are therefore more similar to exclusive dealing).

For example, in *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608 (8th Cir. 2011), the Eighth Circuit considered C.R. Bard's program offering discounts to hospitals that agreed to purchase a specified percentage of their catheters from Bard.  *Id*. at 611.  The program offered

United States District Court

For the Northern District of California

increasingly steep discounts as the percentage allocated to Bard grew.  Like Tyco in *Allied*, Bard also provided sole-source discounts in the event a customer purchased all of its catheters from Bard.  *Id*.  Plaintiffs argued that Bard's discount programs were "*de facto* exclusionary because the discount prices are so attractive that hospitals cannot afford to forgo them."  *Id*. at 612.  However, the court noted that the only penalty for failing to meet the agreed upon percentage of purchases was that the customer "simply lost its negotiated discount."  *Id*.  The court found that the agreements were not exclusionary "[b]ecause [they] are voluntary agreements, terminable at will and on short notice, [and] any hospital could, at any time, decide to forego [sic] the offered discounts and purchase catheters from a different brand."  *Id*. at 617 (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (granting summary judgment to defendants in similar case in which plaintiffs had argued that "golden handcuffs" forced customers to accept market-share discount because the agreements were voluntary and customers were willing to purchase the products elsewhere if they received a better offer)).

In the instant case, C&D's POG program, as currently implemented and described in the record, is arguably permissible as a matter of law under the controlling law of this circuit.  First, like Tyco's program in *Allied*, here C&D does not force retailers to purchase anything, much less a certain percentage, of condom products from C&D.  Nor do the agreements force retailers to give any specified amount of shelf space to C&D over its rivals.  Rather, retailers are free to give C&D as much or as little shelf space as they want.  The only consequence is that retailers may not receive a rebate based on those decisions.  Thus, the distinction drawn in *Allied Orthopedic*, 592 F.3d at 997 n.2 – between contracts that obligated customers to purchase a set percentage of their products from a supplier and those which merely conditioned a discount on such a purchase – applies here.

Second, retailers can terminate their agreements with C&D at any time, for any reason, on 30 days notice.[12]  *Omega* found that a 60-day termination period "substantially negated" the risk of

---

[12] C&D argues separately that the Ninth Circuit created a safe harbor for short duration contracts such as its planogram agreements.  *See* Reply at 18 (citing *Omega*, 127 F.3d at 1163 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition.").  However, while *Omega*, like *Allied*, highlighted short duration as an element in favor of a challenged contract, it does not appear to create any safe harbor as a matter of law for such contracts.

United States District Court

For the Northern District of California

foreclosure effects. 127 F.3d at 1163. Even absent early termination, the contracts last only one year. The Seventh Circuit has stated, "Exclusive-dealing contracts terminable in less than a year are presumptively lawful" as a matter of antitrust law. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (reviewing contracts under the Clayton Act) (cited by *Omega*, 127 F.3d at 1163).

Finally, the POG leaves open existing and potential alternative channels of distribution. Each POG retailer is free to contract with C&D's competitors for shelf space, and a substantial portion of the retail market is untouched by the POG program at all, including Wal-Mart (which accounts for 20% of all retail condom revenues and 33% of unit sales), 10% of other FDM retailers, c-stores, dollar stores, and club stores. Even within POG stores, there is substantial (typically 25 to 35%) shelf space not covered by the POG rebate program. In addition, rivals are free to compete for endcap and sidecap space, supplemental facings in other sections of the store (*i.e.*, feminine hygiene and others), and other promotional display space in the store. Rivals can also negotiate for premium space within the condom section, as the POG program places no restrictions on where retailers must place C&D products. Mayer does not dispute that rivals may compete for these alternative paths to distribution. These alternative channels leave competitors a wide range of options to get their products to customers. *See Southeast Missouri*, 642 F.3d at 616 ("[I]n determining whether a market is foreclosed, the relevant inquiry is what products are *reasonably available* to a consumer, not what products the consumer ultimately chooses to buy.").[13]

(b) <u>Distinguishing *Allied Orthopedic*</u>

Mayer claims that, notwithstanding the purported short duration, easy terminability, and voluntary nature of the POG program *in theory*, it is nonetheless coercive *in practice*. Mayer claims that there are distinct facts about C&D's POG's program that distinguish it from *Allied*. Thus, assuming *Allied* does not render the POG program *per se* permissible (because of its basic nature as

---

[13] Indeed, given *Allied*'s and *Omega*'s focus on *potential* alternative channels of distribution, the Court's focus on existing alternatives within retail stores is conservative. For example, CVS's buyer indicated that internet sales, on which the parties do not substantially focus, are a potential alternative channel that may be uniquely suited to small rivals attempting to gain a foothold in the market. *See* Martineau Depo. at 82 (indicating that she sometimes puts a new item on CVS.com to monitor its sales before deciding whether to carry it in the store); *id.* at 91-92 (indicating that a new condom product had received placement on CVS.com to evaluate its potential in-store sales).

United States District Court

For the Northern District of California

1   a price-based incentive to which retailers may respond voluntarily), the Court will address Mayer's

2   claims that the facts in this case nonetheless establish a Section I violation.

3   　　　First, Mayer argues that *Allied* is distinguishable because in that case, Tyco had only a 35%

4   market share as compared to its primary rival, which had a 40+% share.  In contrast, C&D occupies

5   over 75% of the condom market, and is five times larger than its biggest rival, Durex, at under 15%.

6   *See* Wright Report at Attachment 8.  While a dominant market share does not necessarily render a

7   leading player's efforts to maintain that share anticompetitive, *see Harmar*, 218 S.W.3d at 676-77

8   (contracts requiring shelf space commensurate with 75-80% market share not anticompetitive);

9   *Louisa Coke*, 94 F. Supp. 2d at 815 (contracts by distributor with 70% market share to guarantee

10  shelf space not anticompetitive); *Reynolds*, 199 F. Supp. 2d at 388 (shelf space commensurate with

11  55% market share not anticompetitive), the coercive effect of a discounted-based incentive can be

12  amplified where the entity providing the inducement sells at volumes many times greater than its

13  competing rivals.  For example, a 7% discount from a company that sells $10 million in merchandise

14  results in a savings of $700,000 to the retailer.  If the rival manufacturer only has a sales volume of

15  $2 million, it would have to discount its merchandise by 35% to match the $700,000 in savings

16  offered by the dominant firm.

17  　　　This is related to Mayer's second argument.  Mayer's expert posits that C&D's program

18  creates a "tax" on competitors by increasing the cost of switching from C&D to rival products if

19  such a switch would result in a reduction or cancellation of the C&D rebate.  Baseman Report,

20  Mayer Ex. 9, at 25.  Mayer claims that in this case, the tax is exacerbated by the fact that the POG

21  program offers a discontinuous stepped rebate hierarchy.  In other words, C&D's POG program has

22  set participation rates (*e.g.*, 65%, 70%, and 75% of shelf space) with discrete rebate levels that drop

23  off when retailers miss a certain target rate, rather than a continuously increasing discount or a

24  discount applied only to increased marginal purchases.[14]  Mayer contends that such a discontinuous

25  rebate structure creates "cliffs" whereby retailers face harsh penalties (in the form of lost rebates

26  applicable to all sales starting with the first dollar, thus increasing costs to the retailer) for moving

27

28

---

[14]  For example, one could offer a 7% rebate on purchases *above* a certain level, rather than a 7% rebate on *all* purchases back to the first dollar once a retailer reaches a certain level.

United States District Court
For the Northern District of California

1    downward on the rebate rate schedule.  There is an especially jarring penalty for dropping below the

2    65% level (at which point they would lose the 7% rebate on *all* of their purchases of C&D products).

3    Mayer argues that the POG is particularly coercive and results in golden handcuffs, whereby

4    retailers cannot afford to forgo the rebate and thus are forced to devote unjustified display space to

5    C&D.

6         Mayer makes a third related argument in claiming that unlike in *Allied*, C&D's product has

7    strong brand loyalty and is considered a "must carry" brand in the FDM market.  Opp. at 34;

8    Baseman Report at 6.  This arguably gives C&D more leverage to "force" retailers to give it a

9    certain percentage of shelf space because they have to purchase at least some of the product anyway.

10   Brand loyalty thus theoretically increases the coercive effect of the golden handcuffs.

11        Before considering the evidence in the record to support Mayer's theories, the Court first

12   notes that with respect to Mayer's tax effect theory, it is noteworthy that such a theory has yet to be

13   recognized by this Circuit.  Interestingly, the district court in *Allied Orthopedic Appliances, Inc. v.*

14   *Tyco Health Care Group L.P.*, 2008 WL 7346921, at *5 (C.D. Cal. July 9, 2008), considered the

15   expert's conclusions that contracts imposed costs on competitors and found that "regardless of

16   whether Tyco's discounts represent a penalty price or involve kickbacks to hospitals, they do not

17   'force' hospitals to do anything.").  The Ninth Circuit did not question that finding.  *Allied*, 592 F.3d

18   at 996-98 (considering plaintiff's arguments and expert projections and concluding that

19   characteristics of the contracts – such as the lack of purchase requirement and easy terminability –

20   precluded a finding that the contracts foreclosed competition).  There is no indication that *Allied*'s

21   discount program worked any differently than C&D's POG program here.  There is no indication

22   that the gradation of discounts in *Allied* did not also have a theoretical "tax effect."  Yet, the *Allied*

23   court did not find the discount structure was material to its analysis.

24        In any event, even assuming Mayer's arguments in distinguishing *Allied* have potential legal

25   merit in theory, Mayer has failed to present any evidence that the POG program had any more

26   coercive effect than in *Allied* and similar cases (*e.g.*, *Western Parcel Express*, *Omega*, *Southeast*

27   *Missouri Hosp.*, *Concord Boat*).

28

United States District Court
For the Northern District of California

Irrespective of Mayer's theories, Mayer must present some competent evidence of an actual coercive effect that substantially foreclosed competition in order to create a genuine dispute of material fact. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 89 (Tex. 2006) (applying federal antitrust law and stating that although challenged contracts "*could have had* anticompetitive and monopolistic effects," it was improper to "conclude[] that the jury was therefore entitled to infer that the CMAs *did have* such effects"; instead, "[t]here must be evidence of 'demonstrable economic effect,' not just an inference of possible effect") (emphasis in original) (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988)).

In this regard, the Court notes that a number of cases dealing specifically with shelf space limitations have found they do not foreclose competition based on the facts particular to the challenged practice. For example, in *Harmar Bottling Co.*, the Texas Supreme Court relied on federal antitrust law and upheld contracts requiring favorable promotion, placement, and pricing, including shelf space commensurate with 75-80% market share, limits on rivals' shelf space and some bans on certain products. 218 S.W.3d at 676-77. The court also noted that such contracts were common in the industry. In *Frito-Lay, Inc. v. Bachman Co.*, 659 F. Supp. 1129, 1135 (S.D.N.Y. 1986), the court considered a retail display case and concluded that "[b]ecause of the limited duration of the TOP program, the fact that defendant has not alleged that Frito-Lay obtained a greater share of shelf space than its sales warranted, and the fact that dealers were free to drop out of the program or not enroll in it at all, leaving Bachman free to introduce its own competitive scheme, it is very difficult to see how the agreements between Frito-Lay and their retailers could constitute contracts in restraint of trade within the meaning of Section 1 of the Sherman Act." Similarly, in *Reynolds*, a North Carolina district court held that cigarette manufacturers' contracts with retailers for advertising and product space are not anticompetitive where they "do not preclude the display of competing products, do not control the prices at which those products are offered, and do not provide Defendant with more than its market share of product space." 199 F. Supp. 2d at 387. Finally, one court specifically noted the zero-sum game inherent in some shelf-space agreements, yet found that such an outcome did not foreclose competition when "all of the evidence indicates that the store owners within the Louisa Coke market allot shelf, storage and display space

United States District Court

For the Northern District of California

1    at their sole discretion based on such factors as the market's demand for a product and the supplier's

2    ability to keep such products in stock." *Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metropolitan*

3    *Bottling Co., Inc.*, 94 F. Supp. 2d 804, 814 (E.D. Ky. 1999).

4         In the case at bar, Mayer has not presented admissible evidence of a coercive effect

5    distinguishing this case from *Allied*.  First, if the POG coerced retailers into increasing their C&D

6    shelf space allocations (at the expense of Mayer or other rivals) solely because of C&D's rebate

7    program, one would expect to see retailers clustered at the bottom tier of the rebate structure.  Such a

8    cluster could indicate – or at least create a reasonable inference – that retailers were seeking to avoid

9    the penalty of dropping out of the rebate entirely, and that there were no other business justifications

10   for giving C&D that level of shelf space.  However, the record does not indicate such an effect.

11   Instead, the majority of retailers choose tiers higher than the minimum required to obtain the rebate,

12   suggesting that other market factors govern their decisions.  For example, from 2004-2007, despite

13   the fact that a 55% shelf space tier was available, retailers' participation at that level never exceeded

14   3.3%, and declined to under 1% by 2007.  Wright Report Attachment 14.  Instead, the majority of

15   retailers participated at the 65% shelf space level.  In 2007 and 2008 the data is even more

16   pronounced, as a substantial number of retailers moved to the 70% level despite the availability of

17   lower tiers.  The only exception to this trend is 2009, during which over 70% of C&D's revenues

18   came from retailers at the lowest available tier.[15]  However, this phenomenon lasted only one year.

19   On the whole, then, these data belie Mayer's theory that the POG creates any cusp or "cliff" effect,

20   forcing retailers to make decisions they otherwise would not make solely to obtain the rebate.  In

21   short, Mayer presented no factual evidence of a coercive "tax effect."  *See Concord Boat*, 207 F.3d

22   at 1056 (rejecting tax theory in the context of a market-share discount because some buyers

23   purchased more than necessary to qualify for the discount).

24         Moreover, as shown by undisputed data, a significant number of large retailers do not

25   participate in the program, and some have changed levels of participation, indicating that retailers

26   are not locked into POG participation.  *See* Wright Report Attachment 15 (providing chart of top 25

27   retailer planogram participation by level, showing that as of 2011, 6 retailers do not participate at all,

28   _____

     [15]  In 2009, the lowest available tier was 70% of shelf space.

United States District Court

For the Northern District of California

1   participates at 55%,[16] 1 at 65%, 10 at 70%, and 7 at 75%; showing that 2 retailers had decreased

2   levels from 2010-2011 and others had shifted downward in previous years).

3         The record also contains qualitative evidence that retailers can and do reduce or eliminate

4   their participation in the planogram agreements based on market forces.  For example, CVS buyer

5   Michele Martineau testified before the FTC that she does not include the C&D rebate in sales

6   projections, that her planogram decisions do not depend on the rebate, and that CVS is not currently

7   getting the rebate because it is out of compliance due to independent sales decisions.  Martineau

8   FTC Depo., Mayer Ex. 1, at 59-62, 67.  Similarly, 2009 emails between Rite-Aid and Ansell

9   (Lifestyles) show that Ansell proposed a rebate in exchange for a certain number of SKUs[17] and

10  vertical planogram positioning.  In response to Rite-Aid's statement that Ansell would need to be

11  competitive on their incentive offer to match C&D's 7.5% rebate, Ansell in fact revised its offer to

12  do so.  C&D Exs. 18, 19; *see also* Wright Rebuttal Report, C&D Ex. 121, App. B, at 5 n.12 ("Rite

13  Aid indicated that it first independently determines what share of its planogram it wants to devote to

14  Church & Dwight products and then claims whatever rebate it is entitled to as a result of that

15  decision.") (citing Rite Aid email to the FTC, September 24, 2009, RAHC 000775 at 776)).  Mayer

16  provides no evidence to rebut these retailers' assertions.

17        Furthermore, the undisputed evidence in the record indicates that C&D's average share of

18  sales at non-POG retailers is roughly on par with its share of sales at POG retailers. *See* Silberman

19  Report Ex. 3.  In fact, comparing those retailers that never had POG programs with those that always

20  had them, C&D's share of unit sales at "never had" retailers has *always equaled or exceeded* its

21  share of sales at "always had" retailers for every quarter between 2004 and 2010.  Wright Rebuttal

22  Report Figure A3.  In only two quarters of 2010 were the shares actually equal; in every other

23  quarter measured, sales at "never had" retailers exceeded those at "always had" retailers.  Indeed, for

24  nearly three of the years measured, C&D's share of sales at "never had" retailers was at least five

25  (and sometimes ten+) percentage points higher than at "always had" retailers.

26  _____

27        [16]  Meijer has a special contract to keep its 55% planogram participation, which is apparently
      not offered to other retailers.

28        [17]  SKU refers to a stock-keeping unit.

United States District Court
For the Northern District of California

Similarly, C&D's data indicate that system-wide, C&D's shelf share rarely exceeded its market share.  *See* Wright Report at Attachment 16A (comparing average shelf share per year to unit sales share per year from 2004-2010, and showing that sales share exceeded shelf share for all years except 2005 and 2009, when it trailed by .8% and .5% respectively); Table 16B (breaking same data out by retailer and showing few deviations below parity).  In addition, of the top 25 FDM merchants (excluding Wal-Mart) selling C&D products between 2004 and 2011, on only five instances has C&D's shelf share exceeded its market share.  *See* Wright Report Attachments 15 and 17B.[18] Mayer's claim that "C&D consistently used the planogram program to obtain shelf space that exceeded its market share" is thus unsupported by the record.  Opp. at 32.  The isolated instances in which C&D's market share fell slightly below its sales share are not indicative of an antitrust violation.  *See LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of [the defendant's] exclusionary practices considered together.... [C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."); *see generally Harmar Bottling Co.*, 218 S.W.3d at 689-90 ("There is no evidence that such isolated instances impacted consumers throughout any exclusive territory, much less throughout the Ark-La-Tex region.  While consumers may have paid more on occasion in a particular store, there is no evidence that Coke's CMAs caused consumers to pay higher prices generally.").  Courts have considered parity between shelf space and market share to be an important indicator that a firm is not using its contracts to foreclose competition.  *Reynolds*, 199 F. Supp. 2d at 388 (considering it significant in foreclosure analysis that "[u]nder every level of Retail Leaders, PM obtains cigarette product space in an amount equal to or less than its market share"); *Frito-Lay, Inc. v. Bachman Co.*, 659 F. Supp. 1129, 1134 (S.D.N.Y.1986) (upholding agreement that guaranteed supplier shelf space equal to its market share); *Harmar Bottling Co.*, 218 S.W.3d at 677(reversing judgment and holding that there was no evidence of anticompetitive harm based in part on the fact that contracted shelf space did not exceed market share).

---

[18]  Moreover, C&D points out that in the case of Target, the reason for the aberration was its acceptance of a two brand strategy promoted by Durex, an event unconnected to the POG program.

United States District Court

For the Northern District of California

1        Mayer also fails to account for the fact that Durex and Lifestyles have avoided the purported

2   anticompetitive effect of C&D's POG program.  *See* Silberman Report, Mayer Ex. 24, at 15

3   (admitting that Durex's sales have been "essentially unaffected" by the planogram rebate program).

4   Durex has maintained its roughly 15% market share throughout the period in question, and

5   Lifestyles has both dropped and increased during the same period.  Although Mayer's counsel

6   averred at oral argument that Lifestyles may have been affected by the POG program, Mayer

7   provides no evidence or argument in the record from which a jury could draw such a conclusion.

8   *See id.* (stating that Lifestyles's market share fell between 2004-2006 and 2008-2010, but offering

9   no facts or analysis as to why).  By contrast, C&D offers unrebutted evidence to explain Lifestyles's

10  changes in market share, including an FDA quarantine in 2005 and a successful Durex strategy to

11  persuade retailers to adopt a two-brand strategy with Durex and Trojan only. *See* Wright FTC

12  Report, Mayer Ex. 8, at 87; *see also* Wright Report at 115-21 (describing other factors, including a

13  decline in Lifestyles sales among small non-POG retailers, minimal advertising as compared to

14  C&D and Durex, and changes in packaging that may have confused consumers).

15        Without explaining how C&D's two primary competitors have escaped relatively unscathed,

16  Mayer has not provided a plausible basis for attributing its own misfortune to C&D rather than other

17  forces.  In fact, C&D has presented evidence of numerous reasons why Mayer has lost business.  For

18  example, C&D presents evidence that (1) Mayer prices its condoms at a high level (which Mr.

19  Mayer admits)[19]; (2) it targets a narrow sub-set of the condom-buying population, women age 25-35;

20  (3) it has limited product offerings, with 10 SKUs in 2010 as compared to Ansell, Durex, and C&D

21  at 43, 51, and 65 SKUs respectively; (4) it is severely financially constrained with high production

22  costs due to its dependency on its supplier, Sagami, for lines of credit and its failed investments in

23  products such as eZ-on and the Female Condom; (5) it faced inventory constraints in 2006 and 2007

24  due in part to an FDA hold on shipments; (6) it did not engage in consistent marketing efforts; (7) it

25  has faced continual competition in the ultra-thin segment of the condom market, where Durex and

---

[19]  Indeed, C&D supports its claim that Mayer's high prices are at least partially responsible for its limited success by offering evidence that its 2004 "buy-one-get-one-free promotion at Longs quadrupled Mayer's sales.  Wright Report at 132.  In contrast, the record is replete with internal Mayer documents bemoaning the fact that buyers complain about high prices. *See, e.g.*, Mayer Depo. at 174, C&D Exs. 44-51, 54-56.

1   Ansell hold 33% and 20% shares, respectively; (8) it faced competition from the new ONE brand

2   condom, which Mayer blamed internally for its difficulty gaining new distribution in 2007; (9)

3   Mayer suspected that Ansell and Durex were buying shelf space to keep Mayer out in 2007; and (10)

4   it chooses not to compete in the c-store channel.  *See* Wright Report at 126-63, 202-03.

5          In addition, C&D offers evidence that Mayer has had opportunities to sell its products

6   through large chain retailers, but has lost those opportunities due to poor sales and other factors.

7   *See, e.g.*, *id.* at 168-69 (Rite Aid discontinued some Mayer products in 2006 and all products in 2007

8   due to what Mayer described at the time as a lost battle with bigger companies who introduced new

9   products); *id.* at 174-75 (Brooks/Eckerd failed to stock Mayer products in half the stores in which it

10  had agreed to stock them in 2005, and sales were lower than expected: Mayer was discontinued in

11  2007); *id.* at 177-78 (CVS Kimono sales were lower than the CVS average per condom product, and

12  were outpaced by smaller rivals; CVS discontinued Mayer in 2007 but reintroduced five SKUs in

13  2009 in California stores); *id.* at 186-87 (Walgreens introduced ONE condoms in 2008 which

14  outpaced Kimono sales; Walgreens complained in 2010 that Kimono's sales were low and declined

15  to increase their distribution); *id.* at 189-92 (Duane Reade discontinued one of four Kimono SKUs in

16  2008 due to poor sales, and discontinued a second slow-selling SKU in 2009); *id.* at 195-96 (Target

17  ran a test of Kimono SKUs in selected stores in 2010, but discontinued the test after what an internal

18  Mayer document described as "no gains for Kimono after a test").

19         Mayer's expert fails to address most of these and other proffered reasons for Mayer's losses.

20  *See, e.g.*, Silberman Damages Report at 15-16 (noting that the small manufacturer segment of

21  condom manufacturers could have declined due to the consolidation of retailers and their central

22  purchasing strategies, as well as some chains' adoption of a two-brand strategy with Durex and

23  Trojan, but nonetheless attributing the decline to C&D's planogram program).  Mr. Silberman's

24  Rebuttal Report addresses and rebuts some of C&D's evidence from the early 2000s, pointing out

25  that any weaknesses in Mayer's financial position and business model did not prevent Mayer from

26  increasing its sales from 2001-2006.  Silberman Rebuttal Report at 4.  The Court credits that rebuttal

27  for purposes of summary judgment.  However, Mr. Silberman still fails to address the more recent

28  alternative explanations cited above.  Most critically, Mayer fails to explain any alternative reasons

United States District Court

For the Northern District of California

1  for why it suffered from slow sales in the national retailers in which it had already secured at least

2  some distribution, or how any slow sales and resulting discontinuance were due to C&D rather than

3  Mayer's performance or some other factor.  Instead, Mr. Silberman merely states that Mayer's lost

4  distribution is also consistent with C&D's increased POG efforts, but does nothing to draw any

5  causal connection.  *See id.* at 11 (noting without explaining that Rite Aid reduced number of stores

6  carrying Kimono in 2006, and stating that Mayer's internal document indicating it had lost the battle

7  with larger manufacturers that had introduced new products was "entirely consistent with C&D's

8  shelf-space contracts having an anticompetitive effect"); *id.* at 16 (repeating argument that removal

9  of certain SKUs from Longs coincides with increases in POG program, but failing to address any

10 alternative reasons for the coincidence).  Mr. Silberman also presents other unrelated evidence that

11 has no connection to the POG program.  *See id.* at 12 (explaining Mayer's low sales at CVS in 2006

12 due to C&D achieving eye-level placement in the planogram, a perk unconnected to the POG); *id.* at

13 17 (stating that Walgreens accounted for a large percentage of Kimono's sales in 2008, which says

14 nothing about how Kimono performed relative to other brands at Walgreens).  Failure to account for

15 alternative causes of a business injury renders Mayer's assertion that it lost business due to C&D's

16 program unsubstantiated.  *See Frito-Lay*, 659 F. Supp. at 1135 ("[E]ven though defendant has made

17 specific allegations regarding its own market losses, it has asserted no facts to show that its losses

18 were a result of defendant's allegedly anticompetitive activity, rather than a result of financial

19 difficulties within the company or some other problem.").

20         Mayer also fails to present any direct evidence of anticompetitive harm suffered as a result of

21 C&D's POG program.  Mayer offers only a couple of anecdotes from Mr. Mayer and Mr. Wedel (of

22 Global Protection Corporation, the makers of ONE condoms) relaying hearsay statements of

23 suppliers who stated they could no longer make room for Mayer/GPC products because they needed

24 the space for C&D.  *See* Silberman Report, Mayer Ex. 24, at 16-17 (Duane Reade employee stated

25 that they could not lose the C&D rebate); Wedel Decl., Mayer Ex. 10, ¶ 91 (██ buyer told Global

26 Protection that it was discontinuing its SKUs because C&D agreement required them to increase self

27 space by 10% for C&D).  But these statements constitute hearsay and are not admissible.  If

28 anything, Mayer's reliance on such hearsay underscores the fact that Mayer did not depose any third

United States District Court

For the Northern District of California

1    party retailers and presented no admissible testimony or documents showing C&D's POG program

2    had the anticompetitive effect of coercing displacement of competitors' display space.  In any event,

3    such evidence is insufficient to support a jury verdict that C&D harmed competition (rather than

4    simply one or two discreet competitors).  *See Louisa Coca-Cola*, 94 F. Supp. 2d at 814 ("Plaintiff

5    offers nothing other than its own projected lost profits to prove that Pepsi's actions have foreclosed a

6    substantial share of the soft drink market.  A single competitor's lost profits does not demonstrate a

7    market wide competitive detriment.") (citations omitted); *Frito-Lay*, 659 F. Supp. at 1135 (failure to

8    trace losses to accused conduct dooms claim of harm to competition).

9         Mayer further fails to address the fact that POG rebates comprise only a small part of C&D's

10   promotional budget.  C&D spends only approximately 3.4% of gross sales on the planogram rebate,

11   as compared to other promotional programs that make up 15% of gross sales.  Wright FTC Report at

12   2, 30, Table 7A, 7B.  These additional promotions are commonplace in the industry and include

13   things like slotting fees, trade promotions, and cash discounts.  *See, e.g.,* C&D Ex. 61 (2004 email

14   from Mayer to Sagami noting increasing costs imposed by retailers through means such as slotting

15   fees); C&D Ex. 115 (Durex proposal to Target including funds for promotional discount).  Given

16   that C&D's other promotional dollars dwarf its spending on the POG program, in the absence of

17   evidence to the contrary, it is difficult to see how the program exercises the coercive power on the

18   market that Mayer alleges.  In addition, C&D points out that its promotional spending, including the

19   POG agreements, is proportionate to its main competitors, including Mayer.  Wright Report

20   Attachment 12 (showing C&D, Mayer, Durex, Ansell, and Global Protection all spending

21   approximately 10% of gross condom purchases on promotional funding).

22        In sum, there is no evidentiary support in the record that C&D's POG rebates created a

23   coercive effect on retailers which foreclosed competitors from a substantial share of the market.  The

24   lack of such evidence of coercive effect stands in contrast to cases where such an effect was found.

25   For instance, *Allied,* in finding no substantial foreclosure, distinguished a previous case involving

26   Tyco's contracts in which the court had found anticompetitive conduct because a patent still in effect

27   precluded customers from purchasing generic products as a substitute for Tyco sensors.  *See Allied*,

28   592 F.3d at 997 n.2 ("The R-Cal patent was still in effect during the time period at issue in *Masimo*,

United States District Court

For the Northern District of California

1    so owners of Tyco's R-Cal monitors had no choice but to purchase Tyco's sensors for use with those

2    monitors.") (citing *Masimo Corp. v. Tyco Health Care Group*, No. 07-55960, 2009 WL 3451725

3    (9th Cir. Oct. 28, 2009)).  The level of coercion at issue in *Masimo* was much higher than in this

4    case, as customers in *Masimo* had *no* product alternatives.  *Cf.* Wright Rebuttal Report, C&D Ex.

5    121, at 54 n.154 ("Church & Dwight's Omnibus Study found that 52% of consumers would go to

6    another store to purchase condoms if their preferred brand were not available.  The remaining 48%

7    would stay in the store and choose from other brands.").

8           Qualitatively, Mayer has failed to raise a genuine issue of fact as to whether C&D's POG

9    program has had a coercive effect upon retailers, forcing them against their own business judgment

10   to take display space away from rivals and give it to C&D.

11                          ii.      Overestimating the Foreclosure Rate

12          Even if the Court were to assume there was evidence of a coercive effect which foreclosed

13   some competition, thus distinguishing this case from *Allied*, there is no evidence that competition

14   was foreclosed from a *substantial* portion of the market.

15          In this regard, Mayer's expert claims that the foreclosure rate is upwards of 75-95%,

16   depending on the scope of the relevant market.  Mr. Baseman arrives at this rate by calculating the

17   percentage of FDMx sales by retailers who participated in and were in compliance with C&D's

18   planogram program (not including c-stores).  Baseman Report at 38.  Using this formula, Mr.

19   Baseman concludes that the foreclosure rate ranged from a low of 76.8% in 2005 to a high of 88.8%

20   in 2008.  *Id*.  However, Mr. Baseman's methodology is implausible and unsupported by evidence.

21          First, his formula fails to account for the portion of shelf space available in a C&D-compliant

22   store that is *not* covered by the planogram agreements.  Mayer offers no basis to conclude that all

23   competition is foreclosed in retailers participating in the program; all retailers do not devote 100%

24   of shelf space to C&D.[20]  However, as the court noted in *Omega*, 127 F.3d at 1163, "If competitors

25   can reach the ultimate consumers of the product by employing existing or potential alternative

---

[20]  Mr. Baseman seems to acknowledge the speculative nature of his foreclosure calculation, as he describes the foreclosure rate in terms of the percentage of retailers that were "likely incentivized" by the POG.  Yet all discounts offered by competitors "likely incentivize" buyers to buy more of the discounted product.  That is the point of discounts.  The question is not whether the POG "likely incentivized" retailers to choose C&D products, but whether it *foreclosed* competition.

United States District Court

For the Northern District of California

1    channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part

2    of the relevant market." (Emphasis in original). *Cf. Reynolds*, 199 F. Supp. 2d at 387 (comparing

3    shelf space rebate program to an exclusive dealing agreement but noting that "[b]ecause Retail

4    Leaders is less restrictive than an exclusive dealing arrangement, it arguably should face less

5    scrutiny under antitrust analysis"). Indeed, in *Reynolds*, the court excluded stores from its

6    foreclosure calculation in which plaintiffs still had an opportunity to display and promote their

7    products, even though defendant required a percentage of available signage. *Id*. at 390. The court

8    noted that the proper foreclosure rate would probably take into account only stores in which the

9    defendant had an exclusive contract, but it used a higher number merely for the sake of argument.

10   *Id*.[21] By contrast, Mayer's expert not only included all stores in which C&D had secured a

11   planogram agreement, despite Mayer's (and other rivals') ability to compete for space in those

12   stores, he also treated those stores as 100% foreclosed. In fact, 25-35% of the space in POG retailers

13   is typically available to rivals, which equals or exceeds those rivals' combined market share.

14          Second, the calculation is flawed because it overstates the actual foreclosure effect in this

15   context – it overstates the amount of total shelf space in the condom market under the auspices of

16   the POG. In *Omega*, 127 F.3d at 1162, the court calculated the foreclosure rate by multiplying the

17   "percent of Gilbarco's total dispenser sales [that] are through distributors" (70%) by Gilbarco's

18   market share (55%). Using *Omega's* foreclosure methodology, if C&D has a 75% market share, and

19   66.1%[22] of its sales derive from POG contracts and c-store contracts, the foreclosure rate would be

20   49.6%. However, even this rate overstates the actual foreclosure in the market because it treats

21   exclusive contracts POG/percentage contracts as equally foreclosing, which does not reflect the

---

22          [21] Indeed, the court even voiced concern that the "exclusive" contracts still did not foreclose
23   competition because "Retailers generally carry manufacturers' products in these stores even though
     they do not have merchandising contracts in these stores. Furthermore, Plaintiffs are free to
24   negotiate merchandising contracts with these stores." *Id*. at 390 n. 20.

25          [22] 22% of C&D's sales derive from the c-store channel. Wright Report at 51. 28% of its
     sales derive from Wal-Mart. Wright Report Attachment 2. 1% of its sales derive from Sam's Club.
26   *Id.* This leaves 49% of C&D revenues which derive from all other retailers, which the Court will
     label FDMx for simplicity's sake even though it also includes a small portion from dollar stores and
27   club stores. Of those revenues in the FDMx channel, 90% of C&D's FDMx revenues derive from
     POG retailers. Thus, approximately 44.1% of C&D revenues (90 X 49) derive from POG
28   participants. 44.1% (POG sales) + 22% (c-store sales) = 66.1% of C&D revenues that derive from
     some form of exclusive or semi-exclusive agreement.

1   realities of the market.  Instead, one could apply *Omega* to the realities of this market, in which

2   C&D's average contracted shelf share is 72%[23] in the POG stores and 60%[24] in the c-stores.  *See*

3   Wright Report Attachment 16A; *id.* at 53.  If 44.1% of C&D's sales derive from POG retailers,

4   where it has a contracted shelf share of 72%, and 22% of its sales derive from c-stores, where it has

5   a 60% share, one could calculate a foreclosure rate of 45%.[25]  Yet another method would be to

6   attempt to calculate the approximate total shelf space in the condom market dedicated to C&D

7   through either the POG or c-store contracts.  Such a method would first multiply the percentage of

8   the total condom market occupied by POG retailers (51.6%)[26] by C&D's average shelf share in those

9   retailers (72%), which is  37%, or the total percentage of condom shelves occupied by the POG

10  program.  Second, for the c-store market, one would multiply the percentage of the total condom

11  market occupied by c-stores (22.5%)[27] by C&D's average shelf share in that market (60%), which is

12  13.5%, or the total percentage of the condom market occupied by C&D c-store sales.  Adding these

13  two figures together, the total percentage of condom shelves dedicated to C&D through a POG or

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22

---

23  [23]  72% is the highest average shelf share, reflecting data from 2009.  It is thus a high water mark for the POG program.

24  [24]  60% is again a high water mark, as Mr. Wright calculates C&D's c-store market share at

25  50-60%.

26  [25]  44.1% X 72% = 31.8%.  22% X 60% = 13.2%.  31.8% + 13.2% = **45%**.

27  [26]  92% of FDMx sales are from POG retailers (Baseman Report Table 2) X 56.1% of condom market is FDMx retailers = 51.6% of the condom market that is POG retailers.

28  [27]  Wright Report Attachment 1.

United States District Court

For the Northern District of California

1    c-store agreement is 50.5%.[28]  Thus, using any of these three methods, the foreclosure rate could be

2    calculated as 49.6%, 45%, or 50.5%.

3           Any one of these rates, though high, is not clearly outside of the permissible range.  *See, e.g.*,

4    *B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008) ("Courts routinely

5    observe that foreclosure levels are unlikely to be of concern where they are less than 30 or 40

6    percent.") (internal citations and quotation marks omitted); *Omega*, 127 F.3d at 1162-63 (agreement

7    foreclosing 38% did not violate antitrust laws); *Reynolds*, 199 F. Supp. 2d at 390 (upholding space-

8    to-sales rebate program with 34% foreclosure); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d

9    227, 237-38 (1st Cir. 1983) (Breyer, J.) (upholding requirements contract with 50% foreclosure

10   rate).

11          Importantly, courts assessing similar contracts have discounted the quantitative foreclosure

12   rates because of the qualitative factors the Court has already discussed.  In *Omega*, the court

13   discounted the foreclosure rate of 38% due to qualitative factors, including the fact that (1) the

14   exclusive dealing occurred at the distributor level, leaving open alternative channels of distribution;

15   (2) the contracts were short in duration; and (3) the contracts were easily terminable.  127 F.3d at

16   1162-64.  In *Barry Wright*, 724 F.2d at 237-38, Judge Breyer discounted a 50% foreclosure rate

17   based on a three-year high fixed dollar amount contract affecting 50% of the market as

18   "considerably overstat[ing] the size of the foreclosure and its likely anticompetitive effect" because

19   the buyer still had the ability to buy small amounts from other sellers if necessary and the contracts

20   were each one year, among other factors.

21

22   _____

     [28] This final method uses the data for *revenue share* to determine what percentage of the
23   condom market is occupied by POG retailers and c-stores.  Yet another alternative method would be
     to use the percentage of *unit sales* to calculate each segment's market share.  These percentages are
24   different because each channel uses somewhat different pricing (*e.g.*, drugstores charge higher retail
     prices, so they have a greater revenue share than unit share in the condom market).  Using unit share
25   would arguably yield a more accurate rate for purposes of this case because it would calculate the
     total percentage of condom units sold that are attributable to the POG or c-stores.  Under this
26   method, 45% of the condom market is occupied by POG retailers.  *See* Wright Report Attachment 1
     (49% of unit sales are from FDMx retailers); Baseman Report Table 1 (92% of FDMx retailers are
27   POG retailers).  Since C&D contracts for an average shelf share of 72% in POG retailers, the
     foreclosure rate due to the POG would be 32.4%.  In the c-store channel, c-stores account for 14.9%
28   of condom unit sales.  Wright Report Attachment 1.  Since C&D has an average 60% share of the c-
     store channel, the foreclosure rate due to the c-store contracts would be 8.9%.  Thus, the total
     foreclosure rate using this method would be 41.3%, lower than any of the above-calculated rates.

44

United States District Court

For the Northern District of California

1    Most importantly, the 45-50.5% foreclosure rate must be discounted because the POG

2    incentive-based program lacks the same coercive effect as an exclusive contract.  As discussed

3    above, *Allied* can be read as presuming there is no foreclosure given the voluntary price-based

4    nature of the incentive.  *Allied*, 592 F.3d at 997 (approving of incentive-based exclusive contracts).

5    As the analysis above demonstrates, if there is any tax effect or coercive impact due to the POG

6    program, it does not exist with respect to the entire shelf space covered by the program.  At best,

7    there may be a marginal effect at the cusps of the rebate hierarchy.  The evidence discussed above

8    demonstrates that the vast majority of shelf space devoted to C&D would have been stocked with

9    C&D product even in the absence of the POG program.  The foreclosure effect, if any, of the POG

10    program appears only at the margins.

11    Finally, Mayer contends that C&D forecloses competition because its POG indirectly limits

12    new entrants' ability to gain a foothold in the market.  Mayer argues that certain non-POG retailers,

13    such as Wal-Mart, will not stock smaller brands' products unless they already have an established

14    market presence, and that the retailers most suited to giving small brands a shot at establishing that

15    presence are "foreclosed" by the POG, thus leaving small brands at a disadvantage.  *See* █████

16    Decl. ¶¶ 106-07.  However, that certain major alternative channels of distribution such as Wal-Mart

17    may be less hospitable to Mayer does not give rise to an antitrust law violation.  The antitrust law

18    does not require competitors to be able to *succeed* in alternative channels; it merely requires them to

19    have the *opportunity* to succeed.  *Omega*, 127 F.3d at 1163 ("Competitors are free to sell directly, to

20    develop alternative distributors, or to compete for the services of the existing distributors.  Antitrust

21    laws require no more.").  *See American Professional Testing Service, Inc. v. Harcourt Brace*

22    *Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997)

23    ("[R]eputation alone does not constitute a sufficient entry barrier in this Circuit."); *United States v.*

24    *Syufy Enterprises*, 903 F.2d 659, 669 (9th Cir. 1990) ("We fail to see how the existence of good will

25    achieved through effective service is an impediment to, rather than the natural result of,

26    competition.")).  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (no

27    anticompetitive impact where plaintiffs not foreclosed from every alternative)).  As for the POG

28    retailers, the Court has already found that a substantial part of the market is open to competition.

United States District Court
For the Northern District of California

iii.   Conclusion

Accordingly, the Court concludes that Mayer has failed to raise a genuine issue of material fact as to whether C&D's POG programs foreclose competition in a substantial share of the relevant market.  Undisputed record evidence supports the conclusion that C&D's program falls within the conduct permitted by *Allied* and other persuasive authority.  While there may be factual scenarios that might render conduct such as C&D's POG program impermissible even under *Allied*, on this record, Mayer has failed to make the requisite factual showing to escape its ambit.

The Court therefore **GRANTS** summary judgment to C&D as to Mayer's § 1 Sherman Act claim, and declines to reach the question of whether the POG program has pro-competitive effects, and whether there are less restrictive means by which C&D could tailor its program.

C.      Section 2 – Sherman Act

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations." 15 U.S.C. § 2.  Mayer alleges three theories of liability under § 2: monopolization, attempted monopolization, and conspiracy to monopolize.

To prevail on its § 2 monopolization claim, Mayer must prove: (1) C&D's possession of monopoly power in the relevant market, (2) C&D's willful acquisition or maintenance of that power (as opposed to success resulting from "a superior product, business acumen, or historic accident"), and (3) a resulting antitrust injury.  *See Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 448 (2009).

To prove an unlawful monopolization conspiracy under § 2, Mayer must show: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) causal antitrust injury.  *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

A private party seeking damages under an attempted monopolization theory must demonstrate "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of

United States District Court
For the Northern District of California

1   achieving monopoly power; and (4) causal antitrust injury." *McGlinchy v. Shell Chem. Co.*, 845

2   F.2d 802, 811 (9th Cir. 1988); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456

3   (1993); *Rebel Oil*, 51 F.3d at 1433 (noting that a private party seeking damages for antitrust

4   violations "must prove that his loss flows from an anticompetitive aspect or effect of the defendant's

5   behavior").

6   Each claim is similar, "differing primarily in the requisite intent and the necessary level of

7   monopoly power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir.

8   1997) (on remand). The key question under § 2 in the context of C&D's motion for summary

9   judgment is whether Mayer has raised a genuine issue of material fact as to exclusionary conduct or

10  anticompetitive acts. *See R.J. Reynolds*, 199 F. Supp. 2d at 394-395.

11  In the case at bar, Mayer alleges the same anticompetitive conduct described above as a basis

12  for each of its Sherman Act claims. Thus, Mayer's § 2 claim necessarily fails to the extent that it

13  rests on the POG alone. As the Ninth Circuit held in *Williams v. I.B. Fischer Nevada*, 999 F.2d 445,

14  448 (9th Cir. 1993), a "§ 1 claim insufficient to withstand summary judgment cannot be used as the

15  sole basis for a § 2 claim." "The two sections overlap in the sense that a monopoly under § 2 is a

16  species of restraint under § 1." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59

17  (1940).

18  However, Mayer raises additional conduct as part of its § 2 claim, including alleged

19  misconduct by C&D in its role as category captain for certain retailers and its purported

20  "sabotaging" of Mayer's performance. *See* Opp. at 39. Mayer also claims C&D has engaged in

21  similar conduct with respect to Global Protection Corporation, a rival condom manufacturer. *Id.*

22  (citing Wedel Decl., Mayer Ex. 10). In assessing C&D's potential antitrust liability, the Court

23  considers the effects of its conduct in the aggregate, including, as appropriate, cumulative or

24  synergistic effects. *See Masimo Corp. v. Tyco Health Care Group, L.P.*, No. 02-4770, 2004 U.S.

25  Dist. LEXIS 26916, at *19 (C.D. Cal. June 10, 2004) (considering the combined effect of all of the

26  defendant's allegedly exclusionary contracts, including, inter alia, sole source contracts and "market

27  share volume/loyalty discounts in compliance-based contracts"); *Tele Atlas N.V. v. NAVTEQ Corp.*,

28  No. C-05-01673 RMW, 2008 WL 4809441, at *23 (N.D. Cal. Oct. 28, 2008). Accordingly, the

**United States District Court**
For the Northern District of California

1   Court considers Mayer's evidence regarding C&D's purported misconduct outside of and in addition

2   to its POG program.

3         1.   <u>Monopoly Power</u>

4         Monopoly power is "power to control prices or exclude competition." *Eastman*, 504 U.S. at

5   481 (citations omitted). Like market power, Mayer may establish monopoly power either directly or

6   indirectly. "Monopoly power under § 2 requires, of course, something greater than market power

7   under § 1." *Id.* However, the § 2 case law indicates that at least for summary judgment purposes,

8   monopoly power may sometimes be inferred from market share, especially when accompanied by

9   barriers to entry. *See id.* ("Respondents' evidence that Kodak controls nearly 100% of the parts

10  market and 80% to 95% of the service market, with no readily available substitutes, is, however,

11  sufficient to survive summary judgment under the more stringent monopoly standard of § 2.");

12  *United States v. Grinnell*, 384 U.S. 563, 571 (1966) ("The existence of [monopoly] power ordinarily

13  may be inferred from the predominant share of the market."). *Cf. Safeway Inc. v. Abbott*

14  *Laboratories*, 761 F. Supp. 2d 874, 889 (N.D. Cal. 2011) ("A high market share, though it may

15  ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers

16  or other evidence of a defendant's inability to control prices or exclude competitors.") (quoting

17  *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (1988)).

18        In the instant case, as with market power in the context of the Section 1 claim, the Court will

19  assume *arguendo* that Mayer has raised a genuine issue of material fact as to C&D's monopoly

20  power.

21        2.   <u>Willful Acquisition or Maintenance of Monopoly Power</u>

22        The second element distinguishes "the willful acquisition or maintenance of [monopoly]

23  power . . . from growth or development as a consequence of a superior product, business acumen, or

24  historic accident." *Grinnell*, 384 U.S. at 570-71. Section 2 thus prohibits "the use of monopoly

25  power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'"

26  *Eastman*, 504 U.S. at 482-83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).

27        As described above, Mayer has not produced evidence to support a jury finding that C&D's

28  POG programs are anticompetitive and exclusionary so as to violate § 2 of the Sherman Act. As for

United States District Court

For the Northern District of California

1    C&D's conduct additional to the POG program, Mayer compares C&D's actions as category captain

2    for certain retailers to defendant's conduct in *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768

3    (6th Cir. 2002).  In *Conwood*, the Sixth Circuit found that the defendant had abused its category

4    captain position "by providing misleading information to retailers in an effort to dupe retailers into .

5    . . discontinu[ing] carrying Conwood products" and by removing Conwood products from the racks

6    without store authorization.  *Id*. at 783.

7          However, Mayer's evidence of purported misconduct is nowhere near the level of that in

8    *Conwood*.  The only conduct to which Mayer can point involves, at best, C&D's suggested

9    planogram designs which some retailers decided to adopt.  *See* Martineau FTC Depo., C&D Ex. 118,

10   at 70 (stating that C&D made some recommendations as to how CVS could increase its shelf space

11   dedicated to C&D, some of which CVS adopted).  Mayer provided no evidence as to how often

12   these recommendations were adopted and whether they had the intent and/or effect of sabotaging

13   Mayer.  Its evidence is extremely thin, amounting to nothing more than a "scintilla" of support for

14   its claims.  *Anderson*, 477 U.S. at 252.  For instance, Mayer alleges that "[f]ollowing C&D's

15   appointment as category captain [at Long's in 2007], the shelf placement of condom SKUs for

16   Kimono products at Long's changed.  After C&D became category captain, Long's double faced one

17   of Kimono's slower moving SKUs."  Baseman Report, Mayer Ex. 9, at 44-45.  But Mayer produced

18   no evidence that C&D was actually responsible for this change.  Indeed, unrebutted evidence in the

19   record indicates that category captains do not have control over retailer's shelf placement decisions,

20   either in the case of Long's or any other retailer.  *See* Walker Depo., Mayer Ex. 47, at 222 (stating in

21   response to question about Long's planogram while she was category captain, which double faced

22   the Kimono product  that she "had no input in the Kimono brand"); *id*. at 92 (she only followed

23   Long's directions when adjusting the planogram); *id*. at 42-45 (stating that category captains do not

24   have control over planogram designs); Martineau Depo. at 74 (when C&D was category captain, it

25   made suggestions but CVS required data to support them).

26         Unlike *Conwood*, there is no evidence that C&D surreptitiously undermined the retailers'

27   decisions and attempted to change arrangements without their approval.  Instead, undisputed

28   evidence in the record indicates that it is commonplace in the industry for manufacturers to suggest

United States District Court

For the Northern District of California

1    planogram designs to retailers or provide retailers with other information to advocate for their

2    brands, regardless of whether those manufacturers serve as category captains.  Martineau Depo. at

3    78 (all manufacturers give ideas on best ways to present the category); *id*. at 59 ("[M]anufacturers

4    complain about other manufacturers [in relationship to shelf space and other retailer decisions],

5    complain all the time.  So in one ear, out the other, whatever.  I expect a manufacturer to complain,

6    that's great, but the name on the store still says CVS.").

7         Mayer itself has engaged in certain advocacy tactics in an attempt to influence retailer

8    decisions.  *See* C&D Ex. 135 (Mayer email to Target providing data to show that Kimono is

9    outperforming other brands in the thin-condom segment and expressing hope that Target will give

10   Kimono a broader distribution); Wright Report at 199-200 (describing Mayer's proposal to Safeway

11   that it replace Durex as the second brand).  That Mayer may have been unaware of – or uninterested

12   in – other means by which manufacturers compete for retailers' business does not render C&D's

13   conduct nefarious.  *See, e.g.*, Mayer Depo., C&D Ex. 17, at 57 (stating that he was unaware of the

14   ability to pay fees in exchange for shelf placement, and that Mayer has never done so:  "We did not

15   understand that it was part of the planogram decision making process, that it was sold based on

16   position on shelf."); *id*. at 145-47 (stating that 7-Eleven rejected Mayer's proposed business deal,

17   that he was unaware C&D had won its exclusive contract through a bidding process, and that Mayer

18   has not focused on the c-store market).

19        Thus, the fact that C&D was successful in achieving a degree of cooperation with retailers

20   does not, without more, establish anticompetitive conduct.  *See generally United States v. Aluminum*

21   *Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.) ("The successful competitor, having been

22   urged to compete, must not be turned upon when he wins.").

23        Accordingly, there is no evidence in the record to suggest that C&D engaged in any

24   exclusionary conduct with respect to its POG programs and its role as category captain, considered

25   in isolation or together.  Without such exclusionary conduct, the Court cannot reasonably infer either

26   general or specific intent to monopolize so as to support either a claim of completed or attempted

27   monopolization.  The Court therefore **GRANTS** summary judgment to C&D on Mayer's § 2 claim.

28

United States District Court

For the Northern District of California

D.       Antitrust Injury

There is another reason to grant summary judgment on Mayer's Sherman Act claims.  In addition to the elements described above, to assert a claim under the federal antitrust laws, a plaintiff must have suffered an "antitrust injury," meaning an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see In re Lorzepam and Clorazepate Antitrust Litig.*, 295 F.Supp.2d at 38 (a plaintiff must show a "direct relationship between the claimed injury and the alleged anticompetitive conduct.... The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.").  Furthermore, the plaintiff must allege an injury to the market or to competition in general, not merely to itself.  *Id.* (quoting *Brunswick Corp.*, 429 U.S. at 489 ("The antitrust laws were enacted for the protection of competition, not competitors.")); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (the correct measure of harm is "harm [to] the competitive process and thereby harm [to] consumers.  In contrast, harm to one or more competitors will not suffice"); *Louisa Coke*, 94 F. Supp. 2d at 814 ("A single competitor's lost profits does not demonstrate a market wide competitive detriment.") (citing *Baum Research and Development Co., Inc. v. Hillerich & Bradsby Co., Inc.*, 31 F. Supp. 2d 1016, 1021 (E.D. Mich.1998)).  Injury can be shown by anticompetitive acts resulting in reduced output or raised prices.  *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002) (internal quotation marks and citation omitted).

The key question here is whether Mayer suffered losses as a result of the defendant's anticompetitive acts, as opposed to other market forces.  *See Safeway Inc. v. Abbott Labs.*, 2011 WL 133008 (N.D. Cal. Jan. 14, 2011) ("To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior .") (citation omitted).

In the instant case, Mayer has failed to raise a genuine issue of fact as to the existence of such harm.  While Mayer alleges harm to itself and to other small manufacturers (*i.e.*, Global Protection, the maker of ONE brand condoms) in terms of diminution in sales and market share over the last several years, it fails to:  (1) causally link this harm to C&D's anticompetitive conduct; and (2) demonstrate harm to competition.

51

First, Mayer fails to explain why other larger rivals in the industry have managed to compete with C&D despite the alleged misconduct. *See, e.g.*, Silberman Damages Report, Mayer Ex. 24, at 15 (admitting that Durex's "share of sales appears to have been essentially unaffected by the ramp up in Planogram Rebate tiers"); *id.* (noting that Lifestyles has been in decline from 2004-2010, but declining to offer any suggested reason for the decline); Wright FTC Report at 72 (discussing internal C&D documents revealing that C&D believed it had been "out maneuvered" by Durex and Lifestyles for premium space in Wal-Mart); *id.* at 77 (from 2008-2010, Lifestyles and Durex introduced new products that captured 5% market share in the FDMx channel). Durex's market share has not materially changed over the relevant time period. Wright Report at 115 & Attachment 24 (showing Durex market share consistently between 14-15% from 2004-2010). While Lifestyles declined in market share from 2004-2008, it began bouncing back in 2009 and 2010. Wright FTC Report at Table 4. Ms. Martineau of CVS attributes part of Lifestyles' recent success to its popular new SKYN condom. Martineau Depo. at 96-98 (explaining that Ansell "hit a home run" with SKYN, ██████████████████████████████████████████████████ ████). As noted above, C&D has offered unrebutted explanations for the vicissitude in Lifestyles' sales unrelated to C&D's POG program. Wright Report at 115-21.

As for the small manufacturers' sales (accounting for roughly 1% of the market), Mayer's only direct evidence that C&D blocked access to retailers is in the form of inadmissible hearsay. *See, e.g.*, Silberman Report, Mayer Ex. 24, at16-17 (discussing Mr. Mayer's statement that a Duane Reade employee said the C&D rebate was too big to lose); Wedel Decl., Mayer Ex. 10, ¶ 91 (stating that a ████ buyer told Global Protection they needed to make room for C&D shelf space). As previously noted, this hearsay is inadmissible. Mayer fails to present *any* direct testimony from *any* retailers or other third parties on the subject.

Instead of direct evidence to prove antitrust injury, Mayer relies almost entirely on the supposed correlation between increases in C&D's rebate tiers and Mayer's (and small manufacturers generally) diminution in sales to infer causation. Mayer's primary correlation claim is that its sales increased from .31% to .46% between 2001 and 2007, and then decreased to .34%, .27%, and .29% in 2008, 2009, and 2010 respectively. Silberman Report, Mayer Ex. 24, at Ex. 1. Small brands in

United States District Court

For the Northern District of California

1    general (including Mayer) faced a similar fate; their market share increased from 1.8-1.9% from

2    2004-2005, held at 1.6% in 2006 and 2007, and decreased to 1.3% in 2008 and .8% in 2009 and

3    2010.  Wright FTC Report, Mayer Ex. 8, at Table 4.  Mayer attempts to correlate this trend with the

4    period during which C&D introduced its higher rebate level and began to more strictly enforce

5    compliance.

6           Yet Mr. Silberman's own data indicates a less noticeable pattern.  For example, from 2004-

7    2007, Mayer's market share increased steadily, even though C&D's average shelf share also

8    increased.  Moreover, C&D implemented stricter compliance measures for its POG program in

9    2005, well before Mayer and the small competitors suffered any loss in sales.  Opp. at 10.  In

10   addition, the major change in C&D's POG program took place in 2007, when C&D introduced its

11   80% planogram level and many retailers moved from 65% to 70%.  *See* Wright Report, C&D Ex. 3,

12   at Table 14 (showing C&D's revenues by shelf share for 2004-2010).  Yet, the market share of all

13   small manufacturers also held steady at 1.6% in both 2006 and 2007, suggesting they were

14   unaffected by C&D's conduct.  Moreover, examining the data separately for each of the big retailers

15   for which Mr. Silberman alleges Mayer lost sales due to C&D conduct (*i.e.*, Long's, CVS,

16   Walgreens, and Duane Reade), the Court finds that C&D's percentage of shelf space does not map

17   onto Mayer's variation in sales.  In short, Mayer produced no evidence that its rough and imperfect

18   correlation between C&D's escalation of its POG program and Mayer's decline in sales was

19   statistically significant.

20          More importantly, given Mayer's tiny market share, without more substantial evidence, it is

21   speculative to infer that Mayer's decline from .46% in 2007 to .27% in 2009 is the result of C&D's

22   expansion from 69% to 72% during the same period.  In raw dollars, Mayer claims that C&D's $5.3

23   *million* increase in annual sales in 2009 (over 2007) must have caused Mayer's $450,000 decrease in

24   annual sales over the same period.  Given the structure of the market, there is no basis for assuming

25   a zero-sum game between Mayer and C&D; there is no factual basis to infer a one-to-one correlation

26   between C&D's and Mayer's market shares.

27          The same flaw applies to shelf-space allocations.  Mayer asks the Court to assume, without

28   admissible evidence, that its loss of a few facings on certain retailers' shelves is the result of C&D's

1  POG program coercing retailers to increase C&D's shelf share from 65% to 70%.  Such a

2  conclusion requires several assumptions – that C&D's shelf share increase was not warranted by its

3  sales performance; that Mayer's shelf share decline was not warranted by its sales performance; and

4  that among the remaining 25-35% of shelf space available in POG retailers, Mayer was unable to

5  secure a larger portion of that residual space because of C&D's conduct.  The only admissible

6  evidence in the record from actual retailers like CVS and Rite Aid is to the contrary – display

7  decisions were made without regard to incentives created by the POG program.

8          Mayer's evidentiary conjecture mirrors the claims found wanting in *Louisa Coke*.  The

9  court's analysis in that case is worth repeating here as it applies directly to Mayer's purported

10  antitrust injury:

11          There is probably no question that Pepsi's promotions influence
           retailers to give more space to Pepsi products.  When Pepsi gets more
12          space, others will obviously get less.  There is no evidence, however,
           that Pepsi can control the retailers' decisions or has the power to
13          exclude its rivals' products outright.  Rather, all of the evidence
           indicates that the store owners within the Louisa Coke market allot
14          shelf, storage and display space at their sole discretion based on such
           factors as the market's demand for a product and the supplier's ability
15          to keep such products in stock.  Common sense dictates that retailers
           will give more space to those products which are more popular with
16          consumers and available for sale.  Pepsi's uncontraverted evidence
           indicates that it is superior within Louisa Coke's territory in both
17          respects.  Not only are Pepsi products more popular among consumers,
           Pepsi presented ample evidence that Louisa Coke has an inadequate
18          service record franchise-wide.  Indeed, Coke USA's own investigation
           confirmed that Louisa Coke was fairly represented among its retailers
19          given its operational shortcomings.

20          To refute Pepsi's evidence, Louisa Coke offered neither claim nor
           evidence that Pepsi's allotted shelf space is inconsistent with its
21          market share.  Nor did it provide any proof that either it or any other
           soft drink competitor received less retail shelf space than either market
22          demand or their service history justified.  Under these circumstances,
           this Court has no business in engaging in "affirmative action" among
23          retail outlets by telling retailers to give Coke and Pepsi equal retail
           space.  The Court would be protecting a competitor rather than
24          competition if it were to do so.  Since Louisa Coke has failed to justify
           its demand for more retail space, it has failed to state an antitrust
25          injury premised upon the same.

26  *Louisa Coke*, 94 F. Supp. 2d at 814-15 (internal citations omitted).

27  ///

28  ///

United States District Court

For the Northern District of California

1    Mayer's failure to raise a genuine issue of material fact whether C&D's conduct caused any

2    antitrust injury is an independent bar to its Sherman Act claims.  Summary judgment in favor of

3    C&D a claim under both Sections 1 and 2 is warranted on this basis as well.

4    E.      Cartwright Act & UCL Claims

5            Mayer's Cartwright Act claims rise and fall with the antitrust claims above.  *See Theme*

6    *Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1001 & n.3 (9th Cir. 2008) (stating

7    that California courts analyze Cartwright Act claims under the same rubric as antitrust claims and

8    citing to federal antitrust case law).  Accordingly, the Court **GRANTS** summary judgment in C&D's

9    favor as to Mayer's Counterclaims III, IV, VIII and XII.

10   F.      Tortious Interference with Contract

11           C&D next argues that summary judgment is warranted on Mayer's counterclaim for tortious

12   interference with contract.  Mayer claims that C&D interfered with its contractual relationship with

13   Sagami, Mayer's condom supplier.  Mayer claims it has an exclusive distribution contract with

14   Sagami, and the C&D tortiously interfered with said contract by inducing Sagami to sign an

15   agreement to supply condoms to C&D.

16           The elements of a tortious interference with contract claim are: (1) a valid contract between

17   plaintiff and a third party, (2) defendant's knowledge of this contract, (3) defendant's intentional

18   acts designed to induce a breach or disruption of the contractual relationship, (3) actual breach or

19   disruption of the contractual relationship, and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear*

20   *Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) (citing *Seaman's Direct Buying Service, Inc. v.*

21   *Standard Oil Co*., 36 Cal.3d 752, 765-766 (1984).  Mayer claims that C&D interfered with Mayer's

22   exclusive contract with Sagami, the supplier for Mayer's microthin condoms.  C&D argues that

23   summary judgment is appropriate because Mayer cannot demonstrate any of the elements of this

24   claim.

25           Although Mayer's evidence is thin, the Court finds that summary judgment cannot be

26   granted in light of credibility determinations at issue.

27           First, Mayer has not produced any independent evidence of a valid contract.  Its only

28   evidence is Mayer's own representations.  *See* Opp. at 43-44 (reciting Mayer's verified interrogatory

United States District Court

For the Northern District of California

1    responses in which Mayer states he had a verbal agreement with Sagami to be its exclusive North

2    American distributor and agent); Mayer Depo., Mayer Ex. 17, at 128-29 (Around 1998, Sagami told

3    Mayer that Mayer would be its exclusive distributor in North America); Mayer Ex. 68 (Mayer 1999

4    memo to Sagami with meeting minutes including the statement: "Mayer can be the sole agent

5    representing Sagami, for the sale of latex condoms in North America"); *id.* at Mayer_160496 (2005

6    Mayer letter to Sagami acknowledging notice of Sagami's contract to sell C&D its polyurethane

7    condom, noting that Sagami had stated Mayer would be its exclusive representative, and requesting

8    clarification); *id*. at Mayer3454 (2007 Mayer letter to Sagami stating that Mayer has been Sagami's

9    exclusive distributor of latex condoms, and that Sagami's sales of latex condoms to C&D are a

10   breach of their agreement; acknowledging that Sagami does not think they had an exclusive

11   agreement).

12          That representation is contradicted by substantial record evidence, including statements from

13   Sagami personnel denying an exclusive agreement.  *Id.* at Mayer3455 (2007 Mayer letter to Sagami

14   acknowledging that Sagami does not think they had an exclusive agreement); Mayer Depo., Mayer

15   Ex. 17, at 134-36 (acknowledging statements made by Mr. Burt of Sagami to the French Minister of

16   Justice that Mr. Burt did not think there was an exclusive agreement); *id*. at 137-39 (acknowledging

17   statements from Sagami that there has never been an exclusive agreement); C&D Ex. 103 (Mayer

18   document translating notes from 2008 meeting with Sagami, noting that Mr. Oato did not recall any

19   exclusive agreement with Mayer).  There do not appear to be any documents or statements in the

20   record in which Sagami directly acknowledges exclusivity.

21          However, drawing all inferences in Mayer's favor, it is possible the jury could credit Mr.

22   Mayer's testimony over the conflicting evidence.  Given that the existence of a contract is

23   essentially a "he-said/she-said" dispute, it may not be resolved on summary judgment.

24          Assuming there was an exclusive contract, Mayer's evidence with respect to the remaining

25   elements also turn on credibility determinations.  For example, the primary evidence that C&D knew

26   of the purported contract was Mr. Mayer's statements to C&D.  C&D Second Amended Complaint,

27   ¶ 70 (acknowledging that Mr. Mayer informed C&D that he believed he had an exclusive agreement

28   with Sagami).  Although Mayer acknowledges that Sagami told C&D otherwise (Opp. at 45; *see*

United States District Court

For the Northern District of California

1   Daniels Depo., C&D Ex. 13, at 222-24 (C&D VP of Marketing stating that Sagami had told C&D

2   there was no exclusive arrangement with Mayer)), a confidentiality agreement drafted for a 2007

3   meeting between Mayer and C&D states that the parties were to discuss a possible C&D acquisition

4   of the "Kimono brand and distribution rights to Sagami products."  Mayer Ex. 72, at 1.  Given

5   C&D's acknowledgment that it was informed about Mayer's position, and the fact that documents

6   indicate C&D may have acknowledged at least some distribution rights attached to Mayer's

7   relationship with Sagami, a jury could infer that C&D knew an exclusive contract existed.

8          Intent to induce breach is also a jury question. C&D need not have developed its relationship

9   with Sagami for the sole – or even primary – purpose of disrupting its relationship with Mayer.  *See*

10  *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 56 (1998) ("[T]he tort of intentional

11  interference with performance of a contract does not require that the actor's primary purpose be

12  disruption of the contract. . . . The rule applies, in other words, to an interference that is incidental to

13  the actor's independent purpose and desire but known to him to be a necessary consequence of his

14  action.").  Thus, the requisite scienter may reasonably be inferred here.

15         Similarly, Mayer has raised a question of fact as to actual breach and resulting damages

16  because if the point of the contract was exclusivity, as Mayer suggests, then C&D's relationship

17  with Sagami necessarily entails a breach of that contract and could result in harm to Mayer.  *See*

18  Mayer Ex. 68, at Mayer3454-55 (2007 Mayer letter to Sagami indicating that, in Mayer's view,

19  losing exclusivity with Sagami would directly cause Mayer to lose business as market players would

20  view Kimono as a redundant product).

21         Accordingly, the Court **DENIES** C&D's motion for summary judgment as to Mayer's

22  tortious interference with contract claim.

23  G.     Tortious Interference with Economic Relations

24         The similar tort of interference with economic relations with retailers has the following

25  elements:  (1) an economic relationship between the plaintiff and a third party with a likelihood of

26  future economic benefit to the plaintiff, (2) the defendant's knowledge of such a relationship, (3)

27  intentional act designed to disrupt the relationship, (4) actual disruption of the relationship, and (5)

28  resulting economic harm.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153

United States District Court

For the Northern District of California

1    (2003).  Mayer's claim here is based on C&D's purported interference with Mayer's retailer

2    relationships.  As such, it rises and falls with Mayer's Sherman Act claims above.  Accordingly, the

3    Court **GRANTS** summary judgment to C&D on this claim.

4    H.    <u>False Designation, Trademark Infringement, and UCL</u>

5          Mayer's final counterclaims against C&D are based on C&D's use of the term "micro-thin"

6    to describe its ultra-thin condoms.  C&D has used the term since 2006.  C&D Ex. 113.  Mayer has

7    used the mark "microthin" on its Kimono MicroThin line of products since 1992, and filed an

8    application to register "MICROTHIN" as a trademark in April 2008.  *Id.*  Mayer received a

9    trademark registration in June 2009.

10         To prevail on a claim for trademark infringement, a holder of a registered service mark must

11   show that another person is using:  (1) any reproduction, counterfeit, copy or colorable imitation of a

12   mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering

13   for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion, or

14   to cause a mistake or to deceive.  15 U.S.C. § 1114(1)(a); *Century 21 Real Estate Corp. v. Sandli*n,

15   846 F.2d 1175, 1178 (9th Cir.1988).  The analysis for the related claim of false designation of origin

16   under 15 U.S.C. § 1125 is generally "identical" to the analysis for infringement of a registered

17   trademark under 15 U.S.C. § 1114.  *See Brookfield Communs., Inc. v. West Coast Entertainment*

18   *Corp.*, 174 F.3d 1036, 1046-47 & n. 8 (9th Cir. 1999).[29]

19         A "trademark" is any combination of words or symbols used in commerce to identify and

20   distinguish one's goods from those manufactured or sold by others and to indicate the source of the

21   goods.  15 U.S.C. § 1127.  "The first to use a mark is deemed the 'senior' user and has the right to

22   enjoin 'junior' users from using confusingly similar marks in the same industry and market or within

23   the senior user's natural zone of expansion."  *Brookfield*, 174 F.3d at 1047.

24         The key question in assessing trademark-related claims is the likelihood of confusion prong.

25   *See M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 & n.5 (9th Cir. 2005) ("The

26
_____
27         [29]  In its summary judgment papers, Mayer offered neither evidence nor argument to rebut
     C&D's contention that it labels its condoms "Made in Japan" because they are, in fact, made in
     Japan.  Accordingly, the Court finds that Mayer has abandoned any claim against C&D based on the
28   designation of certain condoms as "Made in Japan."

United States District Court

For the Northern District of California

1   test of trademark infringement under state, federal, and common law is whether there will be a

2   likelihood of confusion. . . . Furthermore, for M2 Software to succeed on each of its other federal,

3   state, and common-law based claims, it must establish a likelihood of confusion.") (citations

4   omitted).  The Court assesses likelihood of confusion via the eight-factor *Sleekcraft* test:

> (1) strength of the mark; (2) proximity of the goods; (3) similarity of
> the marks; (4) evidence of actual confusion; (5) marketing channels
> used; (6) type of goods and the degree of care likely to be exercised by
> the purchaser; (7) defendant's intent in selecting the mark; and (8)
> likelihood of expansion of the product lines.

8   *Surfvivor Media Inc. v. Survivor Productions*, 406 F.3d 625, 630 (9th Cir. 2005).  The Ninth Circuit

9   has cautioned that summary judgment should not be routinely granted on the issue of likelihood of

10  confusion.  *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901-02 (9th Cir. 2002) (district

11  courts should grant summary judgment motions "regarding the likelihood of confusion sparingly, as

12  careful assessment of the pertinent factors that go into determining likelihood of confusion usually

13  requires a full record.").

14       A "properly registered service mark is presumed to be valid" and constitutes "prima facie

15  evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's

16  exclusive right to use the mark in commerce in connection with the goods or services specified in

17  the certificate, subject to any conditions and limitations stated therein."  *Surgicenters of America,*

18  *Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 & n.8 (9th Cir. 1979) (quoting

19  *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 542 (2d Cir. 1956); 15 U.S.C. § 1057(b)).

20  However, the Ninth Circuit has found it relatively easy to overcome the presumption of validity

21  where the defendant produces evidence that the mark is generic or lacks secondary meaning.  *See,*

22  *e.g.*, *Surgicenters*, 601 F.2d at 1014 (noting presumption but proceeding to analyze secondary

23  meaning and likelihood of confusion; granting summary judgment for defendant due to lack of

24  evidence of secondary meaning); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir.

25  2002) ("Overall, the plaintiff retains the ultimate burden of persuasion in a trademark infringement

26  action, namely proof of infringement.  A necessary concomitant to proving infringement is, of

27  course, having a valid trademark; there can be no infringement of an invalid mark.").

28

United States District Court

For the Northern District of California

1    The presumption merely shifts the burden of production to the defendant.  *Id.*  If "the

2  presumption of validity is overcome, however, the mark's registration is merely evidence of

3  registration, nothing more."  *Id.* (citations and quotation marks omitted).  Thus, once "the defendant

4  can demonstrate through law, undisputed facts, or a combination thereof that the mark is invalid, the

5  evidentiary bubble bursts and the plaintiff cannot survive summary judgment."  *Id.*; *see also Brown*

6  *v. Quiniou*, 744 F. Supp. 463, 469 (S.D.N.Y. 1990) ("[A]lthough a registered mark is presumptively

7  distinctive, it does not inevitably follow that the mark is strong.") (citations omitted); *Shaw-Barton,*

8  *Inc. v. John Baumgarth Co.*, 313 F.2d 167, 169 (7th Cir.), *cert. denied*, 374 U.S. 831 (1963) ("It is

9  well established that where descriptive words are used, the presumption of validity attaching to a

10 registered trademark may be easily overcome.").

11    In the instant case, the parties dispute whether C&D's use of the word "microthin" is a valid

12 trademark and whether it is likely to cause confusion among consumers.  C&D argues that Mayer

13 cannot survive summary judgment because "microthin" is merely a generic or descriptive term to

14 describe thinness, and because Mayer has failed to produce any evidence of secondary meaning or

15 consumer confusion to rebut C&D's proffered evidence.  Mot. at 47-48.  C&D does not address the

16 remaining *Sleekcraft* factors.

17    1.    Validity of the Mark

18    "The strength of a mark is determined by its placement on a continuum of marks from

19 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection;

20 to 'arbitrary' or 'fanciful' awarded maximum protection."  *E. & J. Gallo Winery v. Gallo Cattle Co.*,

21 967 F.2d 1280, 1291 (9th Cir. 1992) (quotations omitted); *see also Filipino Yellow Pages, Inc. v.*

22 *Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (grouping trademarks into four

23 categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful").  C&D places

24 the term "microthin" on the generic/descriptive end of the spectrum, arguing that it merely describes

25 the thinness of the condom.  C&D also provides evidence to that effect, noting  that "microthin" is

26 defined on www.dictionary.com as "extremely or, sometimes, microscopically thin."  Mot. at 47.

27 Dictionary definitions are relevant to determining the placement of a mark on the spectrum of

28 generic to fanciful.  *See Surgicenters*, 601 F.2d at 1015 n.11.

United States District Court

For the Northern District of California

The Court finds that "microthin" is descriptive because it immediately conveys the intended meaning as to the type of condom sold – one that is extremely thin.  *See Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1019 (9th Cir. 1979) (distinguishing a suggestive term – one that "requires imagination, thought and perception to reach a conclusion as to the nature of goods" – from a descriptive term – one that "conveys an immediate idea of the ingredients, qualities or characteristics of the goods").  Indeed, Mayer does not appear to contest that its mark is descriptive, as it focuses its argument on secondary meaning.  *See* Opp. at 47.

If a term is otherwise merely descriptive, a plaintiff must demonstrate a valid mark by showing that the mark carries secondary meaning, which is "the consumer's association of the mark with a particular source or sponsor."  *Id*. (citations omitted); *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir.1999).  Mayer argues that microthin has developed secondary meaning associated specifically with Kimono condoms.  Although the presumption of validity attached to Mayer's registered mark places the initial burden of production on C&D to show that the mark lacks secondary meaning, the "ultimate burden of persuasion" still rests with Mayer.  *Tie Tech*, 296 F.3d at 783.

"[T]he question of secondary meaning is one of fact." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc). To determine whether a descriptive mark has secondary meaning, a finder of fact considers: "(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005) (quoting *Levi Strauss*, 778 F.2d at 1358).

C&D has presented evidence to rebut the presumption of validity.  Specifically, C&D's letter of protest to the PTO attaches numerous articles using the term microthin in various contexts, including to describe Lifestyles condoms and to describe a point of competition in the condom market over "'microthin sheaths.'"  *See* Mayer Ex. 75, ¶ 2.  It also points out the Lifestyles and a brand called SURE use the term "micro-thin technology" in its own advertisements for its condoms.

1    *Id.* at Ex. F.  Other articles use the term microthin to describe non-condom products such as latex

2    gloves.  *Id.* at Ex. G.  Absent further rebuttal by Mayer, this evidence is sufficient to overcome the

3    presumption.  *See Tie Tech*, 296 F.3d at 783. ("In the face of sufficient and undisputed facts

4    demonstrating [lack of secondary meaning] . . . the registration loses its evidentiary significance.").

5        In contrast, the only evidence Mayer offers in support of its argument that microthin has

6    secondary meaning is Mr. Mayer's own declaration filed with the U.S. Patent and Trademark Office

7    ("PTO").  *See* Mayer Ex. 74, ¶¶ 4-7 (stating that Mayer has been the only company to use the term

8    microthin in relationship to condoms since it began using the term in 1992 until C&D began using it,

9    that Mayer has advertised under the mark through package design and point of sale materials, and

10   that the media refer to microthin as unique to Kimono).  Mayer failed to file the exhibits to Mr.

11   Mayer's declaration in this record, so the articles to which he refers are not included in the record.

12   The Ninth Circuit has found that self-serving statements by a trademark holder are entitled to little

13   weight.  *See Filipino Yellow Pages*, 198 F.3d at 1152 (granting summary judgment where "the only

14   evidence of secondary meaning offered by FYP was contained in the declaration of its founder and

15   president" because "[e]vidence of secondary meaning from a partial source possesses very limited

16   probative value" and the president's "vague, uncorroborated, and clearly self-interested testimony

17   did not create a genuine issue for trial as to whether 'Filipino Yellow Pages' has acquired secondary

18   meaning").

19       Given the descriptive nature of the word, without any expert reports, surveys, or other

20   independent evidence of secondary meaning, Mayer has not demonstrated that it has a protectable

21   mark notwithstanding its registration.  *See Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287

22   F.3d 866, 875 (9th Cir. 2002) (affirming summary judgment where, although company had been

23   using mark since 1984, there was little evidence of pervasive advertising, few declarations from

24   customers regarding actual confusion, and an affidavit from the company president that lacked

25   foundation to state that the company had received "many" letters and "several" calls from confused

26   customers); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1122 (C.D. Cal. 2003) ("Echo Drain

27   offered no expert reports or surveys to prove that the Echo Drain mark has secondary meaning.  In

28   addition, there is no consumer testimony in this case to indicate that a significant portion of the

United States District Court

For the Northern District of California

1   consuming public associates the Echo Drain mark with the products or services offered by Echo

2   Drain.  Because the Echo Drain mark is descriptive and there is no evidence that it has acquired a

3   secondary meaning, the mark is not protectable and the Court grants Defendants' motion for

4   summary judgment.") (internal citations omitted).  *Cf. Yellow Cab*, 419 F.3d at 930 (reversing grant

5   of summary judgment when plaintiff had provided "various declarations detailing the history of the

6   Yellow Cab of Sacramento, customer confusion concerning the companies, advertising data and

7   other evidence addressing the [secondary meaning] factors").

8               2.          Likelihood of Confusion

9          Mayer admits it has produced no evidence of actual confusion on the part of consumers.  *See*

10  Opp. at 48 ("Mayer has not offered evidence of actual confusion.").  Mayer is correct that its failure

11  to do so is "not dispositive,"  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979).

12  However, it is another factor weighing in favor of summary judgment.  *See Cohn v. Petsmart, Inc.*,

13  281 F.3d 837, 842-43 (9th Cir. 2002) (where "the parties used the same trademark in the same city

14  for six years to market closely-related goods and services . . . some evidence of actual confusion

15  should have become available if Petsmart's coexisting use had created a genuine likelihood of

16  confusion."); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998) ("Survey

17  evidence is not required to establish likelihood of confusion, but it is often the most persuasive

18  evidence. . . . Consequently, a plaintiff's failure to conduct a consumer survey, assuming it has the

19  financial resources to do so, may lead to an inference that the results of such a survey would be

20  unfavorable.") (internal citations omitted).

21         Without some evidence beyond Mr. Mayer's own testimony, the Court cannot infer that

22  consumers might view "microthin" any differently than they view other descriptive terms used by

23  condom manufacturers, such as "ultra-thin."  As the Ninth Circuit has pointed out, even when a

24  defendant uses the same mark in the same type of business, the danger of confusion is lower when

25  those marks are merely "taglines" to descriptive business names.  *See id. at 842* (finding no

26  likelihood of confusion between "Critter Clinic – Where Pets Are Family," and "Petsmart – Where

27  Pets Are Family" due in part to the fact that "[t]he names 'Petsmart' and 'Critter Clinic' present the

28  dominant commercial identity").  Likewise, in this case Trojan and Kimono are the dominant brand

1    terms; "microthin" is used by the parties merely as a type of Kimono condom and a descriptive

2    phrase for certain Trojan condoms. *See* C&D Ex. 113 (picturing Trojan package with the phrase,

3    "Now with Micro-Thin Technology"). The term is also apparently used to describe certain thin

4    Lifestyles condoms, as well as at least one other brand of condom and additional Ansell latex

5    products, such as surgical gloves. *See id.* Ex. F (displaying websites advertising LifeStyles condoms

6    as "us[ing] Micro-Thin technology," and advertising a SURE brand condom called the "SURE

7    Micro-Thin"); *id.* Exs. G, H (advertising Ansell latex gloves as "micro-thin"). Further, as noted

8    above, there is undisputed evidence in the record that consumers look for particular brands and

9    many will go to a different store to find their preferred brand. Mayer has "fail[ed] to create a

10    genuine issue that confusion is 'probable, not simply a possibility.'" *Id.* (quoting *Rodeo Collection,*

11    *Ltd. v. West Seventh*, 812 F.2d 1215, 1217(9th Cir. 1987)); *see* Wright Rebuttal Report, C&D Ex.

12    121, at 54 n.154 ("Church & Dwight's Omnibus Study found that 52% of consumers would go to

13    another store to purchase condoms if their preferred brand were not available.") (quoting Baseman

14    Report, Mayer Ex. 9, at 6 n. 13).

15        In sum, Mayer has failed to establish a genuine issue of fact whether "microthin" is a valid

16    mark (given the lack of substantial evidence of secondary meaning) and whether its use by C&D is

17    likely to cause consumer confusion.

18        Accordingly, the Court **GRANTS** summary judgment in C&D's favor as to Mayer's

19    trademark claims. The Court therefore declines to address C&D's laches claim.

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

**United States District Court**
For the Northern District of California

**III.   CONCLUSION**

For the foregoing reasons, the Court **DENIES** C&D's motion for summary judgment as to tortious interference with contract, and **GRANTS** the motion as to all other claims.  In light of the Court's ruling, C&D's motion to exclude portions of Mr. Baseman's expert report is **DENIED** as moot.  Docket No. 232.

This Order disposes of Docket Nos. 198, 232.


IT IS SO ORDERED.


Dated:  March 1, 2012

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California